**Page 1**

**CONFIDENTIAL**

1    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MARYLAND
2
3    CRYSTAL LONG,                    :
                                      :
4         Plaintiff,                  :
                                      :
5    v.                               : Civil Action No:
                                      : 8:17-cv-01955-GJH
6    PENDRICK CAPITAL                 :
     PARTNERS, II, LLC,               :
7                                     :
     ABILITY RECOVERY                 :
8    SERVICES, LLC,                   :
                                      :
9    EXPERIAN INFORMATION             :
     SOLUTIONS, INC.,                 :
10                                    :
       and                           :
11                                    :
     EQUIFAX INFORMATION              :
12   SYSTEMS, LLC,                    :
                                      :
13        Defendants.                 :
14
15   CONFIDENTIAL DEPOSITION OF CRYSTAL M. LONG
16         Monday, February 19, 2018
              1:01 p.m.
17
18        The Goldson Law Office
             1734 Elton Road
19             Suite 210
          Silver Spring, Maryland
20
21      Terry L. Bradley, Court Reporter
22

**Page 2**

1              APPEARANCES OF COUNSEL
2
3    For the Plaintiff:
4      THE GOLDSON LAW OFFICE
       INGMAR B. GOLDSON, ESQ.
5      COURTNEY WEINER, ESQ.
       1734 Elton Road
6      Suite 210
       Silver Spring, MD 20903
7      T-240.780.8829
       E-igoldson@goldsonlawoffice.com
8
9    For the Defendant Ability Recovery
     Services, LLC:
10
       MARSHALL, DENNEHEY, WARNER, COLEMAN
11     & GOGGIN
       RONALD M. METCHO, II
12     2000 Market Street
       Philadelphia, PA 19103
13     T-215.575.2595
       E-rmetcho@mdwcg.com
14
15   For the Defendant Pendrick Capital
     Partners II, LLC:
16
       SESSIONS, FISHMAN, NATHAN & ISRAEL
17     MORGAN I. MARCUS, ESQ.
       120 South LaSalle Street
18     Suite 1960
       Chicago, IL 60603
19     T-312.578.0990
       E-mmarcus@sessions.legal
20
21
22

**Page 3**

1              INDEX OF EXAMINATION
2
3    EXAMINATION                          PAGE
4    By Mr. Metcho. . . . . . . . . . .     4
     By Mr. Marcus. . . . . . . . . . .    65
5
6                    ~~~~~
7
              INDEX OF EXHIBITS
8
9    **1. TransUnion Report 4/26/17        57
     **2. Mint Notification                75
10
     **CONFIDENTIAL
11
12   (Original Exhibits retained by Court Reporter.)
13                   ~~~~~
14
15
16
17
18
19
20
21
22

**Page 4**

1         P R O C E E D I N G S
2
3         CRYSTAL M. LONG,
4    having been first duly sworn, testified as
5    follows:
6
7              EXAMINATION
8    BY MR. METCHO:
9    Q.   You ready?
10        Good afternoon, Ms. Long.  My name
11   is Ron Metcho.  I'm with the law firm of
12   Marshall, Dennehey, Warner, Coleman & Goggin.
13   I represent an entity by the name of Ability
14   Recovery Services LLC in a lawsuit that has
15   been filed in the United States District Court
16   for the District of Maryland.  Alongside me
17   here is Morgan Marcus, who represents Pendrick
18   Capital Partners, who is the creditor at issue
19   in this particular matter.  And I'd like to
20   thank you for being here today.
21        You know, I know that Mr. Marcus
22   needs to get on a flight at approximately



Page 5

1   4 o'clock, so we'll try to streamline this as
2   much as we can and move this along, okay?
3        So just to give you a roadmap of
4   what we're going to do today, I'd just like to
5   get some background information on you, we're
6   going to discuss the allegations in your
7   complaint, we're going to talk some about your
8   employment, also about your credit history, and
9   then just some follow-up questions by Mr.
10  Marcus as well pertaining to the allegations
11  against his client?
12       MR. GOLDSON:  Has Pendrick actually
13  noticed --
14       Has Pendrick noticed for this
15  deposition?
16       MR. MARCUS:  Do you have issues with
17  Pendrick asking --
18       -- with my asking follow-up
19  questions?  I guess I can notice a separate
20  deposition for her, but I thought it would be
21  unnecessary.
22       MR. GOLDSON:  I don't know if

Page 6

1   it's --
2        MS. WEINER:  Well, we are, you know,
3   dismayed by the lack of compliance with
4   procedure, but it seems to me that it's --
5        MR. GOLDSON:  It's fine.
6        MS. WEINER:  -- it's fine, but
7   perhaps in the future you should follow the
8   Rules of Civil Procedure.
9        MR. GOLDSON:  All right.
10       MR. METCHO:  So, is it okay if --
11       MR. GOLDSON:  Yeah, it's fine.
12  BY MR. METCHO:
13       Q.   Okay.  Very good.  Let's get back on
14  track here.
15            Ms. Long, please state your full
16  name for the record, please.
17       A.   Crystal Michelle Long.
18       Q.   Okay.  Have you ever been deposed
19  before?
20       A.   No.
21       Q.   Have you ever been involved in a
22  lawsuit before?

Page 7

1        A.   No.
2        Q.   Okay.  So what we're going to do
3   today is we're going to ask a series of
4   questions, again, regarding the allegations in
5   your complaint, the allegations against my
6   client, and also against Pendrick.  We do not
7   have representatives of the other two remaining
8   defendants, Experian and Equifax here, so you
9   know, we'll leave it that.  Again, this is your
10  first instance in sitting in a deposition?
11       A.   That's correct.
12       Q.   So what I'd like to ask you to do is
13  listen to the full question I ask you, give
14  your counsel an opportunities to object if it's
15  necessary, and then provide a complete answer
16  to the questions.  What we don't want to do
17  is --
18            We want to have a complete record
19  for the Court, so please refrain from saying
20  such things as "uh-huh" and "yes" and "no"
21  answers and complete answers to the best of
22  your ability, okay?

Page 8

1            What is your current address?
2        A.   ███████████████
        ████████████████████████████Maryland,
4   ████
5        Q.   How long have you lived there?
6        A.   5 years.
7        Q.   Do you own or rent the space?
8        A.   I own.
9        Q.   Okay.  How much is approximately
10  your mortgage payment monthly?
11       A.   1933.
12       Q.   Are you married?
13       A.   No.
14       Q.   Do you have any children?
15       A.   No.
16       Q.   Have you ever been married?
17       A.   No.
18       Q.   What's your current telephone
19  number?
20       A.   ██████8476.
21       Q.   Do you have any dependents?
22       A.   No.



Page 9

1    Q.   Do you live alone?
2    A.   Yes.
3    Q.   Just a little bit about your
4  educational background.  What's your highest
5  level of education?
6    A.   Master's degree.
7    Q.   Where did you get your Master's
8  degree from?
9    A.   Walden University, W-A-L-D-E-N.
10   Q.   And what is the Master's degree in?
11   A.   Business.
12   Q.   I'm assuming you have an
13  undergraduate degree obviously?
14   A.   I do.
15   Q.   And where is that from?
16   A.   Bowie State University.
17   Q.   And what is your undergraduate
18  degree in?
19   A.   Business.
20   Q.   Where did you go to high school?
21   A.   Jenks High School.
22   Q.   And where is that located?

Page 10

1    A.   Jenks, Oklahoma.
2    Q.   How long did you live in Oklahoma?
3    A.   Um, let's see.  From 3rd grade to
4  senior high school.  I'm not sure how old you
5  are in when you're in 3rd grade.
6    Q.   When did you relocate to --
7         Excuse me.  When do you move to
8  Maryland from Oklahoma?
9    A.   1999.
10   Q.   And what was the reason for the
11  move?
12   A.   To attend college.
13   Q.   Okay.  Who's your current employer?
14   A.   Trusted Health Plans Inc.
15   Q.   Can you spell that, please?
16   A.   T-R-U-S-T-E-D, Plans, P-L-A-N-S,
17  Inc.
18   Q.   And how long have you been at this
19  place of employment?
20   A.   A year and 5 months.
21   Q.   Okay.  Now was this the place of
22  employment --

Page 11

1         This was not the place of employment
2  that you were at in regards to the allegations
3  in your complaint.  Is that correct?
4    A.   I don't understand your question.
5    Q.   In your complaint you allege that
6  you were employed at a certain place between
7  roughly November of 2016 through May of 2017.
8    A.   Yes.
9    Q.   This was a different --
10   A.   That's Trusted Health Plans Inc.
11   Q.   You were at the same place?
12   A.   Yes.
13   Q.   Okay.  And what do you do at Trusted
14  Plans Inc?
15   A.   I am the Director of Health Plan
16  Accounting.  I run the finance department.
17   Q.   Can you describe what your daily
18  activities of your work are.
19   A.   That would include overseeing the
20  staff accountants, the temps, closing the
21  books, approving financial transactions, and
22  reviewing staff accountants' work.

Page 12

1    Q.   What do you mean by "closing the
2  books"?
3    A.   That would include ensuring that the
4  bank reconciliations are reconciled, that
5  includes approving payments, that includes
6  reviewing invoices for approval, that includes
7  issuing financial statements.
8    Q.   Issuing financial statements to
9  whom?
10   A.   To the CFO to be presented to the
11  Board of Directors.
12   Q.   And how long have you been at this
13  place of employment?
14   A.   A year and 5 months.
15   Q.   When you first began at this place
16  of employment what was your original position?
17   A.   Senior Account Manager.
18   Q.   Have you had the same position at
19  this place of employment throughout your entire
20  employment?
21   A.   I'm not sure of your question.  Can
22  you repeat it.



CRYSTAL M. LONG                                                    February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                                          13–16

Page 13

1    Q.   Sure.  When you began working this
2  job have you had different positions throughout
3  your employment?
4    A.   Yes.
5    Q.   Can you please tell me about each
6  one of your positions of employment.
7    A.   I was the Senior Account Manager --
8    Q.   Let's step back a second.  When you
9  first started what was your employment
10  position?
11    A.   Senior Account Manager.
12    Q.   Okay.  And what was your next
13  employment position?
14    A.   Acting Controller.
15    Q.   What did you do as the Senior
16  Account Manager?
17    A.   I oversaw the payroll AP clerk, I
18  created journal entries, I did bank
19  reconciliations.
20    Q.   Okay.  And to your second position,
21  what did you do under that position?
22    A.   I then oversaw the staff accountants

Page 14

1  and the senior accountants when they were
2  there, and issued the financial statements.
3    Q.   And I'm a bit confused about you've
4  stated several times "issuing financial
5  statements".  Can you delve a little bit more
6  into that.  What that actually entails.
7    A.   Preparing financial statements for
8  the CFO to review.
9    Q.   And what type of information is in
10  these financial statements?
11    A.   Information that you would find on a
12  balance sheet, income statement, cash flow.
13    Q.   How often do you prepare them?
14    A.   Monthly.
15    Q.   Does your employer check your credit
16  score regularly?
17    A.   I can't answer that question.  I
18  don't --
19        I'm not privy to what HR does on a
20  regular basis.
21    Q.   Are you aware of your employer ever
22  checking your credit score?

Page 15

1    A.   What I am aware of is that I signed
2  an agreement indicating that I gave them
3  permission to review my credit.
4    Q.   And are you aware of them ever
5  checking your credit score?
6    A.   I can't speak to what the HR
7  department does.  All I can say is that I've
8  given them permission to do so.
9    Q.   Are you personally aware of your
10  employer ever checking your credit score?
11        MR. GOLDSON:  Objection.
12        MR. METCHO:  On what basis?
13        MR. GOLDSON:  Asked and answered.
14        MR. METCHO:  I don't believe the
15  question was answered.  You can --
16        The objection is noted on the
17  record.
18        You can answer the question if
19  you're able.
20        THE WITNESS:  Can you repeat the
21  question.
22  BY MR. METCHO:

Page 16

1    Q.   Sure.  Are you personally aware of
2  your employer ever checking your credit score?
3    A.   That is a question I cannot answer.
4  I do not work in the HR department.
5    Q.   Are you aware of your employer
6  having a policy and procedure in place
7  regarding checking your credit score or your
8  credit reputation?
9    A.   I cannot speak to the policies of
10  HR.  What I can speak to is that upon
11  employment I gave them --
12        -- I signed a document, gave them
13  permission.
14    Q.   Permission for what?
15    A.   To access necessary information,
16  including my background check.
17    Q.   Do you have this documentation?
18    A.   No, I do not.
19    Q.   Do you know who has the
20  documentation?  Does your employer have this
21  documentation?
22        MR. GOLDSON:  Objection.



Page 17

1        MR. METCHO:  On what basis?

2        MR. GOLDSON:  You're asking her a

3   question about another entity, not a personal

4   knowledge.

5        MR. METCHO:  We're in Federal Court.

6   There are two objections.  There's one to

7   privilege, and this is not a privileged matter.

8        MR. GOLDSON:  Uh-huh.

9        MR. METCHO:  So again, I'll note the

10  objection for the record.

11        You can answer if you're able.

12        THE WITNESS:  Can you repeat the

13  question.

14  BY MR. METCHO:

15   Q.   Sure.  Are you aware of your

16  employer having a policy and procedure in place

17  regarding the checking of your credit score?

18   A.   I don't have enough information to

19  answer that question.  What I can say is that

20  upon hiring I filled out a document indicating

21  that I gave them permission to do a background

22  check.

Page 18

1    Q.   What did the background check

2   entail?

3    A.   I can't speak to that.  All I know

4   is that I had to fill out information

5   indicating that they could access my

6   information.  I provided my Social Security

7   Number.

8    Q.   When is the last time you checked

9   your credit score?

10   A.   The last time I checked my credit

11  score probably was maybe a couple weeks ago.

12   Q.   Why did you check it?

13   A.   Why did I check my credit score?

14   Q.   Yeah.

15   A.   Because it was an option on my

16  credit reporting.

17   Q.   Option on your credit reporting?

18   A.   Yes.

19   Q.   What does that mean?

20   A.   That means that when I log into my

21  financial information they let me know if

22  there's any changes to my credit, and I have

Page 19

1   the option to see, so I clicked.

2    Q.   How often do you do that?

3    A.   It depends.

4    Q.   When was the last time prior to that

5   that you checked your credit score?

6    A.   I can't give you a definitive date.

7    Q.   Do you have an approximate date?

8    A.   Approximately --

9        Approximately a month prior.

10   Q.   When was the last time you applied

11  for credit?

12   A.   I can't recall.

13   Q.   How many credit cards do you have?

14   A.   I have three personal credit cards.

15   Q.   Who are the credit cards with?

16   A.   Chase, um, Barclay, and Sealy's

17  Furniture something.  S-E-L-E-Y, I believe.

18   Q.   Do you have balances on these cards?

19   A.   One.

20   Q.   What's the current balance on the

21  Chase card?

22   A.   Zero.

Page 20

1    Q.   Barclay's card?

2    A.   Zero.

3    Q.   The Sealy's card?

4    A.   No.  I'm sorry.  Sealy's --

5        -- or Barclay's about maybe 7200.

6    Q.   What are your monthly payments on

7   the Sealy's card?

8    A.   The Sealy's is paid for.  It doesn't

9   have a balance.

10   Q.   Okay.  Which account do you have a

11  balance on?

12   A.   Barclay.

13   Q.   Okay.  The Barclay's account.  When

14  is the last time you made a payment?

15   A.   Maybe a week and a half ago.

16   Q.   And how much was the payment for?

17   A.   $500.

18   Q.   Do you make monthly payments?

19   A.   I do.

20   Q.   How do you pay it?  Do you pay it

21  online?  Do you pay it by check?

22   A.   I pay it online through my banking



Page 21

1   institution.
2        Q.   Okay.  Do you have student loans?
3        A.   I do.
4        Q.   Approximately how much are your
5   student loans that are outstanding?
6        A.   Collectively I would say about
7   63,000.
8        Q.   Do you pay those monthly?
9        A.   I do.
10       Q.   How much do you pay a month?
11       A.   Collectively about 500 bucks.
12       Q.   When you say "collectively", does
13   that mean that you have multiple lenders for
14   your student loans?  Or are they through one
15   entity?
16       A.   They're two lenders.  Yes.
17       Q.   Who are the lenders?
18       A.   Um, let's see.  Navient.  And what
19   is the other one?
20            I can't think of the name.
21       Q.   Okay.  In your allegations in your
22   complaint you allege that you deal with

Page 22

1   millions of dollars of transactions.  Can you
2   describe that for me, please.
3        A.   I oversee millions of dollars of
4   transactions.
5        Q.   What does that mean?
6        A.   That means that I deal with a high
7   volume of revenue in which I have access to and
8   which I record and which I make payments from
9   on behalf of the company I work for.
10       Q.   And you also state in your
11   allegations that your employer requires good
12   credit and a solid financial reputation.  How
13   often or by what measure does your employer
14   require you to have good credit?
15       A.   Can you repeat the question.
16       Q.   Sure.  Again, your allegations state
17   that your employer requires good credit and a
18   solid financial reputation.  How does your
19   employer judge your good credit?
20       A.   What I can say is that my position
21   requires a great deal of trust, and working in
22   the field of finance your reputation, as far as

Page 23

1   good character, is also a reflection of your
2   credit.  So when I completed, signed the form
3   for the background check, that is my
4   understanding that is how they measure.
5        Q.   Have you ever discussed your credit
6   history with your employer?
7        A.   No.
8        Q.   Has your employer ever questioned
9   your credit history?
10       A.   No.
11       Q.   Has your employer ever questioned
12   your financial reputation?
13       A.   Define --
14            Can you define "questioned".
15       Q.   Sure.  I'll break it down to an even
16   easier question.  Has your employer ever asked
17   you any questions regarding your financial
18   background?
19       A.   I'm going to say "yes", because I
20   believe that's covered under the background
21   check.  That's where they would have inquired.
22       Q.   Okay.  When did this occur?

Page 24

1        A.   When I was hired.
2        Q.   And what did they ask you?
3        A.   They asked me to complete the
4   document giving permission to do a full
5   background investigation on me.  I had to
6   include my Social Security Number.
7        Q.   Did you ever receive any feedback
8   from this particular background investigation?
9            (Witness nodded.)
10           Can you answer "yes" or "no",
11   please.
12       A.   Not to my knowledge.  Not that I can
13   recall.
14       Q.   Did anyone ever discuss your
15   financial history with you at your place of
16   employment?
17       A.   No.
18       Q.   Are you aware of your employer
19   checking your credit at any time between
20   November of 2016 and May of 2017?
21           MR. GOLDSON:  Objection.
22           MR. METCHO:  On what basis?



Page 25

1        MR. GOLDSON:  Asked and answered.
2        MR. METCHO:  Objection noted.  You
3  can answer the question if you're able.
4        THE WITNESS:  Can you repeat the
5  question.
6  BY MR. METCHO:
7     Q.   Sure.  Are you aware of any time
8  between November of 2016 and May of 2017 of
9  your employer checking your credit score?
10     A.   I'm not aware of what HR does.  I
11  cannot speak to the fact if they did or didn't.
12  I can just speak to the fact that I've given
13  them permission to do so.
14     Q.   So again, I'm the attorney for the
15  defendant in this matter, Ability Recovery
16  Services.  Do you recall speaking with Ability
17  Recovery Services regarding any accounts?
18     A.   I do.
19     Q.   When was the first time you spoke
20  with Ability?
21     A.   The first time I spoke with them was
22  in 2016.  I think it was either --

Page 26

1        I think it was November of 2016.
2     Q.   Did you contact Ability?  Or did
3  Ability contact you?
4     A.   How do you define "contact"?
5     Q.   Did you call Ability?  Did Ability
6  call you?  What was the initiation of the
7  contact with Ability?
8     A.   Ability sent me two letters.
9     Q.   Okay.
10     A.   I called in reference to letters I
11  received.
12     Q.   Do you remember approximately when
13  you called Ability?
14     A.   I do.
15     Q.   When was it?
16     A.   It was the --
17        I believe it was in the middle of --
18        It was in the middle of December of
19  2016.
20     Q.   Do you remember who you spoke with?
21     A.   I don't remember the gentleman's
22  name.

Page 27

1     Q.   Do you remember what you discussed?
2     A.   I do.
3     Q.   Can you give me a summary of what
4  was discussed during the phone call.
5     A.   Sure.  What was discussed was the
6  information on the collection letter that they
7  sent.  The letter summarized, indicated that
8  they had received this debt and that I needed
9  to respond within 30 days.  If they hadn't
10  heard from me, they were going to assume that
11  it was mine, and that if it wasn't I should
12  reach out to them to clear up the matter.  So I
13  called.
14     Q.   Do you recall receiving any letters
15  from Ability?
16     A.   The two letters that I got in the
17  mail.
18     Q.   Okay.  When was the date of the
19  first letter?  Do you remember approximately?
20     A.   I believe they were in --
21        I believe they were 4 November 2016.
22  And I remember, I say that specifically,

Page 28

1  because I knew I had 30 days, which is why I
2  called quickly because I don't think I looked
3  at it until December.
4     Q.   Okay.  When you received that first
5  letter did you send any letters back to
6  Ability?
7     A.   I sent no letters to Ability.
8     Q.   Okay.  So at no point did you send a
9  letter to Ability disputing the debt?
10     A.   No, I did not send them a letter to
11  dispute the debt.  The letter indicated to
12  call, so that's what I did.  I called to
13  dispute the debt.
14     Q.   Did you send a letter to Ability to
15  request verification of the debt?
16     A.   I did not send a letter to Ability
17  about the debt at all.  I called per what the
18  letter instructed.
19     Q.   Okay.  After receiving the letter
20  from Ability did you reach out to the credit
21  bureaus?
22     A.   I did.



CRYSTAL M. LONG
LONG vs ABILITY RECOVERY SERVICES

February 19, 2018
29–32

Page 29

1    Q.    When was this?
2    A.    It was after the phone call in which
3    after indicating that none of the items on the
4    letter had anything to do with me, not the
5    Social Security Number, not the date of birth.
6    The gentleman then indicated that --
7    Q.    The gentleman from who?  The credit
8    bureaus?
9    A.    The gentleman from Ability that I
10   spoke to on the phone.
11          After talking to him, I said:  I got
12   this letter.
13          He said, you know, they weren't sure
14   if it was mine.  They needed to confirm that it
15   was.  I said it wasn't.  He mentioned a name.
16   It wasn't mine.  He mentioned a date of birth,
17   it wasn't mine.  He mentioned dependents, I
18   told him I have none.  I thought the matter was
19   settled.  He then indicated that he was going
20   to report it to the credit bureau.  I asked:
21   How is that possible when the letter indicated
22   that you got this information, you need to

Page 30

1    confirm if it was correct.  I'm confirming that
2    it's incorrect.
3          He indicated that he would still
4    report it to the credit bureaus.
5    Q.    Report it how?  As disputed?
6    A.    He said he would report it as if it
7    was my debt, and I had --
8          It was my responsibility to go to
9    the credit bureaus to defend myself.
10   Q.    Okay.  Now, prior the this time,
11   again, no documentation was sent by you to
12   either Ability or Pendrick or the credit
13   bureaus?
14   A.    I'm sorry.  You have to repeat that.
15   Q.    Prior to this conversation with
16   Ability, after you had received the letters
17   from Ability --
18   A.    Okay.
19   Q.    -- did you send any documentation to
20   Ability to Pendrick or to the credit bureaus?
21   A.    You're going to need to separate
22   those questions because it's confusing.

Page 31

1    Q.    My apologies.  And let me try to
2    break it down for you.
3    A.    Great.
4    Q.    So you had this conversation with
5    Ability regarding the debt and you allegedly
6    not owing the debt, right?
7    A.    That is correct.
8    Q.    Okay.  At this point did you send
9    any documentation to Ability regarding the
10   debt?
11   A.    I wasn't requested to do any of
12   those things, so the answer to that question is
13   "no".  I did not send them a letter.  I think I
14   said that before.  That was not the --
15          The nature of the letter was to give
16   me instructions on how I was to dispute this
17   debt.  I followed the letter.  They said to
18   call.  I called.  I talked to a gentleman.  He
19   shared some information to confirm that this
20   was the same person.  None of the information
21   he shared could confirm this was me.  I thought
22   it was done.  He then told me that he was going

Page 32

1    to send it to --
2          He said he still was going to report
3    it on my credit.  So I'm confused about how we
4    got to this place because the letter indicated
5    that calling and not being able to confirm the
6    data was how you dispute it.
7    Q.    At this point did you check your
8    credit report?
9    A.    I believe I did check after the
10   call.
11   Q.    When was that?
12   A.    That was in December 2016.
13   Q.    And was there any indication on your
14   credit report of any information being reported
15   by Ability?
16   A.    Not at the time of the call.
17   Q.    Okay.  When was the first time that
18   you checked your credit report when you saw
19   information that was being report by Ability?
20   A.    When I got a credit alert from my --
21          There's a --
22          I forget what you call it, but it's



Page 33

1   a credit protection agency that kind of let's
2   you keep you alert of when things change in
3   your credit.  And as per the conversation I had
4   with the gentleman from Ability, he did report
5   it and it did show up as me owing the debt.
6      Q.   When did you sign up for that
7   particular service?
8      A.   I've had it for over --
9         At that time over 2 years.
10     Q.   How often do you receive
11   notifications from that service?
12     A.   Anytime there's changes to my
13   credit.
14     Q.   Why did you sign up for it?
15     A.   I can't recall my thinking at the
16   time, but I believe there was --
17         I don't know.  I thought that was a
18   good thing to do at the time.
19     Q.   Do you pay for it?
20     A.   I do.
21     Q.   Okay.  When was the last time you
22   made a payment for the service?

Page 34

1      A.   I can't recall.
2      Q.   Do you still maintain the service?
3      A.   I do maintain the service.
4      Q.   Are you aware of any time that your
5   employer noticed information on your credit
6   report that was being reported by Ability?
7      A.   I cannot speak to what my job saw
8   that as --
9         I'm not privy to that information.
10     Q.   Were you ever --
11         Between November of 2016 and May of
12   2017 were you reprimanded by your employer
13   regarding your credit history?
14     A.   I have never been reprimanded by my
15   employer.
16     Q.   Between November of 2016 and May of
17   2017 did you speak with anyone at your place of
18   employment regarding your credit history?
19     A.   I think you asked that already.
20     Q.   I'm asking again.
21         MR. GOLDSON:  Objection.
22         MR. METCHO:  Noted.

Page 35

1         You can answer if you're able.
2         THE WITNESS:  Can you repeat the
3   question.
4   BY MR. METCHO:
5      Q.   Sure.  Between November 2016 and May
6   of 2017 did you have any discussions with
7   anyone at your place of employment regarding
8   your credit history?
9      A.   No.
10     Q.   Between November 2016 and May of
11   2017 were you denied any credit opportunities?
12     A.   State that question again.
13     Q.   Sure.  Between November of 2016 and
14   May of 2017 were you denied any credit
15   opportunities?  For instance, did you attempt
16   to open up a credit card and were denied?  Or
17   did you attempt to get a car loan and were
18   denied?  Anything of that nature?
19     A.   From November to December I would
20   say "no".  January 2017 when this showed up on
21   my credit I became very concerned about it
22   being there:  One, because it was inaccurate,

Page 36

1   and I knew how important my credit is.
2         At that point I can't say that I
3   applied for any credit, but I didn't go out of
4   my way to make any decisions relating to my
5   credit at that time because I believed that it
6   was something small that we'd eventually get
7   past it and it wouldn't be an issue.
8         I don't know if that answers your
9   question.
10     Q.   Do you remember how much the debt
11   was for?
12     A.   I think it was $1500 --
13     Q.   Okay.
14     A.   -- or so.  Give or take.
15     Q.   Do you own a car?
16     A.   I do.
17     Q.   What kind of car do you own?
18     A.   A Saturn.
19     Q.   When was the last time you made a
20   payment towards the note on the car?
21     A.   I paid for my car in cash.  There
22   was never a note on it.



Page 37

1    Q.   Okay.  So you don't have a car
2   payment, in other words?
3    A.   I do not.
4    Q.   Um, between -- it's a small
5   timeframe -- but November of 2016 and May of
6   2017 did you seek any credit?  Did you seek to
7   open up a credit card?  Did you seek an auto
8   loan?  Or anything of that sort?
9    A.   I considered purchasing a new car,
10  but did not due to this particular inaccurate
11  information on my credit.
12   Q.   When was that?
13   A.   It was around my birthday.
14   Q.   Which was when?
15   A.   March 13.
16   Q.   Did you still have the same car?
17   A.   I do.
18   Q.   And when did you purchase that car?
19   A.   I purchased that car, I think it was
20  2000 --
21       March of 2016, I believe.
22   Q.   Okay.  And still to this day --

Page 38

1   we're now in February of 2018 -- you still have
2   the same car?
3    A.   I do.
4    Q.   You did not attempt to purchase
5   another car?
6    A.   Not until this had been resolved.
7       MR. GOLDSON:  Just real quick, I'm
8   going to need to take a really short break
9   sometime soon, just whenever is good for you
10  within the next like 10 or so minutes.
11      MR. METCHO:  We can take a break now
12  if you want.
13      (Recess taken at 1:34 p.m.)
14      (Deposition resumed at 1:43 p.m.)
15  BY MR. METCHO:
16   Q.   Ms. Long, do you remember the first
17  time you made a dispute to Ability regarding
18  the account?  In other words, when was the
19  first time you told Ability that you weren't
20  responsible for this particular account?
21   A.   When I made the phone call in
22  December.

Page 39

1    Q.   And just give me a brief description
2   of what was discussed during that call.
3       MR. GOLDSON:  Objection.  I thought
4   this was asked and answered.
5       MR. METCHO:  Okay.  I just --
6       Again, I'm just trying to get some
7   background information.
8       MR. GOLDSON:  Just for the record.
9       MR. METCHO:  That's fine.
10      You can answer if you're able.
11      THE WITNESS:  Will you repeat the
12  question.
13  BY MR. METCHO:
14   Q.   Sure.  When you spoke with Ability
15  in December of 2016 regarding the account and
16  you allegedly not being responsible for the
17  account, what was discussed?
18      Take your time.
19   A.   Yeah, that's correct.
20      Sure.  What was discussed?
21      We discussed the fact that I
22  received two letters from them indicating that

Page 40

1   there was --
2       -- they received information
3   indicating this was my debt, from their
4   information that this belonged to me and that
5   for me to confirm.  In doing so, I was to call.
6   And if they hadn't heard from me in 30 days
7   they would assume that it was mine.  So I got
8   on the phone, I called them, I said:  Hey, I
9   got this letter.  This isn't mine.
10      They said:  Okay.
11      They asked me to indicate the
12  reference number.  I gave the reference number.
13  Then the gentleman asked follow-up questions:
14  You know, they mentioned a date of birth, it
15  wasn't mine; they mentioned a name, it wasn't
16  mine; they mentioned dependents -- I think two
17  different names -- I said I don't have any
18  dependents; they said okay.
19      Then the gentleman indicated that I
20  would have to take this up with the credit
21  agency.  I was perplexed.  I said:  Wait.  I
22  called you within the timeframe to tell you it



CRYSTAL M. LONG

LONG vs ABILITY RECOVERY SERVICES

February 19, 2018

41–44

Page 41

1 wasn't mine. All of the supporting
2 documentation that you've given me that you
3 have that you are --
4          -- what you're saying are
5 identifiers, I said they're not. I don't --
6 they're not my name, my date of birth, I don't
7 have any children.
8          He then told me that I would have to
9 take it up with the credit reporting agency. I
10 then was confused. I asked him to clarify:
11 How was that possible when your letter stated
12 that you got this information, call to confirm,
13 I told you this isn't mine. How can you still
14 report it on my credit when all you have is my
15 name and my address, but none of the other
16 information relates to that?
17          He then said that he couldn't get
18 into that, that my only recourse now was to
19 take it up with my credit agency. We went back
20 and forth. He continued to say the same thing,
21 so I said: Okay.
22          And the next month I got an alert,

Page 42

1 checked my credit. The liability that I called
2 him earlier before is now on my credit.
3      Q.   After that conversation did you have
4 any further conversations with Ability?
5      A.   I did not.
6      Q.   Did you receive any additional
7 letters from Ability?
8      A.   I did not.
9      Q.   After that conversation did you
10 contact the credit bureaus?
11      A.   I disputed it using, I think it was
12 Experian. Their site says they will send my
13 dispute to all the other agencies. So that's
14 what I did.
15      Q.   What happened as a result of that?
16      A.   They sent me correspondence, I think
17 it was via --
18          You had to go back to the site and
19 it indicated they had indicated this was my
20 debt.
21      Q.   When was the last time you checked
22 your credit report when you saw that there was

Page 43

1 information being furnished by Ability?
2      A.   I don't understand your question.
3      Q.   All right. Let me step back.
4          When was the first time you
5 recognized that Ability was furnishing
6 information to the credit bureaus regarding the
7 account at issue?
8      A.   When I got an alert.
9      Q.   Do you remember when that was?
10      A.   It was in --
11          It was in like a month later. In
12 January 2017.
13      Q.   Okay. And when was the last time
14 you checked your credit report and saw that
15 there was information being furnished by
16 Ability?
17      A.   When was the last time that I saw --
18          I'm still not understanding what
19 you're asking.
20      Q.   Okay. Let me try to rephrase it.
21          When was the last time you checked
22 your credit report and saw on your credit

Page 44

1 report that there was information that was
2 being furnished by Ability?
3      A.   Sometime in September in the Fall.
4      Q.   Of what year?
5      A.   2017.
6      Q.   Okay. When was the last time you
7 checked your credit report?
8      A.   A couple weeks ago, a week and a
9 half ago.
10      Q.   Is there still information being
11 furnished by Ability?
12      A.   No.
13      Q.   So you have referenced earlier that
14 when you began your employment you had filled
15 out some type of documentation more or less
16 giving your employer the ability to check your
17 credit history, correct?
18      A.   I said that they had --
19          I gave them permission to do a
20 background check.
21      Q.   Can you describe this particular
22 documentation for me.



Page 45

1    A.    It's a sheet that says you give them
2    permission --
3          You fill out your address, your
4    Social Security Number, and they're saying
5    you're giving us permission to run a background
6    check on you.
7    Q.    After filling out this documentation
8    did you receive any feedback from your
9    employer?
10         MR. GOLDSON:  Objection.
11         MR. METCHO:  Basis?
12         MR. GOLDSON:  Asked and answered.
13         MR. METCHO:  Objection noted.
14         You can answer if you're able.
15         THE WITNESS:  I was hired.
16   BY MR. METCHO:
17   Q.    Okay.  How long have you been at --
18         And again, I may have asked this.
19   Just to refresh my memory, how long have you
20   been at your current place of employment?
21   A.    A year and 5 months.
22   Q.    During that time period have you

Page 46

1    been reprimanded in any way?
2          MR. GOLDSON:  Objection.
3          MR. METCHO:  Basis?
4          MR. GOLDSON:  Asked and answered.
5          MR. METCHO:  You can --
6          Objection noted.
7          You can answer if you're able.
8          THE WITNESS:  No.
9    BY MR. METCHO:
10   Q.    During this particular time period
11   have you been promoted?
12   A.    During what time period?
13   Q.    Throughout your employment?
14   A.    Employment where?
15   Q.    At your current place of employment.
16   A.    Yes.
17   Q.    How many times?
18   A.    Once.
19   Q.    When was --
20         When did that occur?
21   A.    Define "promotion".
22   Q.    Did you obtain different employment

Page 47

1    positions?
2    A.    I got an official promotion in
3    September of 2017.
4    Q.    Did this particular position come
5    with a salary increase?
6    A.    It did.
7    Q.    Have you received salary increases
8    throughout your employment?
9    A.    Yes.
10   Q.    When was the last time you received
11   a salary increase?
12   A.    September 2017.
13   Q.    So you allege in your complaint that
14   you were leery of potentially losing your job
15   over this trade line information that was being
16   reported.  Is that correct?
17   A.    Repeat the question.
18   Q.    Sure.  You allege in your
19   complaint --
20         Here, I can actually bring the
21   document up.  I can read it to you verbatim.
22   In Paragraph 57 you state that:  You suffered

Page 48

1    actual damages, economic damages, and damages
2    regarding credit damage, anxiety,
3    sleeplessness, emotional distress from the
4    prospect of job loss.
5          What made you think that you were
6    going to lose your job over this?
7          MR. GOLDSON:  Objection.
8          MR. METCHO:  Basis?
9          MR. GOLDSON:  Form.
10         MR. METCHO:  You can answer if
11   you're able.
12         THE WITNESS:  Repeat the question.
13   BY MR. METCHO:
14   Q.    Sure.  In Paragraph 57 you state
15   that you suffered actual damages, and one of
16   these damages included a prospect of job loss.
17   What made you think that Ability's attempt to
18   recover this debt was going to lead to you
19   losing your job?
20   A.    When I was hired my background
21   information presented a different version than
22   what this trade line was now representing.



Page 49

1  This trade line was representing that I was
2  irresponsible, I owed a debt and did not pay.
3  And all of that is inaccurate.
4      Q.   Are you aware of anyone at your
5  place of employment seeing this particular
6  trade line being reported?
7      A.   What I can speak to is that when I
8  was hired I had given them permission to do a
9  background check, I provided my Social Security
10 Number.
11     Q.   Did anyone at your place of
12 employment bring this trade line information
13 that was being reported by Ability to your
14 attention at any time?
15     A.   No.
16     Q.   Did you lose your job?
17     A.   No.
18     Q.   You also allege in Paragraph 57 that
19 you had fear of hard earned money being taken
20 away from you, although you just testified
21 under oath that you received a promotion in
22 2017?

Page 50

1      A.   I received a promotion
2  September 2017.  This was reported
3  January 2017.
4      Q.   Okay.
5      A.   So from that time to that time I had
6  no idea what could happen to me at that point.
7      Q.   Did you have any money taken away
8  from you by your employer during that time
9  period?
10     A.   Define "taken away".
11     Q.   Was there a --
12          Did you lose salary?  Did your
13 salary decrease during that time period?
14     A.   No, it did not.
15     Q.   You have a claim in your
16 complaint -- if I can find the particular
17 paragraph -- it's Count 2 for defamation.  Are
18 you aware of anyone other than yourself being
19 aware of this information that was being
20 furnished by Ability on your credit report?
21     A.   Repeat the question.
22     Q.   Sure.  The information that Ability

Page 51

1  was furnishing on your credit report regarding
2  the debt, are you aware of anyone else seeing
3  this information?
4      A.   What I can speak to is that anyone
5  who had access to, who had regular access to my
6  credit report could in fact see it.
7      Q.   Are you aware of anyone seeing it?
8      A.   I'm aware of them having the ability
9  to access and see it.
10     Q.   But are you aware of anyone seeing
11 it?
12     A.   I'm aware of them having the access
13 to see.  I can't speak to what other people do.
14     Q.   It's a "yes" or "no" question.
15     A.   I can speak to them having the
16 ability to access and see.
17     Q.   Was it ever brought to your
18 attention that anyone saw this information on
19 your credit report regarding the debt that was
20 being reported by Ability?
21     A.   Define "brought to my attention".
22     Q.   I'm asking the questions, ma'am.

Page 52

1      A.   I'm asking for clarity on the
2  question, sir.
3          MR. GOLDSON:  Objection.
4  BY MR. METCHO:
5      Q.   Okay.  Was it ever brought to your
6  attention that anyone saw this information that
7  was being furnished by Ability on your credit
8  report?
9      A.   I can speak to individuals having
10 access to see.
11     Q.   Again, it's a "yes" or "no"
12 question.
13     A.   I can speak to them having access to
14 see.
15     Q.   Did they see it?
16          MR. GOLDSON:  Objection.
17          MR. METCHO:  Basis?
18          MR. GOLDSON:  Asked and answered.
19          MR. METCHO:  I didn't get an answer
20 to the question.
21          MR. GOLDSON:  You've got plenty of
22 answers to the question.



Page 53

1      MR. METCHO:  That's not an answer.
2  It's a "yes" or "no" question.
3      MR. GOLDSON:  She's given her
4  answer.
5      MR. METCHO:  It's not an answer.
6  We'll issue additional written discovery on
7  that question -- that's fine -- in the form of
8  a request for admissions.
9  BY MR. METCHO:
10     Q.   What types of economic damages did
11  you suffer as a result of this collection
12  activity?
13     A.   Well, one, it presented loss of
14  opportunity.
15     Q.   What opportunities did you lose?
16     A.   Opportunities to purchase a new car
17  and get a discounted credit rate because this
18  is a derogatory information.  If I had bought a
19  car in 2016 it would be an issue.  When I try
20  to buy one in 2017 now I have the possibility
21  of an increased interest rate that --
22     Q.   When did you try to purchase a car

Page 54

1  in 2017?
2     A.   I spoke to --
3      I was considering purchasing a car
4  on my birthday, as you asked previously.
5     Q.   Okay.
6     A.   So you asked about economic damages.
7  I see that as a missed opportunity because I am
8  now in a holding pattern of not being able to
9  make free economic decisions on my behalf
10  because of inaccurate reporting.
11     Q.   But this is no longer being reported
12  on your credit report, correct?
13     A.   As of a couple weeks ago, no, I
14  didn't see it.
15     Q.   So what's keeping you from buying a
16  car now?
17     A.   I haven't had the time.  But I
18  believe your question was during that
19  timeframe.  Did I misunderstand your question?
20     Q.   No, that's okay.
21     A.   That's what you were saying.  I just
22  want to make sure I'm answering correctly.  So

Page 55

1  if that's not what you meant, please clarify.
2     Q.   We'll move on.  That's fine.
3      What types of inconvenience did you
4  suffer as a result of Ability attempting to
5  recover this debt?
6     A.   Um, inconvenience of having to
7  prolong a purchase of a car, the inconvenience
8  of having the opportunity to refinance my house
9  if I chose to, the inconvenience of having to
10  freely move in the market without having to be
11  concerned about what inaccurate reporting --
12      -- what options it would leave me.
13     Q.   What do you mean by "options"?
14     A.   Relating to, for example, let's say
15  buying a car.  An interest rate of 1.5 or an
16  interest rate of 5.7.  Those are different
17  options based on what I have consistently --
18      I've done my very best to ensure
19  that I pay my debts on time.  That not only is
20  a reflection of my financial responsibility,
21  but my character.  So when you're making
22  financial decisions how they lend you money

Page 56

1  depends on how you have previously handled
2  money.  And this information being reported is
3  inaccurate about how I handle money.
4     Q.   Did you speak financing during that
5  particular time period?
6     A.   As I spoke to the question earlier,
7  I indicated once the information was furnished
8  I held off on pursuing options hoping that this
9  would be resolved quickly.
10     Q.   And it was resolved, correct?
11     A.   Define "resolved", because we're
12  here today.  So what do you mean by "resolved"?
13     Q.   It was taken off your credit report,
14  correct?
15     A.   Yes, it was.
16     Q.   And when was that?
17     A.   I checked my credit report a couple
18  of weeks ago, it was not there.
19     Q.   And since that particular date have
20  you applied for any type of financing?
21     A.   Not as of yet.
22     Q.   You allege in your complaint that



Page 57

1  you had anxiety and sleeplessness.  When was
2  the last time you experienced these two
3  attributes?
4      A.   Last night preparing before I came
5  to this deposition.
6      Q.   What about prior to then?
7      A.   Let's see.  It depends on how
8  frequently I think about this.
9      Q.   Your counsel had earlier handed me
10 this document, which I'll hand to the Court
11 Reporter and we'll mark this as Exhibit A.
12         (Exhibit 1 marked for
13 identification.)
14         Can you describe this document for
15 me, please.
16     A.   Sure.  It is a notification from
17 Mint.
18     Q.   What's Mint?
19     A.   Mint is an app that I use to help
20 manage my finances.
21     Q.   In what way?
22     A.   Maintains my budgets, as well as

Page 58

1  savings goals, as well they keep me
2  up-to-date on my credit score change.
3      Q.   When did you obtain this document?
4      A.   I believe it was in the Fall of
5  2017.
6      Q.   Why wasn't this document produced
7  along with your discovery responses?
8      A.   I can't speak to the date when, but
9  I know it was --
10         It was in the Fall when I received
11 it.
12     Q.   Is there a particular date on that
13 document?
14     A.   Not from what I can see.
15     Q.   Does that document state exactly why
16 your alleged interest rate went up?
17     A.   It does not state why, it just
18 states that it did.
19     Q.   Had you applied for credit prior to
20 when you received that document?
21     A.   Not that I can recall.
22     Q.   Could this particular notification

Page 59

1  have something to do with your balance on your
2  Sealy's card?
3          MR. GOLDSON:  Objection.
4          MR. METCHO:  As to?
5          MR. GOLDSON:  Form.
6          MR. METCHO:  You can answer if
7  you're able.
8          THE WITNESS:  Repeat the question.
9  BY MR. METCHO:
10     Q.   Sure.  Is it possible that this --
11         -- you received this notification
12 due to the balance that's on your Sealy's card?
13     A.   I can't speak to that.  I don't
14 know.
15     Q.   Are you currently content with your
16 place of employment?
17     A.   Define "content".
18     Q.   Sure.  Are you happy with your work?
19     A.   Yeah.  I thoroughly enjoy my work.
20     Q.   Do you plan on staying there?
21     A.   Planning on staying?  What's that
22 mean?

Page 60

1      Q.   At your place of employment.
2      A.   I'm not ready to try to answer that
3  10 years from now, 20 --
4          I can't speak to --
5      Q.   Within the next year.
6      A.   I can't speak to what I plan to do
7  in the future.
8      Q.   Did this particular account or
9  Ability's attempt to recover the account have
10 any effect whatsoever on your employment
11 status?
12     A.   Repeat the question.
13     Q.   Sure.  Ability's attempts to recover
14 this debt obligation at issue, did it have any
15 type of effect on your employment status?
16     A.   Ability's inaccurate reporting on my
17 credit?
18         MR. GOLDSON:  Just, I'm going to put
19 an objection on the record as to form.
20         MR. METCHO:  Okay.  You can answer
21 if you're able.
22         THE WITNESS:  Repeat the question.



CRYSTAL M. LONG                                February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                      61–64

Page 61

1  BY MR. METCHO:
2     Q.   Sure.  Ability's attempt to recover
3  the debt obligation at issue, did it have any
4  type of effect on your employment?
5     A.   Ability's inaccurate reporting of
6  the debt on my credit became an issue for me in
7  the sense that when I was hired that was not
8  the credit reflection or the background
9  information they received and it was also
10  inaccurate, and now it's being presented and it
11  opened up to the possibility for an effect on
12  how I was viewed and my ability to keep their
13  trust in handling their money.
14     Q.   You're not aware of anybody at your
15  place of employment seeing this information on
16  your credit report, right?
17     A.   I can't speak to what they have done
18  with it.  I don't know.
19     Q.   And you had mentioned earlier that
20  you've been getting salary raises throughout
21  your employment, correct?
22     A.   I spoke that I had a promotion in

Page 62

1  September of 2017.
2     Q.   So it hasn't taken away from your
3  ability to work, correct?
4     A.   Repeat the question.
5     Q.   It hasn't taken away --
6        Ability's attempts to recover the
7  account at issue has not taken away from your
8  ability to make a leaving to earn a salary,
9  correct?
10     A.   It's inaccurate reporting has
11  potentially threatened my ability to earn if I
12  chose to leave my job as I would then be
13  subject to the same background information, and
14  this information would be inaccurate and it
15  would be a reflection of my understanding of my
16  trustworthiness, particularly in a role in
17  which I have access to large sums of money.
18     Q.   But it's no longer on your credit
19  report, right?
20        MR. GOLDSON:  Objection.
21        MR. METCHO:  Basis?
22        MR. GOLDSON:  Asked and answered.

Page 63

1        MR. METCHO:  You can ask if you're
2  able.
3        You can answer if you're able.
4  Excuse me.
5        THE WITNESS:  Repeat the question.
6  BY MR. METCHO:
7     Q.   The information that --
8        -- regarding Ability's attempt to
9  collect a debt is no longer on your credit
10  report, correct?
11     A.   From my understanding, yes.
12     Q.   Okay.  Are you aware that probably
13  about a week ago myself on behalf of both
14  Ability and Pendrick had issued to your counsel
15  what's called an Offer of Judgment Pursuant to
16  Federal Rule of Civil Procedure 68?
17     A.   Am I aware of --
18     Q.   Were you aware of that?
19     A.   Yes.
20     Q.   Okay.  And it's still your position
21  today that you're not going to accept the Offer
22  of Judgment?

Page 64

1        MR. GOLDSON:  Objection.
2        MR. METCHO:  Basis?
3        MR. GOLDSON:  Form and privilege.
4  BY MR. METCHO:
5     Q.   Okay.  Um, let me ask you this:
6  What are you looking for here?
7        MR. GOLDSON:  Objection.
8        MR. METCHO:  Basis?
9        MR. GOLDSON:  Form --
10        MR. METCHO:  Okay.  You can answer
11  if you're able.
12        MR. GOLDSON:  -- and harassment.
13        MR. METCHO:  Harassment?
14        MR. GOLDSON:  On the record, form
15  and harassment.
16  BY MR. METCHO:
17     Q.   You can answer.  You filed a lawsuit
18  against several defendants here.  What is your
19  ultimate outcome of this litigation?
20     A.   I'm not sure.
21        MR. METCHO:  Okay.  That's all I
22  have right now.




Page 65

1           EXAMINATION
2   BY MR. MARCUS:
3       Q.   I probably have about 5 minutes of
4   questions.
5           Ms. Long, again, I'm Morgan Marcus.
6   I represent Pendrick.  Your current job you're
7   at Trusted Health Plans Incorporated, correct?
8       A.   That is correct.
9       Q.   And based upon your interrogatory
10  responses that your attorney's provided to me,
11  it indicates that you started there, I believe,
12  September of --
13          -- September 12, 2016.  Does that
14  sound accurate?
15      A.   Yes.
16      Q.   So when did you actually apply to
17  work at Trusted Health Plans Inc?
18      A.   That was June 2016.
19      Q.   And you indicated earlier that you
20  provided --
21          -- that you signed a document, I
22  believe you said, providing your employer the

Page 66

1   ability to check your credit.  Is that correct?
2       A.   That is correct.
3       Q.   And when exactly would you have
4   signed that document?  Do you recall?
5       A.   When I applied during my
6   application --
7       Q.   Would that have been --
8       A.   -- process.
9       Q.   I'm sorry for interrupting you.
10          So that would have been June of
11  2016?
12      A.   That's correct.
13      Q.   And if you can recall the specific
14  document that you signed, did it give them the
15  ability to only check your credit report during
16  the application process?
17      A.   I can't recall.
18      Q.   Did it give them the ability to
19  continuously check your credit report?
20      A.   It gave them permission.  I can't
21  speak to --
22          It gave them permission to check my

Page 67

1   background.  It did not indicate that it was
2   for a window of time.
3       Q.   But it was for the purposes of your
4   application.  Is that correct?
5       A.   It was the purpose of employment.
6   You were required to complete and pass before
7   being hired.
8           -- in a condition of hire.
9       Q.   And to your knowledge did they
10  provide --
11          Did those documents have been
12  provided --
13          Strike that.
14          You signed that document.  Is that
15  correct?
16      A.   I did sign the document.
17      Q.   And did they provide you a copy of
18  that document?  To your recollection.
19      A.   Um, I can't recall.
20      Q.   You indicated just now that one of
21  your concerns was about potentially if you have
22  to look for other jobs.  Have you looked for

Page 68

1   any jobs since December of 2016?
2       A.   I've --
3           I have been --
4           I have checked in and out to see
5   what the job market looked like.  Yes.
6       Q.   What do you mean by that?
7       A.   I've looked at job posting sites.  I
8   have looked at what my skill set earning
9   potential was during that time.
10      Q.   And have you applied for any jobs
11  during that time period?
12      A.   I had, yes.
13      Q.   And where was that to?
14      A.   Several.  I can't list them all.
15      Q.   When would that have happened?
16      A.   That was back in, I would say, May
17  of 2017.
18      Q.   And you submitted applications.  Is
19  that what you're saying?
20      A.   That is correct.
21      Q.   You don't remember any of these
22  companies that you submitted applications to?



Page 69

1    A.   One was for sure was Bond.  It was a
2  healthcare company in Columbia.  And they
3  request that I give permission to --
4        -- for not just a background, but
5  they specified a credit check.
6    Q.   To your knowledge did they do a
7  credit check?
8    A.   I'm not sure.  I wasn't selected for
9  the job.
10   Q.   Any other companies that you
11 submitted applications to?
12   A.   None that I can recall.
13   Q.   What was this company called?  Bond?
14   A.   Bond.  I can't think of the name.  I
15 think it was --
16       It was a Catholic healthcare company
17 in Columbia.  I think it was Bond SE something.
18 I can't think of the name.  It was a different
19 name.  I can't remember.
20   Q.   And what was the position that you
21 were applying for?
22   A.   I believe it was --

Page 70

1        I believe it was a Controller role
2  or a Finance Manager role.
3    Q.   And did they give you any reason --
4        Well, strike that.
5        You submitted your documents to
6  them, and did they bring you in for an
7  interview?
8    A.   They did not.
9    Q.   And did they give you any reason why
10 you weren't selected?
11   A.   They did not.
12   Q.   Ms. Long, you never had any direct
13 contact with Pendrick, right?
14   A.   What do you define as "direct"?
15   Q.   Did you ever have any telephone
16 conversations with Pendrick directly?
17   A.   No.
18   Q.   Did you ever send any written
19 communications directly to Pendrick?
20   A.   No.
21   Q.   Did you ever receive anything
22 directly from Pendrick?

Page 71

1    A.   Define "directly".
2    Q.   Did you ever receive any mailing
3  that came specifically from Pendrick, and not
4  from some other agency?
5    A.   I received a letter from Ability on
6  behalf of Pendrick.  I don't know if that's
7  considered direct, but that's what I received.
8    Q.   Other than the letters that you
9  received from Ability, did you receive anything
10 else?
11   A.   No.
12   Q.   You indicated earlier that you have
13 three credit cards.  Since December --
14       Have you had those three same credit
15 cards since December 2016?
16   A.   Yes.
17   Q.   I believe it was Chase, Barclay's
18 and Sealy's, you said?
19   A.   That's correct.
20   Q.   So continuously from December 2016
21 to today you've had those three cards, correct?
22   A.   That's correct.

Page 72

1    Q.   Other than that you haven't had any
2  other cards?
3    A.   Not that I can recall.
4    Q.   Have you ever missed any payments on
5  those cards?
6    A.   No.
7    Q.   Have you ever been --
8        On any debt have you ever missed a
9  payment on any debt?  Not just those three
10 cards, any debt.
11   A.   In what time period?
12   Q.   Ever.
13   A.   I'm sure when I was in college.
14   Q.   And which debt was it?  If you have
15 any idea.
16   A.   I don't know.
17   Q.   You think you may have missed one in
18 college?
19   A.   You said "late".
20   Q.   I'm sorry.  Say that one more time.
21   A.   You said "late".
22   Q.   Yes.



Page 73

1    A.   Yeah, I'm sure I was late on a
2  payment.  This was long before banks did the
3  payments for you.  This was when you actually
4  had to mail stuff in.
5    Q.   Have you ever defaulted on any debt?
6    A.   Define "default".
7    Q.   Made a payment past a payment due
8  date.
9    A.   So would that be considered late?
10  Or is that considered default?
11    Q.   Well, I think it depends on your
12  cardholder agreement.  But have you made a
13  payment past the payment due date that you
14  negotiated with whatever entity that you got
15  the credit from?
16    A.   Depending what time period are we
17  talking about?
18    Q.   Ever.
19    A.   I'm sure I did.
20    Q.   And it's your position that you
21  never missed a payment with those three ones we
22  talked about -- Chase, Barclay's and Sealy's?

Page 74

1    A.   That is correct.
2    Q.   When did you get the Chase card?
3    A.   I can't recall that.  That's
4  probably my oldest credit card.
5    Q.   Has it been more than 5 years?
6    A.   I would say so, probably.  I can't
7  specify the date.  I don't know.
8    Q.   Do you know what the credit limit is
9  on your Chase credit card?
10    A.   In terms of what time period?
11    Q.   December 2016 'til May of --
12       -- I think May of 2017.
13    A.   I think it was 1600.
14    Q.   And have you ever gone above your
15  credit limit --
16    A.   Yes.
17    Q.   -- during that time period?
18    A.   During that time period?  I can't
19  recall.
20    Q.   And when I asked you if you had ever
21  gone above that credit limit on that card, you
22  indicated the answer was "yes"?

Page 75

1    A.   I can't recall.
2    Q.   Do you recall what the initial
3  interest rate was on the Chase card?
4    A.   No, I do not.
5    Q.   Your attorneys provided the document
6  that we've titled Long 1, which is in front of
7  you.
8    A.   Uh-huh.
9    Q.   It indicates that your interest rate
10  was 27.99 percent at some point.  Do you know
11  when it started --
12       -- when it went to 27.99 percent?
13    A.   No, I do not recall.
14    Q.   I want to provide you a document
15  that your attorney provided to me.  It's
16  plaintiff's production Bates labeled 100.  I
17  want you to take a second to review that, Ms.
18  Long.
19       For the record, why don't we mark
20  that as Long 2.
21       (Exhibit 2 marked for
22  identification.)

Page 76

1       Ms. Long, do you recognize this
2  document?  Do you know what this document is?
3    A.   It is --
4       It looks like a snapshot of my
5  credit report for my Chase card from
6  TransUnion.
7    Q.   And the top left indicates this was
8  from April 26, 2017.  Is that correct?
9    A.   That is also correct.
10    Q.   And it's showing --
11       Is this the Chase card that we've
12  been talking about?
13    A.   Yes.
14    Q.   And it shows the usage is
15  107 percent.  Is that correct?
16    A.   That's what it says.  Yes.
17    Q.   Okay.  Since the Ability trade line
18  was reported, have you had a conversation with
19  anyone at your current employment regarding the
20  trade line?
21    A.   I think I answered this, but do I
22  answer it for your response?



Page 77

1    Q.    I don't believe it was answered, but
2  if it has been then the question is being
3  restated.
4    A.    Can you repeat the question.
5    Q.    Since --
6         Why don't we have the Court Reporter
7  repeat it so we make sure she can state it
8  correctly.
9         (Court Reporter read back.)
10    A.    I've not had any conversations about
11  it --
12         -- this trade line with my current
13  employer.
14    Q.    And have you been provided with any
15  documents from your current employer indicating
16  that they have reviewed your credit report?
17    A.    I have received no documents.
18         MR. MARCUS:  That's all I have.
19         MR. GOLDSON:  Just for the record,
20  Long 1 and Long 2 are both marked confidential,
21  and we do intend to mark portions of the
22  deposition relating to personal information,

Page 78

1  financial and other personal information, as
2  confidential on this deposition as well, but
3  that's it.  I don't have any questions.
4         Read and sign.
5         MR. METCHO:  Regular.
6         MR. GOLDSON:  Copy, yes.
7         MR. MARCUS:  I'll hold out for now.
8         (Deposition concluded at 2:24 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 79

1         DEPOSITION ERRATA SHEET
2   Our Assignment No. J1529142
3   Case Caption:
4   Crystal Long
5   vs.
6   Pendrick Capital Partners, II, LLC, et al
7
8
9      DECLARATION UNDER PENALTY OF PERJURY
10      I declare under penalty of perjury that I
11   have read the entire transcript of my
12   Deposition taken in the captioned matter or the
13   same has been read to me, and the same is true
14   and accurate, save and except for changes
15   and/or corrections, if any, as indicated by me
16   on the DEPOSITION ERRATA SHEET hereof, with the
17   understanding that I offer these changes as if
18   still under oath.
19
20   Signed on the_____day of _____, 2018.
21   _____
22   Crystal M. Long

Page 80

1         DEPOSITION ERRATA SHEET
2   Page No._____ Line No._____ Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____ Line No._____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____ Line No._____ Change to:_____
9   _____
10   Reason for change:_____
11   Page No._____ Line No._____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____ Line No._____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____ Line No._____ Change to:_____
18   _____
19   Reason for change:_____
20
21   SIGNATURE_____DATE:_____
22         Crystal M. Long



CRYSTAL M. LONG
LONG vs ABILITY RECOVERY SERVICES

February 19, 2018
81–82

Page 81

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____ Line No._____ Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____ Line No._____ Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____ Line No._____ Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____ Line No._____ Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____ Line No._____ Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____ Line No._____ Change to:_____
18    _____
19    Reason for change:_____
20
21    SIGNATURE:_____DATE_____
22              Crystal M. Long
```

Page 82

```
 1         CERTIFICATE OF NOTARY PUBLIC
 2         I, Terry L. Bradley, the officer before
 3    whom the foregoing deposition was taken, do
 4    hereby certify that the witness whose testimony
 5    appears in the foregoing deposition was duly
 6    sworn by me; that the testimony of said witness
 7    was taken by me in shorthand and thereafter
 8    reduced to computerized transcription under my
 9    direction; that said deposition is a true
10    record of the testimony given by said witness;
11    that I am neither counsel for, related to, nor
12    employed by any of the parties to the action in
13    which this deposition was taken; and further,
14    that I am not a relative or employee of any
15    attorney or counsel employed by the parties
16    hereto, nor financially or otherwise interested
17    in the outcome of the action.
18
19              Notary Public in and for
                the State Of Maryland
20
21    My Commission expires:  November 15, 2019
22
```

