Kim Nanfeldt
2/22/2018

# EXHIBIT 5

Page 1

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

CRYSTAL LONG,                    *

        Plaintiff,            *

  vs.                            * Case No.:

                      * 8:17-CV-1955-GJH

PENDRICK CAPITAL                 *

PARTNERS II, LLC, et al.,        *

        Defendants.           *

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

        The  deposition of KIM NANFELDT, Corporate

Designee, took place on Thursday, February 22, 2018,

beginning at 10:41 a.m., at the Law Offices of

Marshall, Dennehey, Warner, Coleman & Goggin, 50

Glenmaura National Boulevard, Moosic, Pennsylvania,

before Christine A. Messner, Court Stenographer and

Notary Public in and for the State of Pennsylvania.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

Reported by:

    Christine A. Messner

RECEIVED
MAR 0 9 2018
By

COPY

---

Page 2

1    APPEARANCES:
2    On behalf of the Plaintiff:
3    INGMAR GOLDSON, ESQUIRE
4    The Goldson Law Office
5    1734 Elton Road, Suite 210
6    Silver Spring, Maryland 20903
7    240-780-8829
8    igoldson@goldsonlawoffice.com
9
10   On behalf of the Defendant Ability Recovery Services:
11   RONALD M. METCHO, ESQUIRE
12   Marshall, Dennehey, Warner, Coleman & Goggin
13   2000 Market Street, Suite 2300
14   Philadelphia, Pennsylvania 19103
15   215-575-2595
16   rmmetcho@mdwcg.com
17
18
19
20
21

---

Page 3

1        APPEARANCES (contd.)
2        On behalf of Pendrick Capital Partners:
3        MORGAN MARCUS, ESQUIRE
4        Sessions, Fishman, Nathan and Israel
5        120 S. LaSalle Street, Suite 1960
6        Chicago, Illinois 60603
7        312-578-0985
8        mmarcus@sessions.legal
9        (Via telephone)
10
11
12
13
14
15
16
17
18
19
20
21

---

Page 4

1            I N D E X
2       DEPOSITION OF KIM NANFELDT
3           February 22, 2018
4    EXAMINATION BY:                    PAGE:
5    Mr. Goldson ...................................5
6    Mr. Metcho ..................................32
7
8    EXHIBIT:    DESCRIPTION:          PAGE:
9    3    Verification ..........................16
10   4    Request for production ................24
11   5    Interrogatories ......................24
12   6    Fact sheet ............................25
13   7    Log .......................................26
14   8    Collection letter .....................30
15   9    Collection letter .....................30
16   10   Credit disputes .......................35
17   11   December 17, 2016 letter ..............37
18   12   January 31, 2017 letters ..............37
19
20
21

---

Page 5

1            P R O C E E D I N G S
2
3            STIPULATIONS
4
5        It was agreed by and between counsel that all
6    objections, except as to the form of the question,
7    will be reserved until the time of trial.
8        It was further agreed that the sealing and
9    filing of the deposition transcript will be waived.
10
11   Whereupon --
12        KIM NANFELDT was called, and having
13   been duly sworn, was examined and testified as
14   follows:
15
16        EXAMINATION BY MR. GOLDSON:
17   Q.    Hi.
18   A.    Hi.
19   Q.    Kim, can you just state your name and
20   address for the record please.
21   A.    Sure.  Kim Nanfeldt; 611 Powell Avenue,

---

Page 6

1  Jessup, Pennsylvania 18434.
2      Q.   Thank you.  My name is Ingmar Goldson.
3  I represent the plaintiff in the lawsuit against
4  Ability Recovery Services as you may know.  Just a
5  couple preliminary questions.  Have you ever been
6  deposed before?
7      A.   No.
8      Q.   Okay.  I'm just going to give you a
9  couple basic rules and Mr. Metcho can follow up with
10  a few rules if he pleases.  First is to make your
11  responses verbal because the court reporter cannot
12  pick up body language, head nods or anything of that
13  nature and try to stay away from answers like uh-uh
14  and just say yes or no.  If you do not understand a
15  question, please ask me to clarify.
16          MR. METCHO:  The only thing I
17      would add is conversations between you
18      and I like as we had on the phone are
19      protected by the attorney/client
20      privilege.  So if Mr. Goldson asks a
21      question that may trigger a response

Page 7

1      that includes something you and I
2      discussed in the past or something I
3      discussed with your company, you do not
4      have to provide that response.
5          If that becomes an issue, I'll
6      make you aware of it and we can decide
7      whether or not it's privileged.  So just
8      be aware that that could come up during
9      the deposition.
10          THE WITNESS:  Okay.
11          MR. METCHO:  Thank you.
12  BY MR. GOLDSON:
13      Q.   All right.  Ms. Nanfeldt, first a
14  little educational background.  What's the highest
15  level of education that --
16      A.   Associate's.
17      Q.   Associate's.  Where did you get your
18  Associate's?
19      A.   Penn State.
20      Q.   Do you currently work at Ability
21  Recovery Services?

Page 8

1      A.   I do.
2      Q.   How long have you worked there?
3      A.   Eleven years.
4      Q.   What is your current -- are you on
5  salary or are you paid hourly?
6      A.   No.
7      Q.   You are paid hourly?
8      A.   And a commission, hourly plus
9  commission.
10      Q.   Okay.  Can you tell me what your pay
11  structure is?  How much do you get hourly?
12      A.   Thirteen.
13      Q.   And what's your commission rate?
14      A.   It varies.  It varies based on the
15  collections.  My annual is about $70,000 a year.
16      Q.   Okay.  What's your current position at
17  Ability Recovery Services?
18      A.   I'm the collection manager.
19      Q.   What are your duties as a collection
20  manager?
21      A.   I am in charge of the strategy to bring

Page 9

1  the revenue in.  I place the accounts in the system.
2  I do a little bit of IT work.  I work with the
3  collection staff.  I work with clients, a little bit
4  of everything.
5      Q.   How many people, how many employees
6  does Ability Recovery Service have in its collection
7  staff?
8      A.   About 30.
9      Q.   How many employees as a whole does
10  Ability Recovery Services have?
11      A.   About 37.
12      Q.   So other than the 30 collectors, who
13  are the other employees and what do they do?
14      A.   It would be clerical, they would be
15  client liaison, they would be processing,
16  administration; those types of positions.
17      Q.   How many employees at Ability Recovery
18  Services would have worked on the alleged debt of the
19  plaintiff in this matter Crystal Long?
20      A.   Four.
21      Q.   Can you tell me their names?

Page 10

1     A.   I'm taking it -- I can't.  I'm taking
2  an educated guess there.
3     Q.   Okay.  But you can't say who those four
4  employees were?
5     A.   Other than Mark.
6     Q.   Okay.  What -- do you know their titles
7  then, who those -- the four titles?
8     A.   It would be our clerical staff.
9     Q.   When you say clerical, what does that
10  mean?
11     A.   Their duties would be to handle
12  e-OSCARs, you know, the disputes, you know, those
13  functions, you know, outside of the collection staff,
14  requesting backup; those types of functions.
15     Q.   Who does any sort of work with e-OSCAR
16  at Ability Recovery Services?
17     A.   Currently?  There was probably a change
18  since this matter to, you know, today.
19     Q.   Yeah.  Last year.
20     A.   Shannon Saxon Price, Kathleen Turner.
21  I'd say those would be our two main ones.

Page 11

1     Q.   How are Shannon and Kathleen or how
2  were Shannon and Kathleen trained?
3     A.   They would be trained by the compliance
4  officer.
5     Q.   Who is that?
6     A.   That's Audrey Conflitti.
7     Q.   Was Ms. Conflitti involved in Crystal
8  Long's disputes?
9     A.   No.
10     Q.   Only Shannon and/or Kathleen were?
11     A.   Yes.
12     Q.   Did Shannon and Kathleen -- let me,
13  sorry.
14     A.   That's okay.
15     Q.   Let me ask about them separately.  Did
16  Shannon get training specifically on the FCRA?
17     A.   I don't know.
18     Q.   The Fair Credit Reporting Act.  Did
19  Audrey get training specifically on the FCRA?
20     A.   Yes.
21     Q.   Who trained Audrey?

Page 12

1     A.   Audrey would have trained Audrey.
2  Audrey is our compliance officer.  So Audrey would go
3  out and she would, you know, seek the knowledge and
4  pass it along.
5     Q.   How long has Audrey been with Ability
6  Recovery Services?
7     A.   Since its inception, 2005.
8     Q.   Who are the owners of the Ability
9  Recovery Services?
10     A.   Michael Conflitti.
11     Q.   What's his relationship to Audrey?
12     A.   Audrey is his daughter-in-law.
13     Q.   Okay.  Does the collection staff at
14  Ability Recovery Services receive training on the
15  Fair Credit Reporting Act?
16     A.   Yes.
17     Q.   Do they receive training materials?
18     A.   Yes.
19     Q.   When do they receive that training?
20     A.   When they first start employment.  It's
21  all included in a binder that they keep at their

Page 13

1  desk.
2     Q.   Were -- now, I'm going to show you the
3  responses to the requests for production of documents
4  in this matter.  Do you recognize that document?
5     A.   Yes, I would say I do.
6     Q.   Did you organize the materials to turn
7  over to the plaintiff and respond to that document?
8     A.   I would say that would have been
9  Audrey.
10     Q.   So -- okay.  So Audrey responded to the
11  request for production of documents?
12     A.   Yes.
13     Q.   Who conducts the Fair Credit Reporting
14  Act training for the collection staff?
15     A.   Jeremy, my supervisor Jeremy Mills.
16     Q.   Was Jeremy involved with any of the
17  collection disputes for Crystal Long?
18     A.   No.
19     Q.   How often does Ability Recovery
20  Services find that it's attempting to collect a debt
21  from the wrong person?

Page 14

1      A.   I don't know.
2           MR. METCHO:  I'm going to object
3    to the form of the question, but you can
4    answer if you are able.
5           THE WITNESS:  I don't know the
6    answer to that.
7    BY MR. GOLDSON:
8      Q.   But it does happen?
9      A.   Occasionally.
10     Q.   Do you have any idea of what the error
11   rate is?
12     A.   I don't.
13     Q.   As a debt -- as a collection agency,
14   how much does Ability Recovery Services collect on an
15   annual basis?
16     A.   I don't know.
17     Q.   Can you estimate?
18     A.   I don't know the answer to that.  I
19   would -- that's not part of what I do there.
20     Q.   Okay.  Is Ability Recovery Services
21   indemnifying Pendrick in this matter?

Page 15

1      A.   I believe so.
2      Q.   How many accounts does Ability Recovery
3    Services collect on Pendrick's behalf?
4      A.   About 500,000.  Now, they are not all
5    collected, that's what we have in our system.
6      Q.   About 500,000 different accounts?
7      A.   Mm-mm.
8      Q.   Does Ability Recovery Services carry
9    liability insurance?
10     A.   Yes.
11     Q.   Is Pendrick named in that liability
12   insurance?
13     A.   I believe so, but I don't work with
14   those types of documents.
15     Q.   I'm going to show you this document.
16   That is a verification sent to the plaintiff by your
17   employer Ability Recovery Services.  Is that your
18   signature?
19     A.   Yes.
20          MR. GOLDSON:  I would like to mark
21   this as the next exhibit.

Page 16

1           (Whereupon Exhibit 3 was marked
2    for identification.)
3    BY MR. GOLDSON:
4      Q.   The next document that I'm going to
5    show you is the response to the interrogatories.  Ms.
6    Nanfeldt, is it true that with the verification that
7    I just showed you that you verified all the responses
8    to those interrogatories are true?
9      A.   Yes.
10     Q.   Is that your testimony today?
11     A.   Yes.
12     Q.   I'd like to direct your attention to
13   interrogatory number ten, if you could just read
14   that?
15          MR. METCHO:  That was it.  You can
16   flip it.
17   BY MR. GOLDSON:
18     Q.   You can read the question, the
19   interrogatory out for the record.
20     A.   Right here?
21     Q.   Yes.

Page 17

1      A.   In light of the allegations in the
2    complaint, please identify each incident where you
3    erroneously verified credit information relating to
4    plaintiff which should have not been verified.
5      Q.   Okay.  You can read the response to
6    interrogatory number ten, you can read it out for the
7    record or to yourself.
8      A.   ARS objects to this interrogatory on
9    the grounds that it is confusing, vague, overbroad
10   and not calculated to lead to the discovery of
11   admissible evidence.  Subject to and without
12   having -- without waiving these objections, ARS
13   responds that it does not have any information that
14   is or may be responsive to this interrogatory as it
15   did not erroneously verify credit information related
16   to plaintiff which allegedly should not have been
17   verified.
18     Q.   Do you stand by that answer today?
19     A.   Yeah.
20     Q.   Do you still maintain that the
21   plaintiff Crystal Long owes a debt to Ability

Page 18

1  Recovery Services or Pendrick?
2      A.   I don't think we actually know the
3  answer to that.  I don't know.
4      Q.   When Ability Recovery Services first
5  received the account from Pendrick, at that point did
6  Ability Recovery Services deem that the plaintiff
7  Crystal Long owed that money to Ability and Pendrick?
8          MR. METCHO:  I'm going to object
9  to the form of the question.  If you
10  understand it, you can answer.
11         THE WITNESS:  I don't think we
12  really know who owes what until we get
13  to situations a little bit farther down
14  the road.  If someone tells us they
15  don't owe it, you know, then we take a
16  look at the information that we have on
17  file and take it from there.  So to say
18  whether she owed it or not when it first
19  came to our office, I don't know the
20  answer to that.
21  BY MR. GOLDSON:

Page 19

1      Q.   Okay.  Thank you.  In your response you
2  just said take it from there, what -- can you
3  describe that process?
4      A.   Sure.  In the case Crystal Long she
5  called in from a letter, she was disputing it.  We
6  put it in a disputed status and reported it to the
7  bureaus as disputed.  She didn't get any more phone
8  calls.  She didn't get any additional letters.
9          At that point, you know, she didn't
10  provide any additional information to us to state
11  that it wasn't her, so we left it in a disputed
12  status.  You know we get the e-OSCARs over with no
13  additional information, so we verified what we had on
14  the system which was unknown.
15      Q.   When you said verified as unknown, can
16  you explain what you mean by that?
17      A.   Sure.  When an e-OSCAR comes over and
18  they're saying, you know, this isn't my debt, we take
19  a look at the information that came over with the
20  file and that was loaded in our system.  In Crystal's
21  case that information was unknown.

Page 20

1          We didn't have a Social, we didn't have
2  a date of birth and that's what we reported back to
3  over to the bureaus is that information to identify
4  her as either being responsible or not responsible
5  for the debt was unknown.
6      Q.   Is it your testimony that Ability
7  Recovery Services did not respond to the disputes
8  that the reported information was accurate?
9      A.   We reported it as unknown, that was
10  accurate.
11      Q.   What was accurate?
12      A.   That the information was unknown was
13  our accurate response.  We did not know that
14  information.
15      Q.   So did Ability respond that the
16  information was accurate?
17      A.   We responded that it was unknown.
18      Q.   Okay.  All right.  I'm going to show
19  you a document that was turned over for requests for
20  production in this case.  Do you recognize that
21  document?

Page 21

1      A.   I do.
2      Q.   What is it?
3      A.   That's our activity history from
4  Crystal Long's account.
5      Q.   Okay.  And was that document created in
6  the regular course of business for Ability Recovery
7  Services?
8      A.   Yes.
9      Q.   Okay.  Sorry.
10     A.   That's okay.
11     Q.   I have one copy so let me take a quick
12  look.  I'm going to ask you a few questions about
13  that document --
14     A.   Sure.
15     Q.   -- that doesn't seem clear at this
16  point.  Here it says broken promise work was A51.
17  Can you explain what that means?
18     A.   That just means that this in our world
19  is an open queue.  Based on what happens with the
20  account, the accounts are rearranged in priority.  So
21  this was something that right here, okay?

Page 22

1   Q.   Yeah.
2   A.   Rolled out to an A51 queue. So it's
3   just an open queue is all that is. It just means
4   that no collector has ownership of that account and
5   wants to continue to work it.
6   Q.   Okay. Here at May 24 it says e-OSCAR
7   verified, image added and e-OSCAR verified. What is
8   your understanding of what that means?
9   A.   That means that the e-OSCAR dispute came
10  in and they took a look at it, they reviewed the Debt
11  Master and they verified the information that we had
12  on file.
13  Q.   Were there any other steps taken?
14  A.   Other than viewing the account?
15  Q.   Yeah.
16  A.   I don't believe so.
17  Q.   Sorry.
18  A.   That's okay.
19  Q.   Just for the record right here where it
20  says gave copy to Audrey, is that Audrey Conflitti?
21  A.   Yes. Complaint received, added to

Page 23

1   docket, yeah. So that would have been the complaint
2   that was received on that day, yeah.
3   Q.   Okay. Thank you. I see a list of
4   phone numbers here and then it says CBC skip four
5   times. What is CBC skip?
6   A.   CBC skip, CBC Innovis is a company that
7   we use to batch our accounts out to retrieve the best
8   location information possible, meaning phone numbers
9   and addresses. So we'll take the information that we
10  have from our client, the way the file came over and
11  we'll create a file and send it out for a batch. CBC
12  will return information, what they consider to be
13  their best information so that we can reach out and
14  locate the consumer.
15  Q.   Okay. So that would be you're
16  describing Ability Recovery Services' skip tracer?
17  A.   Yes.
18  Q.   Does Ability Recovery Services use any
19  other skip tracers?
20  A.   No.
21  Q.   In your response -- I'm sorry. In your

Page 24

1   response to the interrogatories here, the first
2   interrogatory requests information for anyone who
3   knows any facts alleged in, any information, any
4   facts alleged in the complaint. We didn't receive
5   anything about any skip tracers, do you know why?
6   A.   Was the question asked? I don't know.
7       MR. METCHO: I'm going to object
8   to the question on the grounds that it
9   may seek information that is protected
10  by the attorney/client privilege, but
11  you can answer if you are able.
12      THE WITNESS: I don't know why it
13  wouldn't have been included. I don't
14  know the answer to that.
15      MR. GOLDSON: Okay. That's fine.
16  I would like to mark this as Exhibit 4.
17      (Whereupon Exhibits 4 and 5 were
18  marked for identification.)
19  BY MR. GOLDSON:
20  Q.   All right. The next document that I'm
21  going to show you is a document that I believe we

Page 25

1   received from Pendrick in this matter.
2       MR. METCHO: For the record, as
3   counsel for Ability, I do not recognize
4   this document, but I will allow Ms.
5   Nanfeldt to view it for purposes of
6   engaging in this deposition.
7       THE WITNESS: I don't recognize
8   this either.
9       (Whereupon Exhibit 6 was marked
10  for identification.)
11  BY MR. GOLDSON:
12  Q.   Okay. The next document I'm going to
13  show you is a document I received from your employer
14  Ability Recovery Services. Do you recognize that
15  document?
16  A.   No.
17  Q.   Do you know what this document states,
18  the information in this document?
19  A.   No.
20      MR. GOLDSON: We'll mark this as
21  the next exhibit.

---

Page 26

1          (Whereupon Exhibit 7 was marked
2      for identification.)
3  BY MR. GOLDSON:
4      **Q.    Is it Ability Recovery Services'**
5  **position that the plaintiff Crystal Long owes Ability**
6  **Recovery Services or Pendrick money from a medical**
7  **debt?**
8      A.    I don't think we know at this point.
9      **Q.    I'm going to show you two collection**
10  **letters sent by Ability Recovery Services sent to us**
11  **by your employer in response to a production of**
12  **documents. Do you recognize those documents?**
13      A.    Yes.
14      **Q.    The first document, can you tell me**
15  **what that document is?**
16      A.    That's a collection letter.
17      **Q.    What's the balance on that letter?**
18      A.    55.50 after the discount.
19      **Q.    Okay. After the dispute phone call**
20  **when Crystal Long called, this account did not show**
21  **up on her credit report. Do you know why that is?**

---

Page 27

1          MR. METCHO: I'm going to object
2      to the question on the grounds of form
3      and seeks speculation, speculatory
4      information. But, Kim, you can answer
5      if you're able.
6          THE WITNESS: I don't recall when
7      it showed up on her credit report.
8  BY MR. GOLDSON:
9      **Q.    Okay. And the second document --**
10      A.    Right.
11      **Q.    -- can you describe that document?**
12      A.    Well, it looks like it's the same
13  letter just a different account, discount letter
14  validation.
15      **Q.    What's the balance on the account?**
16      A.    843.75.
17      **Q.    Do you know why this account appeared**
18  **on Crystal Long's credit report while this account --**
19  **I'm sorry. For the record, why the account with the**
20  **total balance where it says your balance is $1,125,**
21  **why that $1,125 account showed up on the credit**

---

Page 28

1  **report and the $74 account did not show up on her**
2  **credit report?**
3      A.    I can tell you that credit reporting is
4  part of our collection software. Okay. That
5  information is built in. Okay. It goes out to each
6  account and it creates the file based on the
7  information that comes over in the file from our
8  clients. That information is gathered and it's
9  uploaded to each of the major bureaus. The bureaus
10  then take the information that we've provided and
11  they find the best fit for it.
12          So we're uploading the information that
13  we have in the system. I believe there was probably
14  a little bit more information maybe on one of the
15  accounts than the other, but you know that's how the
16  credit reporting process would work. We upload the
17  information that we have in our system. The credit
18  bureaus decide the best fit.
19      **Q.    So is it your testimony that this $74**
20  **account was reported in the same fashion as the**
21  **$1,125 account to the credit reporting agencies?**

---

Page 29

1      A.    Whatever information that would have
2  been in each respective account would have been
3  uploaded to the bureau.
4      **Q.    Okay. So the difference in reporting,**
5  **your testimony is that it's because of the credit**
6  **reporting agencies, not Ability?**
7      A.    There's different information in each
8  account. So the bureau would have looked at each
9  one individually and made the best bet.
10      **Q.    Okay. Does Ability Recovery Services**
11  **generate these documents, these two collection**
12  **letters?**
13      A.    We send a file over to our letter
14  company and they would generate them.
15      **Q.    Okay. Does Ability Recovery Services**
16  **generate those documents through the regular course**
17  **of its business?**
18      A.    Yes.
19      **Q.    Okay. Thank you.**
20          MR. GOLDSON: I'd like to mark
21      these exhibits separately please.

---

Page 30

1    (Whereupon Exhibits 8 and 9 were
2    marked for identification.)
3    BY MR. GOLDSON:
4        Q.   When Ability Recovery Services received
5    credit disputes from the credit reporting agencies
6    about the plaintiff's account, was Ability Recovery
7    Services' response consistent with its credit
8    reporting reinvestigation policies and procedures?
9        A.   Yes.
10       Q.   Did Ability Recovery Services
11   communicate with Pendrick about this account after it
12   received the disputes?
13       A.   No.
14       Q.   When did Ability first report
15   information about the plaintiff to the credit
16   reporting agencies?
17       A.   I don't know the exact day, but it
18   would have been more than 30 days from the placement
19   date.
20       Q.   That's the policy --
21       A.   Yes.

Page 31

1        Q.   -- more than 30 days?  When you say
2    more than 30 days, is that because Ability Recovery
3    Services sends out the information on the same day of
4    each month?
5        A.   No.  It's -- that's what the law
6    requires.  The law requires that there's a validation
7    period of 30 days.  So whatever that next credit
8    reporting cycle would fall after that 30-day period
9    is when the account would go over.
10       Q.   Thank you.  All right.  When Ability
11   reports an account or credit reporting agency, is
12   Ability telling the credit reporting agency that the
13   consumer owes that debt?
14       MR. METCHO:  I'm going to object
15   to the form of the question, but you can
16   answer if you are able.
17       THE WITNESS:  I mean basically we
18   are saying this is the information
19   that's been provided to us and we send
20   that information over.  And based on the
21   information that's in that file, the

Page 32

1    credit bureau makes the decision if
2    there's enough information to place it
3    on the record.
4    BY MR. GOLDSON:
5        Q.   Does Ability ever make a determination
6    as to whether or not any of the consumers that it
7    pursues for debt actually owe that debt?
8        A.   I don't understand your question.
9        Q.   Does Ability ever make, ever come to
10   the conclusion through its collection process that a
11   collector, sorry, that a consumer actually owes the
12   debt that Ability Recovery Services purports that
13   that consumer owes?
14       A.   That comes from our partnership with
15   our clients and the ability, you know, to -- we
16   partner with, you know, clients that are credible and
17   that you know these people, you know, do all the
18   debts and they can provide the backup that says that
19   they do.
20       Q.   In this case with the plaintiff Crystal
21   Long, Pendrick your partner sent placement data for a

Page 33

1    Crystal Long that lived in Baltimore.  Ability sent a
2    letter to the plaintiff and that letter went to
3    Bowie, Maryland.  So where did Ability get the Bowie,
4    Maryland address?
5        A.   CBC Innovis.
6        Q.   I'm showing you here the credit
7    disputes for ACDVs, there's four of them there and
8    those are the documents that Ability Recovery
9    Services sent the plaintiff in response to the
10   request for the production of documents.  Do you
11   recognize that document?
12       A.   I don't work hands on with these, but I
13   do know that it's an e-OSCAR.
14       Q.   Okay.  Do you know how these documents
15   are generated?
16       A.   They come to us, the girls log in
17   online and pull the information down that way from
18   like a queue.
19       Q.   How does Ability Recovery Services
20   receive this document?
21       A.   Other than the girls logging in online

Page 34

1  and getting the information through, you know, their
2  website, I don't know.
3      Q.   When you say the girls log in online,
4  are you talking about into the e-OSCAR system?
5      A.   Yes.
6      Q.   Okay.  Thanks.  Can you just turn to
7  the second page.  Can you read that last sentence
8  there for the record.
9      A.   Down here?
10      Q.   Yes.
11      A.   By submitting this ACDV you certify
12  that you have received and considered all associated
13  images, you have verified the accuracy of the data in
14  compliance with its legal requirements and your
15  computer and/or manual records will be adjusted to
16  reflect any changes noted.
17      Q.   Okay.  Just for the record where it
18  says reviewed, I believe you said received.
19      A.   Sorry.  My eyes aren't what they used
20  to be.
21      Q.   All right.  So what's your

Page 35

1  understanding of that statement?
2      A.   That we have reviewed the account and
3  the information that we are reporting over is
4  correct.
5      Q.   Okay.
6          MR. GOLDSON:  I would like to go
7  ahead and mark the exhibit.
8          (Whereupon Exhibit 10 was marked
9      for identification.)
10  BY MR. GOLDSON:
11      Q.   Ms. Nanfeldt, is it your understanding
12  when you respond -- when you responded, I'm sorry,
13  when ARS, Ability Recovery Services, responded to
14  those disputes, is it your understanding that that
15  response was confirming the reporting as accurate?
16      A.   I think it was doing neither.  It was
17  saying this is the information that we have.
18      Q.   Okay.
19      A.   Or just saying that the information we
20  sent over was correct.
21      Q.   The information that you were sending

Page 36

1  is correct, it's your understanding of the
2  verification of those disputes?
3      A.   I'm saying the information as her name,
4  her address, the information that we have on file
5  that went over in that string to the credit bureaus
6  was correct.
7      Q.   Okay.  Did Ability Recovery Services
8  confirm the debt as accurate with the first ACDV?
9      A.   I don't know.
10      Q.   Did Ability Recovery Services confirm
11  that the debt is accurate for the second and third
12  disputes?
13      A.   I'm not that familiar enough with them
14  to answer that.
15      Q.   What is e-OSCAR?
16      A.   e-OSCAR is the online disputing site.
17  Consumers go there, they put their dispute in, it
18  comes to us and we answer it.
19      Q.   Next I'm showing you the consumer, the
20  plaintiff in this matter Crystal Long's dispute,
21  first dispute letter.  Do you recognize that

Page 37

1  document?
2      A.   No.
3          MR. GOLDSON:  I'll mark that as
4      the next exhibit.
5          (Whereupon Exhibits 11 was marked
6      for identification.)
7  BY MR. GOLDSON:
8      Q.   I'm showing you three disputes sent by
9  the plaintiff Crystal Long sent to the credit
10  reporting agencies.  Do you recognize any of those
11  documents?
12      A.   No.
13      Q.   Okay.  Thanks.
14          MR. GOLDSON:  I would like to mark
15      those as one exhibit.
16          (Whereupon Exhibit 12 was marked
17      for identification.)
18  BY MR. GOLDSON:
19      Q.   Ms. Nanfeldt, who at Ability uses
20  e-OSCAR?
21      A.   Shannon Price, Kathleen Turner.  At

Page 38

1   that time that would be those two.
2        Q.   Okay.  Who trained Shannon Price and
3   Kathleen Turner on the use of e-OSCAR?
4        A.   Audrey Conflitti.
5        Q.   Do you know if Audrey Conflitti used
6   any computer programs or training materials when they
7   trained?
8        A.   I don't.
9        Q.   Does Ability Recovery Services record
10  the phone calls that it makes and that it receives
11  from consumers?
12       A.   Yes.
13       Q.   Who receives those phone calls at
14  Ability Recovery Services?
15       A.   They go into our recording drive.
16       Q.   Okay.  Which employees receive the
17  calls?  When a call comes in to Ability Recovery
18  Services from a consumer that receives a letter,
19  which employees field those calls?
20       A.   All of them.
21       Q.   Okay.  All the collection employees?

Page 39

1        A.   All of the collection staff, yes.
2        Q.   Thirty of them, right?
3        A.   Yes.
4        Q.   Do any members of the collection staff
5   have the ability to stop recording?
6        A.   No.
7        Q.   Does anybody at Ability have the
8   ability to edit the calls after --
9        A.   No.
10       Q.   -- they are recorded?  That's all I
11  have.
12            MR. METCHO:  I do have some
13  follow-up questions.  Do you mind if we
14  take a five to ten-minute break?
15            MR. GOLDSON:  That's fine.
16            (Whereupon a recess took place.)
17
18            EXAMINATION
19  BY MR. METCHO:
20       Q.   So, Kim, again what is -- in November
21  of 2016, what was your position with Ability?

Page 40

1        A.   Collection manager.
2        Q.   Okay.  And when did you first become
3   aware of Crystal Long's account with Pendrick?
4        A.   I would say when the lawsuit came.
5        Q.   Okay.  Were you involved at all with
6   the specific collection of the account?
7        A.   No.
8        Q.   We did take a look at these account
9   notes earlier, correct --
10       A.   Yes.
11       Q.   -- which was marked as Exhibit 2?
12       A.   Yes.
13       Q.   You were not involved in the collection
14  of this particular account, however you are familiar
15  with the collection notes and what they report;
16  correct?
17       A.   Yes.
18       Q.   Okay.  In these notes can you tell me,
19  we're looking at the debtor activity history, when
20  was the initial collection letter sent to Ms. Long?
21       A.   November 12, 2016.

Page 41

1        Q.   Okay.  And was there any response to
2   that letter received in writing?
3        A.   Not that I'm aware of.
4        Q.   Okay.  When did Ability receive the
5   call from Ms. Long?
6        A.   November 22, '16.
7        Q.   Okay.  And the entry after the November
8   22 entry, what does that reflect?
9        A.   The e-OSCAR dispute.
10       Q.   Okay.  And what does that mean?
11       A.   That means that she went and -- she
12  went to the credit bureaus, the ones online and
13  disputed it.
14       Q.   Okay.  And going back to the November
15  22, '16 entry, can you just read what the entry
16  means, what it says, excuse me?
17       A.   Sure.  That's taking an account from a
18  new status to a disputed status.
19       Q.   And why would that occur?
20       A.   That would occur because she spoke to
21  someone and she relayed that information to us.

Page 42

1      Q.   Okay. Look at this debtor activity
2 history which you are familiar with. Did Ability
3 place any calls to Ms. Long?
4      A.   No.
5      Q.   Okay. Other than the November 22, 2016
6 entry, did Ability receive any other calls from Ms.
7 Long?
8      A.   No.
9      Q.   Okay. When did Ability cease
10 collection activity on the account?
11      A.   November 22, 2016.
12      Q.   What I'm going to show you now are a
13 few letters that were presented to you. It looks
14 like Exhibit 11, 12 and then 13 and 14. We should
15 mark these. No, excuse me, 11 and 12 was the three
16 documents.
17      Looking at these letters, who are they
18 addressed to?
19      A.   Sir or madam.
20      Q.   On the actual mailing address.
21      A.   Equifax.

Page 43

1      Q.   Okay. And that's on Exhibit 11. If
2 you can take a look at Exhibit 12 the first document,
3 who is that addressed to?
4      A.   Experian.
5      Q.   The second document?
6      A.   Equifax.
7      Q.   And the third?
8      A.   TransUnion.
9      Q.   Okay. Taking at look at these
10 documents, was Ability Recovery Services cc'd or
11 copied on any of these letters that were sent to the
12 credit bureaus?
13      A.   It doesn't appear to so.
14      Q.   Was Pendrick?
15      A.   I don't think so.
16      Q.   It's a yes or no question.
17      A.   No.
18      Q.   Okay. Were any other entities other
19 than the specific credit bureaus?
20      A.   No.
21      Q.   Okay. In your opinion looking at

Page 44

1 debtor history, the documents we've gone through
2 during this deposition, did Ability correctly report
3 all trade line information that was obtained and
4 received from the credit bureaus?
5      A.   Yes.
6      Q.   Okay. Do you have any reason to
7 believe that any of the information that was reported
8 by Ability to the credit bureaus was inaccurate?
9      A.   No.
10      Q.   Do you have any reason to believe that
11 any of the information regarding the disputes that
12 was exchanged between the credit bureaus and Ability
13 was untimely?
14      A.   No.
15      Q.   Do you believe that the policies and
16 procedures that are in place regarding Ability's
17 disputes and their process are compliant with the
18 FCRA?
19      A.   Yes.
20      Q.   I have nothing further.
21      MR. GOLDSON: And just to clarify

Page 45

1 because I don't believe I mentioned this
2 at the beginning, Ms. Nanfeldt, you are
3 testifying as the corporate designee of
4 Ability Recovery Services today,
5 correct?
6      THE WITNESS: Yes.
7      MR. GOLDSON: That's it. Nothing
8 further.
9      MR. METCHO: Morgan, do you have
10 anything?
11      MR. MARCUS: I don't have anything
12 at this time. But, Ron, give me a call
13 later if you have time to speak.
14      (Whereupon the deposition was
15      concluded at 11:59 a.m.)
16
17
18
19
20
21

Page 46

CERTIFICATE

I, Christine Messner, a Notary Public in and
for Wyoming County, Pennsylvania, do hereby certify
that the deposition was reported in machine
shorthand by me, that the said witness was duly
sworn/affirmed by me, that the transcript was
prepared by me or under my supervision and
constitutes a complete and accurate record of same.

I further certify that I am not an attorney
or counsel of any parties, nor a relative or
employee of any attorney or counsel connected with
the action, nor financially interested in the
action.

_____

Christine Messner

Page 47

AL BETZ & ASSOCIATES, INC.
Administrative Offices
P.O. Box 665
Westminster, Maryland  21158
VOICE - (410)752-1733  FAX - (410)875-2857
E-mail- productiondept@albetzreporting.com
www.albetzreporting.com

DATE: March 8, 2018
JOB NUMBER: 180222key_(1)nanfeldt_kim
CASE CAPTION: Crystal Long v. Pendrick Capital
COURT: US District Court, District of Maryland
CASE NUMBER: 8:17-CV-1955-GJH
DEPONENT: Kim Nanfeldt
DATE OF DEPOSITION: February 22, 2018
ATTORNEYS/FIRMS:
   Ingmar Goldson, Esq. / The Goldson Law Office
   Ronald M. Metcho, Esq. / Marshall Dennehey

Page 48

Dear Sir or Madam:

Bound herewith is the transcript of the
above-referenced deposition.  Please read the
transcript and sign the errata pages.  Any
additions or corrections should be listed on the
errata sheets provided.  This is in accordance
completed errata sheets, and return them to the
address listed above for processing.

If this process has not been completed
within (30) thirty days from the date of this
letter, we will assume that the right to read the
deposition has been waived.  This is in accordance
with Rule 30(e) of the Federal Rules of Civil
Procedure and Rule 2-415 of the Maryland Rules of
Procedure.

Page 49

READING & SIGNING PROCEDURE

The Deposition of Mark Carlson, taken in
the matter, on the date, and at the time and place
set out on the title page hereof.
It was requested that the deposition be
taken by the reporter and that same be reduced to
typewritten form.
It was agreed by and between counsel and
the parties that the Deponent will read and sign
the transcript of said deposition.

Page 50

1       DEPOSITION ERRATA SHEET
2   RE:  Al Betz & Associates, Inc.
3   FILE NO.:  180222key_(1)nanfeldt_kim
4   CASE CAPTION:  Crystal Long v. Pendrick Capital
5   DEPONENT:  Kim Nanfeldt
6   DEPOSITION DATE:  February 22, 2018
7       I have read the entire transcript of my
8   Deposition taken in the captioned matter or the
9   same has been read to me.  I request that the
10  changes noted on the following errata sheet be
11  entered upon the record for the reasons indicated.
12  I have signed my name to the Errata Sheet and
13  authorize you to attach it to the original
14  transcript.
15  PAGE/LINE     CHANGE        REASON
16  _____
17  _____
18  _____
19  _____
20  SIGNATURE:_____DATE:_____
21      Kim Nanfeldt

Page 51

1   PAGE/LINE     CHANGE        REASON
2   _____
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  SIGNATURE:_____DATE:_____
21      Kim Nanfeldt

**A**

**a.m (2)** 1:13 45:15
**A51 (2)** 21:16 22:2
**ability (69)** 2:10
  6:4 7:20 8:17 9:6
  9:10,17 10:16
  12:5,8,14 13:19
  14:14,20 15:2,8
  15:17 17:21 18:4
  18:6,7 20:6,15
  21:6 23:16,18
  25:3,14 26:4,5
  26:10 29:6,10,15
  30:4,6,10,14
  31:2,10,12 32:5
  32:9,12,15 33:1
  33:3,8,19 35:13
  36:7,10 37:19
  38:9,14,17 39:5
  39:7,8,21 41:4
  42:2,6,9 43:10
  44:2,8,12 45:4
**Ability's (1)** 44:16
**able (4)** 14:4 24:11
  27:5 31:16
**above-reference...**
  48:4
**account (29)** 18:5
  21:4,20 22:4,14
  26:20 27:13,15
  27:17,18,19,21
  28:1,6,20,21
  29:2,8 30:6,11
  31:9,11 35:2
  40:3,6,8,14
  41:17 42:10
**accounts (6)** 9:1
  15:2,6 21:20
  23:7 28:15
**accuracy (1)** 34:13
**accurate (9)** 20:8
  20:10,11,13,16
  35:15 36:8,11
  46:9
**ACDV (2)** 34:11

36:8
**ACDVs (1)** 33:7
**Act (3)** 11:18
  12:15 13:14
**action (2)** 46:14,15
**activity (4)** 21:3
  40:19 42:1,10
**actual (1)** 42:20
**add (1)** 6:17
**added (2)** 22:7,21
**additional (3)** 19:8
  19:10,13
**additions (1)** 48:6
**address (5)** 5:20
  33:4 36:4 42:20
  48:9
**addressed (2)**
  42:18 43:3
**addresses (1)** 23:9
**adjusted (1)** 34:15
**administration (1)**
  9:16
**Administrative ...**
  47:2
**admissible (1)**
  17:11
**agencies (5)** 28:21
  29:6 30:5,16
  37:10
**agency (3)** 14:13
  31:11,12
**agreed (3)** 5:5,8
  49:9
**ahead (1)** 35:7
**al (3)** 1:8 47:1 50:2
**allegations (1)**
  17:1
**alleged (3)** 9:18
  24:3,4
**allegedly (1)** 17:16
**allow (1)** 25:4
**and/or (2)** 11:10
  34:15
**annual (2)** 8:15
  14:15

**answer (13)** 14:4,6
  14:18 17:18 18:3
  18:10,20 24:11
  24:14 27:4 31:16
  36:14,18
**answers (1)** 6:13
**anybody (1)** 39:7
**appear (1)** 43:13
**APPEARANCE...**
  2:1 3:1
**appeared (1)**
  27:17
**ARS (3)** 17:8,12
  35:13
**asked (1)** 24:6
**asks (1)** 6:20
**Associate's (3)**
  7:16,17,18
**associated (1)**
  34:12
**Associates (2)** 47:1
  50:2
**assume (1)** 48:13
**attach (1)** 50:13
**attempting (1)**
  13:20
**attention (1)** 16:12
**attorney (2)** 46:11
  46:13
**attorney/client (2)**
  6:19 24:10
**ATTORNEYS/...**
  47:16
**Audrey (16)** 11:6
  11:19,21 12:1,1
  12:2,2,5,11,12
  13:9,10 22:20,20
  38:4,5
**authorize (1)**
  50:13
**Avenue (1)** 5:21
**aware (4)** 7:6,8
  40:3 41:3

**B**

**back (2)** 20:2
  41:14
**background (1)**
  7:14
**backup (2)** 10:14
  32:18
**balance (4)** 26:17
  27:15,20,20
**Baltimore (1)** 33:1
**based (4)** 8:14
  21:19 28:6 31:20
**basic (1)** 6:9
**basically (1)** 31:17
**basis (1)** 14:15
**batch (2)** 23:7,11
**beginning (2)** 1:13
  45:2
**behalf (4)** 2:2,10
  3:2 15:3
**believe (10)** 15:1
  15:13 22:16
  24:21 28:13
  34:18 44:7,10,15
  45:1
**best (5)** 23:7,13
  28:11,18 29:9
**bet (1)** 29:9
**Betz (2)** 47:1 50:2
**binder (1)** 12:21
**birth (1)** 20:2
**bit (4)** 9:2,3 18:13
  28:14
**body (1)** 6:12
**Boulevard (1)**
  1:15
**Bound (1)** 48:3
**Bowie (2)** 33:3,3
**Box (1)** 47:3
**break (1)** 39:14
**bring (1)** 8:21
**broken (1)** 21:16
**built (1)** 28:5
**bureau (2)** 29:3
  32:1
**bureaus (13)** 19:7

20:3 28:9,9,18
  29:8 36:5 41:12
  43:12,19 44:4,8
  44:12
**business (2)** 21:6
  29:17

**C**

**C (3)** 5:1 46:1,1
**calculated (1)**
  17:10
**call (4)** 26:19
  38:17 41:5 45:12
**called (3)** 5:12
  19:5 26:20
**calls (8)** 19:8
  38:10,13,17,19
  39:8 42:3,6
**Capital (4)** 1:7 3:2
  47:11 50:4
**CAPTION (2)**
  47:11 50:4
**captioned (1)** 50:8
**Carlson (1)** 49:3
**carry (1)** 15:8
**case (8)** 1:5 19:4
  19:21 20:20
  32:20 47:11,13
  50:4
**CBC (6)** 23:4,5,6,6
  23:11 33:5
**cc'd (1)** 43:10
**cease (1)** 42:9
**certify (3)** 34:11
  46:4,11
**change (3)** 10:17
  50:15 51:1
**changes (2)** 34:16
  50:10
**charge (1)** 8:21
**Chicago (1)** 3:6
**Christine (4)** 1:16
  1:21 46:3,19
**Civil (1)** 48:15
**clarify (2)** 6:15

Kim Nanfeldt
2/22/2018

Page 53

44:21
**clear (1)** 21:15
**clerical (3)** 9:14
    10:8,9
**client (2)** 9:15
    23:10
**clients (4)** 9:3 28:8
    32:15,16
**Coleman (2)** 1:14
    2:12
**collect (3)** 13:20
    14:14 15:3
**collected (1)** 15:5
**collection (25)**
    4:14,15 8:18,19
    9:3,6 10:13
    12:13 13:14,17
    14:13 26:9,16
    28:4 29:11 32:10
    38:21 39:1,4
    40:1,6,13,15,20
    42:10
**collections (1)**
    8:15
**collector (2)** 22:4
    32:11
**collectors (1)** 9:12
**come (3)** 7:8 32:9
    33:16
**comes (5)** 19:17
    28:7 32:14 36:18
    38:17
**commission (3)**
    8:8,9,13
**communicate (1)**
    30:11
**company (3)** 7:3
    23:6 29:14
**complaint (4)** 17:2
    22:21 23:1 24:4
**complete (1)** 46:9
**completed (2)** 48:8
    48:11
**compliance (3)**
    11:3 12:2 34:14

**compliant (1)**
    44:17
**computer (2)**
    34:15 38:6
**concluded (1)**
    45:15
**conclusion (1)**
    32:10
**conducts (1)** 13:13
**confirm (2)** 36:8
    36:10
**confirming (1)**
    35:15
**Conflitti (6)** 11:6,7
    12:10 22:20 38:4
    38:5
**confusing (1)** 17:9
**connected (1)**
    46:13
**consider (1)** 23:12
**considered (1)**
    34:12
**consistent (1)** 30:7
**constitutes (1)**
    46:9
**consumer (6)**
    23:14 31:13
    32:11,13 36:19
    38:18
**consumers (3)**
    32:6 36:17 38:11
**contd (1)** 3:1
**continue (1)** 22:5
**conversations (1)**
    6:17
**copied (1)** 43:11
**copy (2)** 21:11
    22:20
**corporate (2)** 1:11
    45:3
**correct (7)** 35:4,20
    36:1,6 40:9,16
    45:5
**corrections (1)**
    48:6

**correctly (1)** 44:2
**counsel (5)** 5:5
    25:3 46:12,13
    49:9
**County (1)** 46:4
**couple (2)** 6:5,9
**course (2)** 21:6
    29:16
**court (5)** 1:1,16
    6:11 47:12,16
**create (1)** 23:11
**created (1)** 21:5
**creates (1)** 28:6
**credible (1)** 32:16
**credit (33)** 4:16
    11:18 12:15
    13:13 17:3,15
    26:21 27:7,18,21
    28:2,3,16,17,21
    29:5 30:5,5,7,15
    31:7,11,12 32:1
    33:6 36:5 37:9
    41:12 43:12,19
    44:4,8,12
**Crystal (18)** 1:3
    9:19 11:7 13:17
    17:21 18:7 19:4
    21:4 26:5,20
    27:18 32:20 33:1
    36:20 37:9 40:3
    47:11 50:4
**Crystal's (1)** 19:20
**current (2)** 8:4,16
**currently (2)** 7:20
    10:17
**cycle (1)** 31:8

---
**D**

**D (2)** 4:1 5:1
**data (2)** 32:21
    34:13
**date (9)** 20:2 30:19
    47:9,15 48:12
    49:4 50:6,20
    51:20

**daughter-in-law...**
    12:12
**day (3)** 23:2 30:17
    31:3
**days (5)** 30:18
    31:1,2,7 48:12
**Dear (1)** 48:1
**debt (14)** 9:18
    13:20 14:13
    17:21 19:18 20:5
    22:10 26:7 31:13
    32:7,7,12 36:8
    36:11
**debtor (3)** 40:19
    42:1 44:1
**debts (1)** 32:18
**December (1)** 4:17
**decide (2)** 7:6
    28:18
**decision (1)** 32:1
**deem (1)** 18:6
**Defendant (1)**
    2:10
**Defendants (1)** 1:9
**Dennehey (3)** 1:14
    2:12 47:18
**Deponent (3)**
    47:14 49:10 50:5
**deposed (1)** 6:6
**deposition (17)**
    1:11 4:2 5:9 7:9
    25:6 44:2 45:14
    46:5 47:15 48:4
    48:14 49:3,6,11
    50:1,6,8
**describe (2)** 19:3
    27:11
**describing (1)**
    23:16
**DESCRIPTION...**
    4:8
**designee (2)** 1:12
    45:3
**desk (1)** 13:1
**determination (1)**

32:5
**difference (1)** 29:4
**different (3)** 15:6
    27:13 29:7
**direct (1)** 16:12
**discount (2)** 26:18
    27:13
**discovery (1)**
    17:10
**discussed (2)** 7:2,3
**dispute (6)** 22:9
    26:19 36:17,20
    36:21 41:9
**disputed (5)** 19:6
    19:7,11 41:13,18
**disputes (14)** 4:16
    10:12 11:8 13:17
    20:7 30:5,12
    33:7 35:14 36:2
    36:12 37:8 44:11
    44:17
**disputing (2)** 19:5
    36:16
**District (4)** 1:1,2
    47:12,12
**docket (1)** 23:1
**document (25)**
    13:4,7 15:15
    16:4 20:19,21
    21:5,13 24:20,21
    25:4,12,13,15,17
    27:9,11 33:11,20
    37:1 43:2,5
**documents (14)**
    13:3,11 15:14
    26:12,12 29:11
    29:16 33:8,10,14
    37:11 42:16
    43:10 44:1
**doing (1)** 35:16
**drive (1)** 38:15
**duly (2)** 5:13 46:6
**duties (2)** 8:19
    10:11

**E**

E (5) 4:1 5:1,1
46:1,1
E-mail- (1) 47:6
e-OSCAR (12)
10:15 19:17 22:6
22:7,9 33:13
34:4 36:15,16
37:20 38:3 41:9
e-OSCARs (2)
10:12 19:12
earlier (1) 40:9
edit (1) 39:8
educated (1) 10:2
education (1) 7:15
educational (1)
7:14
either (2) 20:4
25:8
Eleven (1) 8:3
Elton (1) 2:5
employee (1)
46:13
employees (8) 9:5
9:9,13,17 10:4
38:16,19,21
employer (3)
15:17 25:13
26:11
employment (1)
12:20
engaging (1) 25:6
entered (1) 50:11
entire (1) 50:7
entities (1) 43:18
entry (5) 41:7,8,15
41:15 42:6
Equifax (2) 42:21
43:6
errata (6) 48:5,7,8
50:1,10,12
erroneously (2)
17:3,15
error (1) 14:10
Esq (2) 47:17,18

ESQUIRE (3) 2:3
2:11 3:3
estimate (1) 14:17
et (1) 1:8
evidence (1) 17:11
exact (1) 30:17
EXAMINATIO...
4:4 5:16 39:18
examined (1) 5:13
exchanged (1)
44:12
excuse (2) 41:16
42:15
exhibit (16) 4:8
15:21 16:1 24:16
25:9,21 26:1
35:7,8 37:4,15
37:16 40:11
42:14 43:1,2
exhibits (4) 24:17
29:21 30:1 37:5
Experian (1) 43:4
explain (2) 19:16
21:17
eyes (1) 34:19

**F**

F (1) 46:1
Fact (1) 4:12
facts (2) 24:3,4
Fair (3) 11:18
12:15 13:13
fall (1) 31:8
familiar (3) 36:13
40:14 42:2
farther (1) 18:13
fashion (1) 28:20
FAX (1) 47:5
FCRA (3) 11:16
11:19 44:18
February (4) 1:12
4:3 47:15 50:6
Federal (1) 48:15
field (1) 38:19
file (11) 18:17

19:20 22:12
23:10,11 28:6,7
29:13 31:21 36:4
50:3
filing (1) 5:9
financially (1)
46:14
find (2) 13:20
28:11
fine (2) 24:15
39:15
first (12) 6:10 7:13
12:20 18:4,18
24:1 26:14 30:14
36:8,21 40:2
43:2
Fishman (1) 3:4
fit (2) 28:11,18
five (1) 39:14
flip (1) 16:16
follow (1) 6:9
follow-up (1)
39:13
following (1)
50:10
follows (1) 5:14
form (6) 5:6 14:3
18:9 27:2 31:15
49:8
four (5) 9:20 10:3
10:7 23:4 33:7
functions (2)
10:13,14
further (4) 5:8
44:20 45:8 46:11

**G**

G (1) 5:1
gathered (1) 28:8
generate (3) 29:11
29:14,16
generated (1)
33:15
getting (1) 34:1
girls (3) 33:16,21

34:3
give (2) 6:8 45:12
Glenmaura (1)
1:15
go (5) 12:2 31:9
35:6 36:17 38:15
goes (1) 28:5
Goggin (1) 1:14
2:12
going (16) 6:8 13:2
14:2 15:15 16:4
18:8 20:18 21:12
24:7,21 25:12
26:9 27:1 31:14
41:14 42:12
Goldson (32) 2:3,4
4:5 5:16 6:2,20
7:12 14:7 15:20
16:3,17 18:21
24:15,19 25:11
25:20 26:3 27:8
29:20 30:3 32:4
35:6,10 37:3,7
37:14,18 39:15
44:21 45:7 47:17
47:17
grounds (3) 17:9
24:8 27:2
guess (1) 10:2

**H**

handle (1) 10:11
hands (1) 33:12
happen (1) 14:8
happens (1) 21:19
head (1) 6:12
hereof (1) 49:5
herewith (1) 48:3
Hi (2) 5:17,18
highest (1) 7:14
history (4) 21:3
40:19 42:2 44:1
hourly (4) 8:5,7,8
8:11

I

idea (1) 14:10
identification (8)
16:2 24:18 25:10
26:2 30:2 35:9
37:6,17
identify (2) 17:2
20:3
igoldson@golds...
2:8
II (1) 1:8
Illinois (1) 3:6
image (1) 22:7
images (1) 34:13
inaccurate (1)
44:8
inception (1) 12:7
incident (1) 17:2
included (2) 12:21
24:13
includes (1) 7:1
indemnifying (1)
14:21
indicated (1)
50:11
individually (1)
29:9
information (50)
17:3,13,15 18:4
19:10,13,19,21
20:3,8,12,14,16
22:11 23:8,9,12
23:13 24:2,3,9
25:18 27:4 28:5
28:7,8,10,12,14
28:17 29:1,7
30:15 31:3,18,20
31:21 32:2 33:17
34:1 35:3,17,19
35:21 36:3,4
41:21 44:3,7,11
Ingmar (2) 2:3 6:2
47:17
initial (1) 40:20
Innovis (2) 23:6

33:5
**insurance (2)** 15:9
15:12
**interested (1)**
46:14
**interrogatories (...**
4:11 16:5,8 24:1
**interrogatory (6)**
16:13,19 17:6,8
17:14 24:2
**involved (4)** 11:7
13:16 40:5,13
**Israel (1)** 3:4
**issue (1)** 7:5

**J**

**January (1)** 4:18
**Jeremy (3)** 13:15
13:15,16
**Jessup (1)** 6:1
**JOB (1)** 47:10

**K**

**Kathleen (7)** 10:20
11:1,2,10,12
37:21 38:3
**keep (1)** 12:21
**Kim (11)** 1:11 4:2
5:12,19,21 27:4
39:20 47:14 50:5
50:21 51:21
**know (41)** 6:4 10:6
10:12,12,13,18
11:17 12:3 14:1
14:5,16,18 18:2
18:3,12,15,19
19:9,12,18 20:13
24:5,6,12,14
25:17 26:8,21
27:17 28:15
30:17 32:15,16
32:17,17 33:13
33:14 34:1,2
36:9 38:5
**knowledge (1)**

12:3
**knows (1)** 24:3

**L**

**language (1)** 6:12
**LaSalle (1)** 3:5
**law (5)** 1:13 2:4
31:5,6 47:17
**lawsuit (2)** 6:3
40:4
**lead (1)** 17:10
**left (1)** 19:11
**legal (1)** 34:14
**letter (16)** 4:14,15
4:17 19:5 26:16
26:17 27:13,13
29:13 33:2,2
36:21 38:18
40:20 41:2 48:13
**letters (7)** 4:18
19:8 26:10 29:12
42:13,17 43:11
**level (1)** 7:15
**liability (2)** 15:9
15:11
**liaison (1)** 9:15
**light (1)** 17:1
**line (1)** 44:3
**list (1)** 23:3
**listed (2)** 48:6,9
**little (5)** 7:14 9:2,3
18:13 28:14
**lived (1)** 33:1
**LLC (1)** 1:8
**loaded (1)** 19:20
**locate (1)** 23:14
**location (1)** 23:8
**log (3)** 4:13 33:16
34:3
**logging (1)** 33:21
**long (19)** 1:3 8:2
9:19 12:5 13:17
17:21 18:7 19:4
26:5,20 32:21
33:1 37:9 40:20

41:5 42:3,7
47:11 50:4
**Long's (5)** 11:8
21:4 27:18 36:20
40:3
**look (8)** 18:16
19:19 21:12
22:10 40:8 42:1
43:2,9
**looked (1)** 29:8
**looking (3)** 40:19
42:17 43:21
**looks (2)** 27:12
42:13

**M**

**M (2)** 2:11 47:18
**machine (1)** 46:5
**madam (2)** 42:19
48:1
**mailing (1)** 42:20
**main (1)** 10:21
**maintain (1)** 17:20
**major (1)** 28:9
**manager (3)** 8:18
8:20 40:1
**manual (1)** 34:15
**March (1)** 47:9
**MARCUS (2)** 3:3
45:11
**mark (10)** 10:5
15:20 24:16
25:20 29:20 35:7
37:3,14 42:15
49:3
**marked (9)** 16:1
24:18 25:9 26:1
30:2 35:8 37:5
37:16 40:11
**Market (1)** 2:13
**Marshall (3)** 1:14
2:12 47:18
**Maryland (7)** 1:2
2:6 33:3,4 47:4
47:12 48:16

**Master (1)** 22:11
**materials (3)**
12:17 13:6 38:6
**matter (8)** 9:19
10:18 13:4 14:21
25:1 36:20 49:4
50:8
**mean (4)** 10:10
19:16 31:17
41:10
**meaning (1)** 23:8
**means (7)** 21:17
21:18 22:3,8,9
41:11,16
**medical (1)** 26:6
**members (1)** 39:4
**mentioned (1)**
45:1
**Messner (4)** 1:16
1:21 46:3,19
**Metcho (16)** 2:11
4:6 6:9,16 7:11
14:2 16:15 18:8
24:7 25:2 27:1
31:14 39:12,19
45:9 47:18
**Michael (1)** 12:10
**Mills (1)** 13:15
**mind (1)** 39:13
**Mm-mm (1)** 15:7
**mmarcus@sessi...**
3:8
**money (2)** 18:7
26:6
**month (1)** 31:4
**Moosic (1)** 1:15
**Morgan (2)** 3:3
45:9

**N**

**N (2)** 4:1 5:1
**name (4)** 5:19 6:2
36:3 50:12
**named (1)** 15:11
**names (1)** 9:21

**Nanfeldt (14)** 1:11
4:2 5:12,21 7:13
16:6 25:5 35:11
37:19 45:2 47:14
50:5,21 51:21
**Nathan (1)** 3:4
**National (1)** 1:15
**nature (1)** 6:13
**neither (1)** 35:16
**new (1)** 41:18
**nods (1)** 6:12
**Notary (2)** 1:17
46:3
**noted (2)** 34:16
50:10
**notes (3)** 40:9,15
40:18
**November (7)**
39:20 40:21 41:6
41:7,14 42:5,11
**number (4)** 16:13
17:6 47:10,13
**numbers (2)** 23:4
23:8

**O**

**O (1)** 5:1
**object (5)** 14:2
18:8 24:7 27:1
31:14
**objections (2)** 5:6
17:12
**objects (1)** 17:8
**obtained (1)** 44:3
**Occasionally (1)**
14:9
**occur (2)** 41:19,20
**office (3)** 2:4 18:19
47:17
**officer (2)** 11:4
12:2
**Offices (2)** 1:13
47:2
**okay (57)** 6:8 7:10
8:10,16 10:3,6

Kim Nanfeldt
2/22/2018

11:14 12:13
13:10 14:20 17:5
19:1 20:18 21:5
21:9,10,21 22:6
22:18 23:3,15
24:15 25:12
26:19 27:9 28:4
28:5 29:4,10,15
29:19 33:14 34:6
34:17 35:5,18
36:7 37:13 38:2
38:16,21 40:2,5
40:18 41:1,4,7
41:10,14 42:1,5
42:9 43:1,9,18
43:21 44:6
**ones (2)** 10:21
41:12
**online (5)** 33:17,21
34:3 36:16 41:12
**open (2)** 21:19
22:3
**opinion (1)** 43:21
**organize (1)** 13:6
**original (1)** 50:13
**outside (1)** 10:13
**overbroad (1)**
17:9
**owe (2)** 18:15 32:7
**owed (2)** 18:7,18
**owes (6)** 17:21
18:12 26:5 31:13
32:11,13
**owners (1)** 12:8
**ownership (1)**
22:4

**P**

**P (1)** 5:1
**P.O (1)** 47:3
**page (4)** 4:4,8 34:7
49:5
**PAGE/LINE (2)**
50:15 51:1
**pages (1)** 48:5

**paid (2)** 8:5,7
**part (2)** 14:19 28:4
**particular (1)**
40:14
**parties (2)** 46:12
49:10
**partner (2)** 32:16
32:21
**Partners (2)** 1:8
3:2
**partnership (1)**
32:14
**pass (1)** 12:4
**pay (1)** 8:10
**Pendrick (15)** 1:7
3:2 14:21 15:11
18:1,5,7 25:1
26:6 30:11 32:21
40:3 43:14 47:11
50:4
**Pendrick's (1)**
15:3
**Penn (1)** 7:19
**Pennsylvania (5)**
1:15,17 2:14 6:1
46:4
**people (2)** 9:5
32:17
**period (2)** 31:7,8
**person (1)** 13:21
**Philadelphia (1)**
2:14
**phone (7)** 6:18
19:7 23:4,8
26:19 38:10,13
**pick (1)** 6:12
**place (7)** 1:12 9:1
32:2 39:16 42:3
44:16 49:4
**placement (2)**
30:18 32:21
**plaintiff (17)** 1:4
2:2 6:3 9:19 13:7
15:16 17:4,16,21
18:6 26:5 30:15

32:20 33:2,9
36:20 37:9
**plaintiff's (1)** 30:6
**please (6)** 5:20
6:15 17:2 29:21
48:4,7
**pleases (1)** 6:10
**plus (1)** 8:8
**point (4)** 18:5 19:9
21:16 26:8
**policies (2)** 30:8
44:15
**policy (1)** 30:20
**position (3)** 8:16
26:5 39:21
**positions (1)** 9:16
**possible (1)** 23:8
**Powell (1)** 5:21
**preliminary (1)**
6:5
**prepared (1)** 46:8
**presented (1)**
42:13
**Price (3)** 10:20
37:21 38:2
**priority (1)** 21:20
**privilege (2)** 6:20
24:10
**privileged (1)** 7:7
**probably (2)**
10:17 28:13
**Procedure (3)**
48:16,17 49:1
**procedures (1)**
30:8 44:16
**process (5)** 19:3
28:16 32:10
44:17 48:11
**processing (2)**
9:15 48:9
**production (6)**
4:10 13:3,11
20:20 26:11
33:10
**productiondept...**

47:6
**programs (1)** 38:6
**promise (1)** 21:16
**protected (2)** 6:19
24:9
**provide (3)** 7:4
19:10 32:18
**provided (3)** 28:10
31:19 48:7
**Public (2)** 1:17
46:3
**pull (1)** 33:17
**purports (1)** 32:12
**purposes (1)** 25:5
**pursues (1)** 32:7
**put (2)** 19:6 36:17

**Q**

**question (12)** 5:6
6:15,21 14:3
16:18 18:9 24:6
24:8 27:2 31:15
32:8 43:16
**questions (3)** 6:5
21:12 39:13
**queue (4)** 21:19
22:2,3 33:18
**quick (1)** 21:11

**R**

**R (2)** 5:1 46:1
**rate (2)** 8:13 14:11
**reach (1)** 23:13
**read (11)** 16:13,18
17:5,6 34:7
41:15 48:4,13
49:10 50:7,9
**READING (1)**
49:1
**really (1)** 18:12
**rearranged (1)**
21:20
**reason (4)** 44:6,10
50:15 51:1
**reasons (1)** 50:11

**recall (1)** 27:6
**receive (8)** 12:14
12:17,19 24:4
33:20 38:16 41:4
42:6
**received (11)** 18:5
22:21 23:2 25:1
25:13 30:4,12
34:12,18 41:2
44:4
**receives (3)** 38:10
38:13,18
**recess (1)** 39:16
**recognize (9)** 13:4
20:20 25:3,7,14
26:12 33:11
36:21 37:10
**record (12)** 5:20
16:19 17:7 22:19
25:2 27:19 32:3
34:8,17 38:9
46:9 50:11
**recorded (1)** 39:10
**recording (2)**
38:15 39:5
**records (1)** 34:15
**Recovery (45)**
2:10 6:4 7:21
8:17 9:6,10,17
10:16 12:6,9,14
13:19 14:14,20
15:2,8,17 18:1,4
18:6 20:7 21:6
23:16,18 25:14
26:4,6,10 29:10
29:15 30:4,6,10
31:2 32:12 33:8
33:19 35:13 36:7
36:10 38:9,14,17
43:10 45:4
**reduced (1)** 49:7
**reflect (2)** 34:16
41:8
**regarding (2)**
44:11,16

regular (2) 21:6
29:16
reinvestigation (1)
30:8
related (1) 17:15
relating (1) 17:3
relationship (1)
12:11
relative (1) 46:12
relayed (1) 41:21
remove (1) 48:7
report (8) 26:21
27:7,18 28:1,2
30:14 40:15 44:2
reported (8) 1:20
19:6 20:2,8,9
28:20 44:7 46:5
reporter (2) 6:11
49:7
reporting (17)
11:18 12:15
13:13 28:3,16,21
29:4,6 30:5,8,16
31:8,11,12 35:3
35:15 37:10
reports (1) 31:11
represent (1) 6:3
request (4) 4:10
13:11 33:10 50:9
requested (1) 49:6
requesting (1)
10:14
requests (3) 13:3
20:19 24:2
requirements (1)
34:14
requires (2) 31:6,6
reserved (1) 5:7
respective (1) 29:2
respond (4) 13:7
20:7,15 35:12
responded (4)
13:10 20:17
35:12,13
responds (1) 17:13

response (13) 6:21
7:4 16:5 17:5
19:1 20:13 23:21
24:1 26:11 30:7
33:9 35:15 41:1
responses (3) 6:11
13:3 16:7
responsible (2)
20:4,4
responsive (1)
17:14
retrieve (1) 23:7
return (2) 23:12
48:8
revenue (1) 9:1
reviewed (3) 22:10
34:18 35:2
right (11) 7:13
16:20 20:18
21:21 22:19
24:20 27:10
31:10 34:21 39:2
48:13
rmmetcho@md...
2:16
road (2) 2:5 18:14
Rolled (1) 22:2
Ron (1) 45:12
Ronald (2) 2:11
47:18
Rule (2) 48:15,16
rules (4) 6:9,10
48:15,16

**S**

S (2) 3:5 5:1
salary (1) 8:5
Saxon (1) 10:20
saying (5) 19:18
31:18 35:17,19
36:3
says (8) 21:16 22:6
22:20 23:4 27:20
32:18 34:18
41:16

sealing (1) 5:8
second (4) 27:9
34:7 36:11 43:5
see (1) 23:3
seek (2) 12:3 24:9
seeks (1) 27:3
send (3) 23:11
29:13 31:19
sending (1) 35:21
sends (1) 31:3
sent (11) 15:16
26:10,10 32:21
33:1,9 35:20
37:8,9 40:20
43:11
sentence (1) 34:7
separately (2)
11:15 29:21
Service (1) 9:6
Services (41) 2:10
6:4 7:21 8:17
9:10,18 10:16
12:6,9,14 13:20
14:14,20 15:3,8
15:17 18:1,4,6
20:7 21:7 23:18
25:14 26:6,10
29:10,15 30:4,10
31:3 32:12 33:9
33:19 35:13 36:7
36:10 38:9,14,18
43:10 45:4
Services' (3) 23:16
26:4 30:7
Sessions (1) 3:4
set (1) 49:5
Shannon (8) 10:20
11:1,2,10,12,16
37:21 38:2
sheet (4) 4:12 50:1
50:10,12
sheets (2) 48:7,8
shorthand (1)
46:6
show (10) 13:2

15:15 16:5 20:18
24:21 25:13 26:9
26:20 28:1 42:12
showed (3) 16:7
27:7,21
showing (3) 33:6
36:19 37:8
sign (2) 48:5 49:10
signature (3)
15:18 50:20
51:20
signed (2) 48:7
50:12
SIGNING (1) 49:1
Silver (1) 2:6
Sir (2) 42:19 48:1
site (1) 36:16
situations (1)
18:13
skip (6) 23:4,5,6
23:16,19 24:5
Social (1) 20:1
software (1) 28:4
sorry (8) 11:13
21:9 22:17 23:21
27:19 32:11
34:19 35:12
sort (1) 10:15
speak (1) 45:13
specific (2) 40:6
43:19
specifically (2)
11:16,19
speculation (1)
27:3
speculatory (1)
27:3
spoke (1) 41:20
Spring (1) 2:6
staff (8) 9:3,7 10:8
10:13 12:13
13:14 39:1,4
stand (1) 17:18
start (1) 12:20
state (4) 1:17 5:19

7:19 19:10
statement (1) 35:1
states (2) 1:1
25:17
status (4) 19:6,12
41:18,18
stay (1) 6:13
Stenographer (1)
1:16
steps (1) 22:13
STIPULATION...
5:3
stop (1) 39:5
strategy (1) 8:21
Street (2) 2:13 3:5
string (1) 36:5
structure (1) 8:11
Subject (1) 17:11
submitting (1)
34:11
Suite (3) 2:5,13
3:5
supervision (1)
46:8
supervisor (1)
13:15
Sure (5) 5:21 19:4
19:17 21:14
41:17
sworn (1) 5:13
sworn/affirmed ...
46:7
system (7) 9:1
15:5 19:14,20
28:13,17 34:4

**T**

T (2) 46:1,1
take (10) 18:15,17
19:2,18 21:11
23:9 28:10 39:14
40:8 43:2
taken (4) 22:13
49:3,7 50:8
talking (1) 34:4

Kim Nanfeldt
2/22/2018

Page 58

telephone (1) 3:9
tell (5) 8:10 9:21
    26:14 28:3 40:18
telling (1) 31:12
tells (1) 18:14
ten (2) 16:13 17:6
ten-minute (1)
    39:14
testified (1) 5:13
testifying (1) 45:3
testimony (4)
    16:10 20:6 28:19
    29:5
Thank (6) 6:2 7:11
    19:1 23:3 29:19
    31:10
Thanks (2) 34:6
    37:13
thing (1) 6:16
think (5) 18:2,11
    26:8 35:16 43:15
third (2) 36:11
    43:7
Thirteen (1) 8:12
thirty (2) 39:2
    48:12
three (2) 37:8
    42:15
Thursday (1) 1:12
time (5) 5:7 38:1
    45:12,13 49:4
times (1) 23:5
title (1) 49:5
titles (2) 10:6,7
today (4) 10:18
    16:10 17:18 45:4
total (1) 27:20
tracer (1) 23:16
tracers (2) 23:19
    24:5
trade (1) 44:3
trained (6) 11:2,3
    11:21 12:1 38:2
    38:7
training (7) 11:16

11:19 12:14,17
    12:19 13:14 38:6
transcript (7) 5:9
    46:7 48:3,5
    49:11 50:7,14
TransUnion (1)
    43:8
trial (1) 5:7
trigger (1) 6:21
true (2) 16:6,8
try (1) 6:13
turn (2) 13:6 34:6
turned (1) 20:19
Turner (3) 10:20
    37:21 38:3
two (4) 10:21 26:9
    29:11 38:1
types (3) 9:16
    10:14 15:14
typewritten (1)
    49:8

U
uh-uh (1) 6:13
understand (3)
    6:14 18:10 32:8
understanding (5)
    22:8 35:1,11,14
    36:1
UNITED (1) 1:1
unknown (7)
    19:14,15,21 20:5
    20:9,12,17
untimely (1) 44:13
upload (1) 28:16
uploaded (2) 28:9
    29:3
uploading (1)
    28:12
use (3) 23:7,18
    38:3
uses (1) 37:19

V
v (2) 47:11 50:4

vague (1) 17:9
validation (2)
    27:14 31:6
varies (2) 8:14,14
verbal (1) 6:11
verification (4)
    4:9 15:16 16:6
    36:2
verified (10) 16:7
    17:3,4,17 19:13
    19:15 22:7,7,11
    34:13
verify (1) 17:15
view (1) 25:5
viewing (1) 22:14
VOICE (1) 47:5
vs (1) 1:5

W
waived (2) 5:9
    48:14
waiving (1) 17:12
wants (1) 22:5
Warner (2) 1:14
    2:12
wasn't (1) 19:11
way (2) 23:10
    33:17
we'll (3) 23:9,11
    25:20
we're (2) 28:12
    40:19
we've (2) 28:10
    44:1
website (1) 34:2
went (4) 33:2 36:5
    41:11,12
Westminster (1)
    47:4
witness (9) 7:10
    14:5 18:11 24:12
    25:7 27:6 31:17
    45:6 46:6
work (10) 7:20 9:2
    9:2,3 10:15

15:13 21:16 22:5
    28:16 33:12
worked (2) 8:2
    9:18
world (1) 21:18
wouldn't (1) 24:13
writing (1) 41:2
wrong (1) 13:21
www.albetzrepo...
    47:7
Wyoming (1) 46:4

X
X (1) 4:1

Y
yeah (6) 10:19
    17:19 22:1,15
    23:1,2
year (2) 8:15
    10:19
years (1) 8:3

Z

0

1
1)nanfeldt_kim ...
    47:10 50:3
1,125 (3) 27:20,21
    28:21
10 (2) 4:16 35:8
10:41 (1) 1:13
11 (5) 4:17 37:5
    42:14,15 43:1
11:59 (1) 45:15
12 (6) 4:18 37:16
    40:21 42:14,15
    43:2
120 (1) 3:5
13 (1) 42:14
14 (1) 42:14
16 (3) 4:9 41:6,15
17 (1) 4:17
1734 (1) 2:5

180222key (2)
    47:10 50:3
18434 (1) 6:1
19103 (1) 2:14
1960 (1) 3:5

2
2 (1) 40:11
2-415 (1) 48:16
2000 (1) 2:13
2005 (1) 12:7
2016 (5) 4:17
    39:21 40:21 42:5
    42:11
2017 (1) 4:18
2018 (5) 1:12 4:3
    47:9,15 50:6
20903 (1) 2:6
210 (1) 2:5
21158 (1) 47:4
215-575-2595 (1)
    2:15
22 (9) 1:12 4:3
    41:6,8,15 42:5
    42:11 47:15 50:6
2300 (1) 2:13
24 (3) 4:10,11 22:6
240-780-8829 (1)
    2:7
25 (1) 4:12
26 (1) 4:13

3
3 (2) 4:9 16:1
30 (9) 4:14,15 9:8
    9:12 30:18 31:1
    31:2,7 48:12
30-day (1) 31:8
30(e) (1) 48:15
31 (1) 4:18
312-578-0985 (1)
    3:7
32 (1) 4:6
35 (1) 4:16
37 (3) 4:17,18 9:11

**4**

**4 (3)** 4:10 24:16,17
**410)752-1733 (1)**
  47:5
**410)875-2857 (1)**
  47:5

**5**

**5 (3)** 4:5,11 24:17
**50 (1)** 1:14
**500,000 (2)** 15:4,6
**55.50 (1)** 26:18

**6**

**6 (2)** 4:12 25:9
**60603 (1)** 3:6
**611 (1)** 5:21
**665 (1)** 47:3

**7**

**7 (2)** 4:13 26:1
**70,000 (1)** 8:15
**74 (2)** 28:1,19

**8**

**8 (3)** 4:14 30:1
  47:9
**8:17-CV-1955-...**
  1:6 47:13
**843.75 (1)** 27:16

**9**

**9 (2)** 4:15 30:1