# EXHIBIT D

# DOCUMENT REDACTED

```
                      **CONFIDENTIAL**
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
 2

 3    CRYSTAL LONG,                :
                                   :
 4          Plaintiff,             :
                                   :
 5    v.                           : Civil Action No:
                                   : 8:17-cv-01955-GJH
 6    PENDRICK CAPITAL             :
      PARTNERS, II, LLC,           :
 7                                 :
      ABILITY RECOVERY             :
 8    SERVICES, LLC,               :
                                   :
 9    EXPERIAN INFORMATION         :
      SOLUTIONS, INC.,             :
10                                 :
         and                       :
11                                 :
      EQUIFAX INFORMATION          :
12    SYSTEMS, LLC,                :
                                   :
13          Defendants.            :

14

15     CONFIDENTIAL DEPOSITION OF CRYSTAL M. LONG

16            Monday, February 19, 2018
                    1:01 p.m.
17

18            The Goldson Law Office
                 1734 Elton Road
19                   Suite 210
              Silver Spring, Maryland
20

21       Terry L. Bradley, Court Reporter

22
```



```
 1              APPEARANCES OF COUNSEL

 2

 3   For the Plaintiff:

 4     THE GOLDSON LAW OFFICE
       INGMAR B. GOLDSON, ESQ.
 5     COURTNEY WEINER, ESQ.
       1734 Elton Road
 6     Suite 210
       Silver Spring, MD 20903
 7     T-240.780.8829
       E-igoldson@goldsonlawoffice.com
 8

 9   For the Defendant Ability Recovery
     Services, LLC:
10
       MARSHALL, DENNEHEY, WARNER, COLEMAN
11     & GOGGIN
       RONALD M. METCHO, II
12     2000 Market Street
       Philadelphia, PA 19103
13     T-215.575.2595
       E-rmetcho@mdwcg.com
14

15   For the Defendant Pendrick Capital
     Partners II, LLC:
16
       SESSIONS, FISHMAN, NATHAN & ISRAEL
17     MORGAN I. MARCUS, ESQ.
       120 South LaSalle Street
18     Suite 1960
       Chicago, IL 60603
19     T-312.578.0990
       E-mmarcus@sessions.legal
20

21

22
```



1                    INDEX OF EXAMINATION

2


3     EXAMINATION                              PAGE

4     By Mr. Metcho. . . . . . . . . . .        4
      By Mr. Marcus. . . . . . . . . . .        65

5                          ~~~~~

6


7                    INDEX OF EXHIBITS

8


9     **1. TransUnion Report 4/26/17           57
      **2. Mint Notification                   75

10
      **CONFIDENTIAL

11

12    (Original Exhibits retained by Court Reporter.)

13                         ~~~~~

14

15

16

17

18

19

20

21

22



```
 1                  P R O C E E D I N G S

 2

 3                  CRYSTAL M. LONG,

 4       having been first duly sworn, testified as

 5       follows:

 6

 7                     EXAMINATION

 8     BY MR. METCHO:

 9        Q.    You ready?

10              Good afternoon, Ms. Long.  My name

11     is Ron Metcho.  I'm with the law firm of

12     Marshall, Dennehey, Warner, Coleman & Goggin.

13     I represent an entity by the name of Ability

14     Recovery Services LLC in a lawsuit that has

15     been filed in the United States District Court

16     for the District of Maryland.  Alongside me

17     here is Morgan Marcus, who represents Pendrick

18     Capital Partners, who is the creditor at issue

19     in this particular matter.  And I'd like to

20     thank you for being here today.

21              You know, I know that Mr. Marcus

22     needs to get on a flight at approximately
```



1   4 o'clock, so we'll try to streamline this as

2   much as we can and move this along, okay?

3            So just to give you a roadmap of

4   what we're going to do today, I'd just like to

5   get some background information on you, we're

6   going to discuss the allegations in your

7   complaint, we're going to talk some about your

8   employment, also about your credit history, and

9   then just some follow-up questions by Mr.

10  Marcus as well pertaining to the allegations

11  against his client?

12           MR. GOLDSON:  Has Pendrick actually

13  noticed --

14           Has Pendrick noticed for this

15  deposition?

16           MR. MARCUS:  Do you have issues with

17  Pendrick asking --

18           -- with my asking follow-up

19  questions?  I guess I can notice a separate

20  deposition for her, but I thought it would be

21  unnecessary.

22           MR. GOLDSON:  I don't know if



1   it's --

2            MS. WEINER:  Well, we are, you know,

3   dismayed by the lack of compliance with

4   procedure, but it seems to me that it's --

5            MR. GOLDSON:  It's fine.

6            MS. WEINER:  -- it's fine, but

7   perhaps in the future you should follow the

8   Rules of Civil Procedure.

9            MR. GOLDSON:  All right.

10            MR. METCHO:  So, is it okay if --

11            MR. GOLDSON:  Yeah, it's fine.

12   BY MR. METCHO:

13       Q.    Okay.  Very good.  Let's get back on

14   track here.

15            Ms. Long, please state your full

16   name for the record, please.

17       A.    Crystal Michelle Long.

18       Q.    Okay.  Have you ever been deposed

19   before?

20       A.    No.

21       Q.    Have you ever been involved in a

22   lawsuit before?



1    A.    No.

2    Q.    Okay.  So what we're going to do

3  today is we're going to ask a series of

4  questions, again, regarding the allegations in

5  your complaint, the allegations against my

6  client, and also against Pendrick.  We do not

7  have representatives of the other two remaining

8  defendants, Experian and Equifax here, so you

9  know, we'll leave it that.  Again, this is your

10  first instance in sitting in a deposition?

11    A.    That's correct.

12    Q.    So what I'd like to ask you to do is

13  listen to the full question I ask you, give

14  your counsel an opportunities to object if it's

15  necessary, and then provide a complete answer

16  to the questions.  What we don't want to do

17  is --

18        We want to have a complete record

19  for the Court, so please refrain from saying

20  such things as "uh-huh" and "yes" and "no"

21  answers and complete answers to the best of

22  your ability, okay?



CRYSTAL M. LONG                                    February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                              8

1              What is your current address?

2       A.    12706 Fairwood -- that's

3    F-A-I-R-W-O-O-D -- Parkway, Bowie Maryland,

4    20720.

5       Q.    How long have you lived there?

6       A.    5 years.

7       Q.    Do you own or rent the space?

8       A.    I own.

9       Q.    Okay.  How much is approximately

10   your mortgage payment monthly?

11      A.    1933.

12      Q.    Are you married?

13      A.    No.

14      Q.    Do you have any children?

15      A.    No.

16      Q.    Have you ever been married?

17      A.    No.

18      Q.    What's your current telephone

19   number?

20      A.    240-464-8476.

21      Q.    Do you have any dependents?

22      A.    No.



```
 1        Q.    Do you live alone?

 2        A.    Yes.

 3        Q.    Just a little bit about your

 4   educational background.  What's your highest

 5   level of education?

 6        A.    Master's degree.

 7        Q.    Where did you get your Master's

 8   degree from?

 9        A.    Walden University, W-A-L-D-E-N.

10        Q.    And what is the Master's degree in?

11        A.    Business.

12        Q.    I'm assuming you have an

13   undergraduate degree obviously?

14        A.    I do.

15        Q.    And where is that from?

16        A.    Bowie State University.

17        Q.    And what is your undergraduate

18   degree in?

19        A.    Business.

20        Q.    Where did you go to high school?

21        A.    Jenks High School.

22        Q.    And where is that located?
```



1       A.      Jenks, Oklahoma.

2       Q.      How long did you live in Oklahoma?

3       A.      Um, let's see.  From 3rd grade to

4    senior high school.  I'm not sure how old you

5    are in when you're in 3rd grade.

6       Q.      When did you relocate to --

7               Excuse me.  When do you move to

8    Maryland from Oklahoma?

9       A.      1999.

10      Q.      And what was the reason for the

11   move?

12      A.      To attend college.

13      Q.      Okay.  Who's your current employer?

14      A.      Trusted Health Plans Inc.

15      Q.      Can you spell that, please?

16      A.      T-R-U-S-T-E-D, Plans, P-L-A-N-S,

17   Inc.

18      Q.      And how long have you been at this

19   place of employment?

20      A.      A year and 5 months.

21      Q.      Okay.  Now was this the place of

22   employment --



1           This was not the place of employment

2    that you were at in regards to the allegations

3    in your complaint.  Is that correct?

4         A.    I don't understand your question.

5         Q.    In your complaint you allege that

6    you were employed at a certain place between

7    roughly November of 2016 through May of 2017.

8         A.    Yes.

9         Q.    This was a different --

10        A.    That's Trusted Health Plans Inc.

11        Q.    You were at the same place?

12        A.    Yes.

13        Q.    Okay.  And what do you do at Trusted

14   Plans Inc?

15        A.    I am the Director of Health Plan

16   Accounting.  I run the finance department.

17        Q.    Can you describe what your daily

18   activities of your work are.

19        A.    That would include overseeing the

20   staff accountants, the temps, closing the

21   books, approving financial transactions, and

22   reviewing staff accountants' work.



```
 1        Q.    What do you mean by "closing the

 2   books"?

 3        A.    That would include ensuring that the

 4   bank reconciliations are reconciled, that

 5   includes approving payments, that includes

 6   reviewing invoices for approval, that includes

 7   issuing financial statements.

 8        Q.    Issuing financial statements to

 9   whom?

10        A.    To the CFO to be presented to the

11   Board of Directors.

12        Q.    And how long have you been at this

13   place of employment?

14        A.    A year and 5 months.

15        Q.    When you first began at this place

16   of employment what was your original position?

17        A.    Senior Account Manager.

18        Q.    Have you had the same position at

19   this place of employment throughout your entire

20   employment?

21        A.    I'm not sure of your question.  Can

22   you repeat it.
```



1        Q.      Sure.   When you began working this

2    job have you had different positions throughout

3    your employment?

4        A.      Yes.

5        Q.      Can you please tell me about each

6    one of your positions of employment.

7        A.      I was the Senior Account Manager --

8        Q.      Let's step back a second.   When you

9    first started what was your employment

10   position?

11       A.      Senior Account Manager.

12       Q.      Okay.   And what was your next

13   employment position?

14       A.      Acting Controller.

15       Q.      What did you do as the Senior

16   Account Manager?

17       A.      I oversaw the payroll AP clerk, I

18   created journal entries, I did bank

19   reconciliations.

20       Q.      Okay.   And to your second position,

21   what did you do under that position?

22       A.      I then oversaw the staff accountants



1  and the senior accountants when they were

2  there, and issued the financial statements.

3      Q.    And I'm a bit confused about you've

4  stated several times "issuing financial

5  statements".  Can you delve a little bit more

6  into that.  What that actually entails.

7      A.    Preparing financial statements for

8  the CFO to review.

9      Q.    And what type of information is in

10  these financial statements?

11      A.    Information that you would find on a

12  balance sheet, income statement, cash flow.

13      Q.    How often do you prepare them?

14      A.    Monthly.

15      Q.    Does your employer check your credit

16  score regularly?

17      A.    I can't answer that question.  I

18  don't --

19          I'm not privy to what HR does on a

20  regular basis.

21      Q.    Are you aware of your employer ever

22  checking your credit score?



1     A.    What I am aware of is that I signed

2   an agreement indicating that I gave them

3   permission to review my credit.

4     Q.    And are you aware of them ever

5   checking your credit score?

6     A.    I can't speak to what the HR

7   department does.  All I can say is that I've

8   given them permission to do so.

9     Q.    Are you personally aware of your

10  employer ever checking your credit score?

11          MR. GOLDSON:  Objection.

12          MR. METCHO:  On what basis?

13          MR. GOLDSON:  Asked and answered.

14          MR. METCHO:  I don't believe the

15  question was answered.  You can --

16          The objection is noted on the

17  record.

18          You can answer the question if

19  you're able.

20          THE WITNESS:  Can you repeat the

21  question.

22  BY MR. METCHO:



1       Q.     Sure.   Are you personally aware of

2   your employer ever checking your credit score?

3       A.     That is a question I cannot answer.

4   I do not work in the HR department.

5       Q.     Are you aware of your employer

6   having a policy and procedure in place

7   regarding checking your credit score or your

8   credit reputation?

9       A.     I cannot speak to the policies of

10  HR.  What I can speak to is that upon

11  employment I gave them --

12             -- I signed a document, gave them

13  permission.

14      Q.     Permission for what?

15      A.     To access necessary information,

16  including my background check.

17      Q.     Do you have this documentation?

18      A.     No, I do not.

19      Q.     Do you know who has the

20  documentation?  Does your employer have this

21  documentation?

22             MR. GOLDSON:  Objection.



```
 1              MR. METCHO:  On what basis?

 2              MR. GOLDSON:  You're asking her a

 3    question about another entity, not a personal

 4    knowledge.

 5              MR. METCHO:  We're in Federal Court.

 6    There are two objections.  There's one to

 7    privilege, and this is not a privileged matter.

 8              MR. GOLDSON:  Uh-huh.

 9              MR. METCHO:  So again, I'll note the

10    objection for the record.

11              You can answer if you're able.

12              THE WITNESS:  Can you repeat the

13    question.

14    BY MR. METCHO:

15       Q.    Sure.  Are you aware of your

16    employer having a policy and procedure in place

17    regarding the checking of your credit score?

18       A.    I don't have enough information to

19    answer that question.  What I can say is that

20    upon hiring I filled out a document indicating

21    that I gave them permission to do a background

22    check.
```



CRYSTAL M. LONG                                      February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                                   18

1        Q.    What did the background check

2   entail?

3        A.    I can't speak to that.  All I know

4   is that I had to fill out information

5   indicating that they could access my

6   information.  I provided my Social Security

7   Number.

8        Q.    When is the last time you checked

9   your credit score?

10       A.    The last time I checked my credit

11  score probably was maybe a couple weeks ago.

12       Q.    Why did you check it?

13       A.    Why did I check my credit score?

14       Q.    Yeah.

15       A.    Because it was an option on my

16  credit reporting.

17       Q.    Option on your credit reporting?

18       A.    Yes.

19       Q.    What does that mean?

20       A.    That means that when I log into my

21  financial information they let me know if

22  there's any changes to my credit, and I have



1   the option to see, so I clicked.

2       Q.    How often do you do that?

3       A.    It depends.

4       Q.    When was the last time prior to that

5   that you checked your credit score?

6       A.    I can't give you a definitive date.

7       Q.    Do you have an approximate date?

8       A.    Approximately --

9             Approximately a month prior.

10      Q.    When was the last time you applied

11  for credit?

12      A.    I can't recall.

13      Q.    How many credit cards do you have?

14      A.    I have three personal credit cards.

15      Q.    Who are the credit cards with?

16      A.    Chase, um, Barclay, and Sealy's

17  Furniture something.  S-E-L-E-Y, I believe.

18      Q.    Do you have balances on these cards?

19      A.    One.

20      Q.    What's the current balance on the

21  Chase card?

22      A.    Zero.



1      Q.    Barclay's card?

2      A.    Zero.

3      Q.    The Sealy's card?

4      A.    No.  I'm sorry.  Sealy's --

5            -- or Barclay's about maybe 7200.

6      Q.    What are your monthly payments on

7   the Sealy's card?

8      A.    The Sealy's is paid for.  It doesn't

9   have a balance.

10      Q.    Okay.  Which account do you have a

11   balance on?

12      A.    Barclay.

13      Q.    Okay.  The Barclay's account.  When

14   is the last time you made a payment?

15      A.    Maybe a week and a half ago.

16      Q.    And how much was the payment for?

17      A.    $500.

18      Q.    Do you make monthly payments?

19      A.    I do.

20      Q.    How do you pay it?  Do you pay it

21   online?  Do you pay it by check?

22      A.    I pay it online through my banking



```
 1   institution.

 2        Q.    Okay.  Do you have student loans?

 3        A.    I do.

 4        Q.    Approximately how much are your

 5   student loans that are outstanding?

 6        A.    Collectively I would say about

 7   63,000.

 8        Q.    Do you pay those monthly?

 9        A.    I do.

10        Q.    How much do you pay a month?

11        A.    Collectively about 500 bucks.

12        Q.    When you say "collectively", does

13   that mean that you have multiple lenders for

14   your student loans?  Or are they through one

15   entity?

16        A.    They're two lenders.  Yes.

17        Q.    Who are the lenders?

18        A.    Um, let's see.  Navient.  And what

19   is the other one?

20              I can't think of the name.

21        Q.    Okay.  In your allegations in your

22   complaint you allege that you deal with
```



1    millions of dollars of transactions.  Can you

2    describe that for me, please.

3        A.    I oversee millions of dollars of

4    transactions.

5        Q.    What does that mean?

6        A.    That means that I deal with a high

7    volume of revenue in which I have access to and

8    which I record and which I make payments from

9    on behalf of the company I work for.

10       Q.    And you also state in your

11   allegations that your employer requires good

12   credit and a solid financial reputation.  How

13   often or by what measure does your employer

14   require you to have good credit?

15       A.    Can you repeat the question.

16       Q.    Sure.  Again, your allegations state

17   that your employer requires good credit and a

18   solid financial reputation.  How does your

19   employer judge your good credit?

20       A.    What I can say is that my position

21   requires a great deal of trust, and working in

22   the field of finance your reputation, as far as



1  good character, is also a reflection of your

2  credit.  So when I completed, signed the form

3  for the background check, that is my

4  understanding that that is how they measure.

5       Q.    Have you ever discussed your credit

6  history with your employer?

7       A.    No.

8       Q.    Has your employer ever questioned

9  your credit history?

10      A.    No.

11      Q.    Has your employer ever questioned

12  your financial reputation?

13      A.    Define --

14            Can you define "questioned".

15      Q.    Sure.  I'll break it down to an even

16  easier question.  Has your employer ever asked

17  you any questions regarding your financial

18  background?

19      A.    I'm going to say "yes", because I

20  believe that's covered under the background

21  check.  That's where they would have inquired.

22      Q.    Okay.  When did this occur?



CRYSTAL M. LONG                                    February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                                24

1        A.      When I was hired.

2        Q.      And what did they ask you?

3        A.      They asked me to complete the

4   document giving permission to do a full

5   background investigation on me.  I had to

6   include my Social Security Number.

7        Q.      Did you ever receive any feedback

8   from this particular background investigation?

9              (Witness nodded.)

10             Can you answer "yes" or "no",

11  please.

12       A.      Not to my knowledge.  Not that I can

13  recall.

14       Q.      Did anyone ever discuss your

15  financial history with you at your place of

16  employment?

17       A.      No.

18       Q.      Are you aware of your employer

19  checking your credit at any time between

20  November of 2016 and May of 2017?

21             MR. GOLDSON:  Objection.

22             MR. METCHO:  On what basis?



```
 1              MR. GOLDSON:  Asked and answered.

 2              MR. METCHO:  Objection noted.  You

 3   can answer the question if you're able.

 4              THE WITNESS:  Can you repeat the

 5   question.

 6   BY MR. METCHO:

 7       Q.    Sure.  Are you aware of any time

 8   between November of 2016 and May of 2017 of

 9   your employer checking your credit score?

10       A.    I'm not aware of what HR does.  I

11   cannot speak to the fact if they did or didn't.

12   I can just speak to the fact that I've given

13   them permission to do so.

14       Q.    So again, I'm the attorney for the

15   defendant in this matter, Ability Recovery

16   Services.  Do you recall speaking with Ability

17   Recovery Services regarding any accounts?

18       A.    I do.

19       Q.    When was the first time you spoke

20   with Ability?

21       A.    The first time I spoke with them was

22   in 2016.  I think it was either --
```



```
 1                 I think it was November of 2016.

 2        Q.    Did you contact Ability?  Or did

 3   Ability contact you?

 4        A.    How do you define "contact"?

 5        Q.    Did you call Ability?  Did Ability

 6   call you?  What was the initiation of the

 7   contact with Ability?

 8        A.    Ability sent me two letters.

 9        Q.    Okay.

10        A.    I called in reference to letters I

11   received.

12        Q.    Do you remember approximately when

13   you called Ability?

14        A.    I do.

15        Q.    When was it?

16        A.    It was the --

17                 I believe it was in the middle of --

18                 It was in the middle of December of

19   2016.

20        Q.    Do you remember who you spoke with?

21        A.    I don't remember the gentleman's

22   name.
```



1      Q.    Do you remember what you discussed?

2      A.    I do.

3      Q.    Can you give me a summary of what

4  was discussed during the phone call.

5      A.    Sure.  What was discussed was the

6  information on the collection letter that they

7  sent.  The letter summarized, indicated that

8  they had received this debt and that I needed

9  to respond within 30 days.  If they hadn't

10 heard from me, they were going to assume that

11 it was mine, and that if it wasn't I should

12 reach out to them to clear up the matter.  So I

13 called.

14     Q.    Do you recall receiving any letters

15 from Ability?

16     A.    The two letters that I got in the

17 mail.

18     Q.    Okay.  When was the date of the

19 first letter?  Do you remember approximately?

20     A.    I believe they were in --

21           I believe they were 4 November 2016.

22 And I remember, I say that specifically,



 1   because I knew I had 30 days, which is why I

 2   called quickly because I don't think I looked

 3   at it until December.

 4        Q.    Okay.  When you received that first

 5   letter did you send any letters back to

 6   Ability?

 7        A.    I sent no letters to Ability.

 8        Q.    Okay.  So at no point did you send a

 9   letter to Ability disputing the debt?

10        A.    No, I did not send them a letter to

11   dispute the debt.  The letter indicated to

12   call, so that's what I did.  I called to

13   dispute the debt.

14        Q.    Did you send a letter to Ability to

15   request verification of the debt?

16        A.    I did not send a letter to Ability

17   about the debt at all.  I called per what the

18   letter instructed.

19        Q.    Okay.  After receiving the letter

20   from Ability did you reach out to the credit

21   bureaus?

22        A.    I did.



1     Q.    When was this?

2     A.    It was after the phone call in which

3   after indicating that none of the items on the

4   letter had anything to do with me, not the

5   Social Security Number, not the date of birth.

6   The gentleman then indicated that --

7     Q.    The gentleman from who?  The credit

8   bureaus?

9     A.    The gentleman from Ability that I

10  spoke to on the phone.

11        After talking to him, I said:  I got

12  this letter.

13        He said, you know, they weren't sure

14  if it was mine.  They needed to confirm that it

15  was.  I said it wasn't.  He mentioned a name.

16  It wasn't mine.  He mentioned a date of birth,

17  it wasn't mine.  He mentioned dependents, I

18  told him I have none.  I thought the matter was

19  settled.  He then indicated that he was going

20  to report it to the credit bureau.  I asked:

21  How is that possible when the letter indicated

22  that you got this information, you need to



1   confirm if it was correct.  I'm confirming that

2   it's incorrect.

3           He indicated that he would still

4   report it to the credit bureaus.

5      Q.    Report it how?  As disputed?

6      A.    He said he would report it as if it

7   was my debt, and I had --

8           It was my responsibility to go to

9   the credit bureaus to defend myself.

10     Q.    Okay.  Now, prior the this time,

11  again, no documentation was sent by you to

12  either Ability or Pendrick or the credit

13  bureaus?

14     A.    I'm sorry.  You have to repeat that.

15     Q.    Prior to this conversation with

16  Ability, after you had received the letters

17  from Ability --

18     A.    Okay.

19     Q.    -- did you send any documentation to

20  Ability to Pendrick or to the credit bureaus?

21     A.    You're going to need to separate

22  those questions because it's confusing.



1     Q.    My apologies.  And let me try to

2  break it down for you.

3     A.    Great.

4     Q.    So you had this conversation with

5  Ability regarding the debt and you allegedly

6  not owing the debt, right?

7     A.    That is correct.

8     Q.    Okay.  At this point did you send

9  any documentation to Ability regarding the

10  debt?

11     A.    I wasn't requested to do any of

12  those things, so the answer to that question is

13  "no".  I did not send them a letter.  I think I

14  said that before.  That was not the --

15         The nature of the letter was to give

16  me instructions on how I was to dispute this

17  debt.  I followed the letter.  They said to

18  call.  I called.  I talked to a gentleman.  He

19  shared some information to confirm that this

20  was the same person.  None of the information

21  he shared could confirm this was me.  I thought

22  it was done.  He then told me that he was going



1    to send it to --

2              He said he still was going to report

3    it on my credit.  So I'm confused about how we

4    got to this place because the letter indicated

5    that calling and not being able to confirm the

6    data was how you dispute it.

7         Q.    At this point did you check your

8    credit report?

9         A.    I believe I did check after the

10   call.

11        Q.    When was that?

12        A.    That was in December 2016.

13        Q.    And was there any indication on your

14   credit report of any information being reported

15   by Ability?

16        A.    Not at the time of the call.

17        Q.    Okay.  When was the first time that

18   you checked your credit report when you saw

19   information that was being report by Ability?

20        A.    When I got a credit alert from my --

21              There's a --

22              I forget what you call it, but it's



1  a credit protection agency that kind of let's

2  you keep you alert of when things change in

3  your credit.  And as per the conversation I had

4  with the gentleman from Ability, he did report

5  it and it did show up as me owing the debt.

6       Q.    When did you sign up for that

7  particular service?

8       A.    I've had it for over --

9            At that time over 2 years.

10      Q.    How often do you receive

11  notifications from that service?

12      A.    Anytime there's changes to my

13  credit.

14      Q.    Why did you sign up for it?

15      A.    I can't recall my thinking at the

16  time, but I believe there was --

17            I don't know.  I thought that was a

18  good thing to do at the time.

19      Q.    Do you pay for it?

20      A.    I do.

21      Q.    Okay.  When was the last time you

22  made a payment for the service?



1        A.     I can't recall.

2        Q.     Do you still maintain the service?

3        A.     I do maintain the service.

4        Q.     Are you aware of any time that your

5    employer noticed information on your credit

6    report that was being reported by Ability?

7        A.     I cannot speak to what my job saw

8    that as --

9               I'm not privy to that information.

10       Q.     Were you ever --

11              Between November of 2016 and May of

12   2017 were you reprimanded by your employer

13   regarding your credit history?

14       A.     I have never been reprimanded by my

15   employer.

16       Q.     Between November of 2016 and May of

17   2017 did you speak with anyone at your place of

18   employment regarding your credit history?

19       A.     I think you asked that already.

20       Q.     I'm asking again.

21              MR. GOLDSON:   Objection.

22              MR. METCHO:   Noted.



 1            You can answer if you're able.

 2            THE WITNESS:  Can you repeat the

 3    question.

 4    BY MR. METCHO:

 5       Q.    Sure.  Between November 2016 and May

 6    of 2017 did you have any discussions with

 7    anyone at your place of employment regarding

 8    your credit history?

 9       A.    No.

10       Q.    Between November 2016 and May of

11    2017 were you denied any credit opportunities?

12       A.    State that question again.

13       Q.    Sure.  Between November of 2016 and

14    May of 2017 were you denied any credit

15    opportunities?  For instance, did you attempt

16    to open up a credit card and were denied?  Or

17    did you attempt to get a car loan and were

18    denied?  Anything of that nature?

19       A.    From November to December I would

20    say "no".  January 2017 when this showed up on

21    my credit I became very concerned about it

22    being there:  One, because it was inaccurate,



1   and I knew how important my credit is.

2            At that point I can't say that I

3   applied for any credit, but I didn't go out of

4   my way to make any decisions relating to my

5   credit at that time because I believed that it

6   was something small that we'd eventually get

7   past it and it wouldn't be an issue.

8            I don't know if that answers your

9   question.

10       Q.    Do you remember how much the debt

11   was for?

12       A.    I think it was $1500 --

13       Q.    Okay.

14       A.    -- or so.  Give or take.

15       Q.    Do you own a car?

16       A.    I do.

17       Q.    What kind of car do you own?

18       A.    A Saturn.

19       Q.    When was the last time you made a

20   payment towards the note on the car?

21       A.    I paid for my car in cash.  There

22   was never a note on it.



1      Q.    Okay.  So you don't have a car

2   payment, in other words?

3      A.    I do not.

4      Q.    Um, between -- it's a small

5   timeframe -- but November of 2016 and May of

6   2017 did you seek any credit?  Did you seek to

7   open up a credit card?  Did you seek an auto

8   loan?  Or anything of that sort?

9      A.    I considered purchasing a new car,

10  but did not due to this particular inaccurate

11  information on my credit.

12     Q.    When was that?

13     A.    It was around my birthday.

14     Q.    Which was when?

15     A.    March 13.

16     Q.    Did you still have the same car?

17     A.    I do.

18     Q.    And when did you purchase that car?

19     A.    I purchased that car, I think it was

20  2000 --

21            March of 2016, I believe.

22     Q.    Okay.  And still to this day --



 1   we're now in February of 2018 -- you still have

 2   the same car?

 3        A.    I do.

 4        Q.    You did not attempt to purchase

 5   another car?

 6        A.    Not until this had been resolved.

 7              MR. GOLDSON:  Just real quick, I'm

 8   going to need to take a really short break

 9   sometime soon, just whenever is good for you

10   within the next like 10 or so minutes.

11              MR. METCHO:  We can take a break now

12   if you want.

13              (Recess taken at 1:34 p.m.)

14              (Deposition resumed at 1:43 p.m.)

15   BY MR. METCHO:

16        Q.    Ms. Long, do you remember the first

17   time you made a dispute to Ability regarding

18   the account?  In other words, when was the

19   first time you told Ability that you weren't

20   responsible for this particular account?

21        A.    When I made the phone call in

22   December.



1      Q.    And just give me a brief description

2    of what was discussed during that call.

3            MR. GOLDSON:  Objection.  I thought

4    this was asked and answered.

5            MR. METCHO:  Okay.  I just --

6            Again, I'm just trying to get some

7    background information.

8            MR. GOLDSON:  Just for the record.

9            MR. METCHO:  That's fine.

10           You can answer if you're able.

11           THE WITNESS:  Will you repeat the

12   question.

13   BY MR. METCHO:

14     Q.    Sure.  When you spoke with Ability

15   in December of 2016 regarding the account and

16   you allegedly not being responsible for the

17   account, what was discussed?

18           Take your time.

19     A.    Yeah, that's correct.

20           Sure.  What was discussed?

21           We discussed the fact that I

22   received two letters from them indicating that



1   there was --

2           -- they received information

3   indicating this was my debt, from their

4   information that this belonged to me and that

5   for me to confirm.  In doing so, I was to call.

6   And if they hadn't heard from me in 30 days

7   they would assume that it was mine.  So I got

8   on the phone, I called them, I said:  Hey, I

9   got this letter.  This isn't mine.

10          They said:  Okay.

11          They asked me to indicate the

12  reference number.  I gave the reference number.

13  Then the gentleman asked follow-up questions:

14  You know, they mentioned a date of birth, it

15  wasn't mine; they mentioned a name, it wasn't

16  mine; they mentioned dependents -- I think two

17  different names -- I said I don't have any

18  dependents; they said okay.

19          Then the gentleman indicated that I

20  would have to take this up with the credit

21  agency.  I was perplexed.  I said:  Wait.  I

22  called you within the timeframe to tell you it



1    wasn't mine.  All of the supporting

2    documentation that you've given me that you

3    have that you are --

4              -- what you're saying are

5    identifiers, I said they're not.  I don't --

6    they're not my name, my date of birth, I don't

7    have any children.

8              He then told me that I would have to

9    take it up with the credit reporting agency.  I

10   then was confused.  I asked him to clarify:

11   How was that possible when your letter stated

12   that you got this information, call to confirm,

13   I told you this isn't mine.  How can you still

14   report it on my credit when all you have is my

15   name and my address, but none of the other

16   information relates to that?

17             He then said that he couldn't get

18   into that, that my only recourse now was to

19   take it up with my credit agency.  We went back

20   and forth.  He continued to say the same thing,

21   so I said:  Okay.

22             And the next month I got an alert,



 1   checked my credit.  The liability that I called

 2   him earlier before is now on my credit.

 3       Q.    After that conversation did you have

 4   any further conversations with Ability?

 5       A.    I did not.

 6       Q.    Did you receive any additional

 7   letters from Ability?

 8       A.    I did not.

 9       Q.    After that conversation did you

10   contact the credit bureaus?

11       A.    I disputed it using, I think it was

12   Experian.  Their site says they will send my

13   dispute to all the other agencies.  So that's

14   what I did.

15       Q.    What happened as a result of that?

16       A.    They sent me correspondence, I think

17   it was via --

18            You had to go back to the site and

19   it indicated they had indicated this was my

20   debt.

21       Q.    When was the last time you checked

22   your credit report when you saw that there was



```
 1   information being furnished by Ability?

 2       A.    I don't understand your question.

 3       Q.    All right.  Let me step back.

 4             When was the first time you

 5   recognized that Ability was furnishing

 6   information to the credit bureaus regarding the

 7   account at issue?

 8       A.    When I got an alert.

 9       Q.    Do you remember when that was?

10       A.    It was in --

11             It was in like a month later.  In

12   January 2017.

13       Q.    Okay.  And when was the last time

14   you checked your credit report and saw that

15   there was information being furnished by

16   Ability?

17       A.    When was the last time that I saw --

18             I'm still not understanding what

19   you're asking.

20       Q.    Okay.  Let me try to rephrase it.

21             When was the last time you checked

22   your credit report and saw on your credit
```



1  report that there was information that was

2  being furnished by Ability?

3      A.    Sometime in September in the Fall.

4      Q.    Of what year?

5      A.    2017.

6      Q.    Okay.  When was the last time you

7  checked your credit report?

8      A.    A couple weeks ago, a week and a

9  half ago.

10     Q.    Is there still information being

11  furnished by Ability?

12     A.    No.

13     Q.    So you have referenced earlier that

14  when you began your employment you had filled

15  out some type of documentation more or less

16  giving your employer the ability to check your

17  credit history, correct?

18     A.    I said that they had --

19          I gave them permission to do a

20  background check.

21     Q.    Can you describe this particular

22  documentation for me.



1        A.    It's a sheet that says you give them

2    permission --

3              You fill out your address, your

4    Social Security Number, and they're saying

5    you're giving us permission to run a background

6    check on you.

7        Q.    After filling out this documentation

8    did you receive any feedback from your

9    employer?

10             MR. GOLDSON:  Objection.

11             MR. METCHO:  Basis?

12             MR. GOLDSON:  Asked and answered.

13             MR. METCHO:  Objection noted.

14             You can answer if you're able.

15             THE WITNESS:  I was hired.

16   BY MR. METCHO:

17       Q.    Okay.  How long have you been at --

18             And again, I may have asked this.

19   Just to refresh my memory, how long have you

20   been at your current place of employment?

21       A.    A year and 5 months.

22       Q.    During that time period have you



```
 1   been reprimanded in any way?

 2            MR. GOLDSON:  Objection.

 3            MR. METCHO:  Basis?

 4            MR. GOLDSON:  Asked and answered.

 5            MR. METCHO:  You can --

 6            Objection noted.

 7            You can answer if you're able.

 8            THE WITNESS:  No.

 9   BY MR. METCHO:

10       Q.   During this particular time period

11   have you been promoted?

12       A.   During what time period?

13       Q.   Throughout your employment?

14       A.   Employment where?

15       Q.   At your current place of employment.

16       A.   Yes.

17       Q.   How many times?

18       A.   Once.

19       Q.   When was --

20            When did that occur?

21       A.   Define "promotion".

22       Q.   Did you obtain different employment
```



 1   positions?

 2        A.    I got an official promotion in

 3   September of 2017.

 4        Q.    Did this particular position come

 5   with a salary increase?

 6        A.    It did.

 7        Q.    Have you received salary increases

 8   throughout your employment?

 9        A.    Yes.

10        Q.    When was the last time you received

11   a salary increase?

12        A.    September 2017.

13        Q.    So you allege in your complaint that

14   you were leery of potentially losing your job

15   over this trade line information that was being

16   reported.  Is that correct?

17        A.    Repeat the question.

18        Q.    Sure.  You allege in your

19   complaint --

20             Here, I can actually bring the

21   document up.  I can read it to you verbatim.

22   In Paragraph 57 you state that:  You suffered



1   actual damages, economic damages, and damages

2   regarding credit damage, anxiety,

3   sleeplessness, emotional distress from the

4   prospect of job loss.

5              What made you think that you were

6   going to lose your job over this?

7              MR. GOLDSON:  Objection.

8              MR. METCHO:  Basis?

9              MR. GOLDSON:  Form.

10             MR. METCHO:  You can answer if

11  you're able.

12             THE WITNESS:  Repeat the question.

13  BY MR. METCHO:

14     Q.    Sure.  In Paragraph 57 you state

15  that you suffered actual damages, and one of

16  these damages included a prospect of job loss.

17  What made you think that Ability's attempt to

18  recover this debt was going to lead to you

19  losing your job?

20     A.    When I was hired my background

21  information presented a different version than

22  what this trade line was now representing.



1   This trade line was representing that I was

2   irresponsible, I owed a debt and did not pay.

3   And all of that is inaccurate.

4       Q.    Are you aware of anyone at your

5   place of employment seeing this particular

6   trade line being reported?

7       A.    What I can speak to is that when I

8   was hired I had given them permission to do a

9   background check, I provided my Social Security

10  Number.

11      Q.    Did anyone at your place of

12  employment bring this trade line information

13  that was being reported by Ability to your

14  attention at any time?

15      A.    No.

16      Q.    Did you lose your job?

17      A.    No.

18      Q.    You also allege in Paragraph 57 that

19  you had fear of hard earned money being taken

20  away from you, although you just testified

21  under oath that you received a promotion in

22  2017?



1        A.    I received a promotion

2    September 2017.  This was reported

3    January 2017.

4        Q.    Okay.

5        A.    So from that time to that time I had

6    no idea what could happen to me at that point.

7        Q.    Did you have any money taken away

8    from you by your employer during that time

9    period?

10        A.    Define "taken away".

11        Q.    Was there a --

12              Did you lose salary?  Did your

13    salary decrease during that time period?

14        A.    No, it did not.

15        Q.    You have a claim in your

16    complaint -- if I can find the particular

17    paragraph -- it's Count 2 for defamation.  Are

18    you aware of anyone other than yourself being

19    aware of this information that was being

20    furnished by Ability on your credit report?

21        A.    Repeat the question.

22        Q.    Sure.  The information that Ability



1   was furnishing on your credit report regarding

2   the debt, are you aware of anyone else seeing

3   this information?

4       A.    What I can speak to is that anyone

5   who had access to, who had regular access to my

6   credit report could in fact see it.

7       Q.    Are you aware of anyone seeing it?

8       A.    I'm aware of them having the ability

9   to access and see it.

10      Q.    But are you aware of anyone seeing

11  it?

12      A.    I'm aware of them having the access

13  to see.  I can't speak to what other people do.

14      Q.    It's a "yes" or "no" question.

15      A.    I can speak to them having the

16  ability to access and see.

17      Q.    Was it ever brought to your

18  attention that anyone saw this information on

19  your credit report regarding the debt that was

20  being reported by Ability?

21      A.    Define "brought to my attention".

22      Q.    I'm asking the questions, ma'am.



1       A.    I'm asking for clarity on the

2   question, sir.

3             MR. GOLDSON:  Objection.

4   BY MR. METCHO:

5       Q.    Okay.  Was it ever brought to your

6   attention that anyone saw this information that

7   was being furnished by Ability on your credit

8   report?

9       A.    I can speak to individuals having

10  access to see.

11      Q.    Again, it's a "yes" or "no"

12  question.

13      A.    I can speak to them having access to

14  see.

15      Q.    Did they see it?

16            MR. GOLDSON:  Objection.

17            MR. METCHO:  Basis?

18            MR. GOLDSON:  Asked and answered.

19            MR. METCHO:  I didn't get an answer

20  to the question.

21            MR. GOLDSON:  You've got plenty of

22  answers to the question.



```
 1              MR. METCHO:  That's not an answer.

 2    It's a "yes" or "no" question.

 3              MR. GOLDSON:  She's given her

 4    answer.

 5              MR. METCHO:  It's not an answer.

 6    We'll issue additional written discovery on

 7    that question -- that's fine -- in the form of

 8    a request for admissions.

 9    BY MR. METCHO:

10        Q.    What types of economic damages did

11    you suffer as a result of this collection

12    activity?

13        A.    Well, one, it presented loss of

14    opportunity.

15        Q.    What opportunities did you lose?

16        A.    Opportunities to purchase a new car

17    and get a discounted credit rate because this

18    is a derogatory information.  If I had bought a

19    car in 2016 it would be an issue.  When I try

20    to buy one in 2017 now I have the possibility

21    of an increased interest rate that --

22        Q.    When did you try to purchase a car
```



```
 1    in 2017?

 2         A.    I spoke to --

 3              I was considering purchasing a car

 4    on my birthday, as you asked previously.

 5         Q.    Okay.

 6         A.    So you asked about economic damages.

 7    I see that as a missed opportunity because I am

 8    now in a holding pattern of not being able to

 9    make free economic decisions on my behalf

10    because of inaccurate reporting.

11         Q.    But this is no longer being reported

12    on your credit report, correct?

13         A.    As of a couple weeks ago, no, I

14    didn't see it.

15         Q.    So what's keeping you from buying a

16    car now?

17         A.    I haven't had the time.  But I

18    believe your question was during that

19    timeframe.  Did I misunderstand your question?

20         Q.    No, that's okay.

21         A.    That's what you were saying.  I just

22    want to make sure I'm answering correctly.  So
```



1  if that's not what you meant, please clarify.

2      Q.    We'll move on.  That's fine.

3            What types of inconvenience did you

4  suffer as a result of Ability attempting to

5  recover this debt?

6      A.    Um, inconvenience of having to

7  prolong a purchase of a car, the inconvenience

8  of having the opportunity to refinance my house

9  if I chose to, the inconvenience of having to

10  freely move in the market without having to be

11  concerned about what inaccurate reporting --

12            -- what options it would leave me.

13      Q.    What do you mean by "options"?

14      A.    Relating to, for example, let's say

15  buying a car.  An interest rate of 1.5 or an

16  interest rate of 5.7.  Those are different

17  options based on what I have consistently --

18            I've done my very best to ensure

19  that I pay my debts on time.  That not only is

20  a reflection of my financial responsibility,

21  but my character.  So when you're making

22  financial decisions how they lend you money



 1   depends on how you have previously handled

 2   money.  And this information being reported is

 3   inaccurate about how I handle money.

 4        Q.    Did you speak financing during that

 5   particular time period?

 6        A.    As I spoke to the question earlier,

 7   I indicated once the information was furnished

 8   I held off on pursuing options hoping that this

 9   would be resolved quickly.

10        Q.    And it was resolved, correct?

11        A.    Define "resolved", because we're

12   here today.  So what do you mean by "resolved"?

13        Q.    It was taken off your credit report,

14   correct?

15        A.    Yes, it was.

16        Q.    And when was that?

17        A.    I checked my credit report a couple

18   of weeks ago, it was not there.

19        Q.    And since that particular date have

20   you applied for any type of financing?

21        A.    Not as of yet.

22        Q.    You allege in your complaint that



1   you had anxiety and sleeplessness.  When was

2   the last time you experienced these two

3   attributes?

4        A.    Last night preparing before I came

5   to this deposition.

6        Q.    What about prior to then?

7        A.    Let's see.  It depends on how

8   frequently I think about this.

9        Q.    Your counsel had earlier handed me

10  this document, which I'll hand to the Court

11  Reporter and we'll mark this as Exhibit A.

12            (Exhibit 1 marked for

13  identification.)

14            Can you describe this document for

15  me, please.

16       A.    Sure.  It is a notification from

17  Mint.

18       Q.    What's Mint?

19       A.    Mint is an app that I use to help

20  manage my finances.

21       Q.    In what way?

22       A.    Maintains my budgets, as well as



CRYSTAL M. LONG                                    February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                              58

1    savings goals, as well as they keep me

2    up-to-date on my credit score change.

3        Q.    When did you obtain this document?

4        A.    I believe it was in the Fall of

5    2017.

6        Q.    Why wasn't this document produced

7    along with your discovery responses?

8        A.    I can't speak to the date when, but

9    I know it was --

10             It was in the Fall when I received

11   it.

12       Q.    Is there a particular date on that

13   document?

14       A.    Not from what I can see.

15       Q.    Does that document state exactly why

16   your alleged interest rate went up?

17       A.    It does not state why, it just

18   states that it did.

19       Q.    Had you applied for credit prior to

20   when you received that document?

21       A.    Not that I can recall.

22       Q.    Could this particular notification



1    have something to do with your balance on your

2    Sealy's card?

3              MR. GOLDSON:  Objection.

4              MR. METCHO:  As to?

5              MR. GOLDSON:  Form.

6              MR. METCHO:  You can answer if

7    you're able.

8              THE WITNESS:  Repeat the question.

9    BY MR. METCHO:

10       Q.    Sure.  Is it possible that this --

11             -- you received this notification

12    due to the balance that's on your Sealy's card?

13       A.    I can't speak to that.  I don't

14    know.

15       Q.    Are you currently content with your

16    place of employment?

17       A.    Define "content".

18       Q.    Sure.  Are you happy with your work?

19       A.    Yeah.  I thoroughly enjoy my work.

20       Q.    Do you plan on staying there?

21       A.    Planning on staying?  What's that

22    mean?



1        Q.    At your place of employment.

2        A.    I'm not ready to try to answer that

3    10 years from now, 20 --

4            I can't speak to --

5        Q.    Within the next year.

6        A.    I can't speak to what I plan to do

7    in the future.

8        Q.    Did this particular account or

9    Ability's attempt to recover the account have

10   any effect whatsoever on your employment

11   status?

12       A.    Repeat the question.

13       Q.    Sure.  Ability's attempts to recover

14   this debt obligation at issue, did it have any

15   type of effect on your employment status?

16       A.    Ability's inaccurate reporting on my

17   credit?

18            MR. GOLDSON:  Just, I'm going to put

19   an objection on the record as to form.

20            MR. METCHO:  Okay.  You can answer

21   if you're able.

22            THE WITNESS:  Repeat the question.



1    BY MR. METCHO:

2        Q.    Sure.  Ability's attempt to recover

3    the debt obligation at issue, did it have any

4    type of effect on your employment?

5        A.    Ability's inaccurate reporting of

6    the debt on my credit became an issue for me in

7    the sense that when I was hired that was not

8    the credit reflection or the background

9    information they received and it was also

10   inaccurate, and now it's being presented and it

11   opened up to the possibility for an effect on

12   how I was viewed and my ability to keep their

13   trust in handling their money.

14       Q.    You're not aware of anybody at your

15   place of employment seeing this information on

16   your credit report, right?

17       A.    I can't speak to what they have done

18   with it.  I don't know.

19       Q.    And you had mentioned earlier that

20   you've been getting salary raises throughout

21   your employment, correct?

22       A.    I spoke that I had a promotion in



CRYSTAL M. LONG                                        February 19, 2018
LONG vs ABILITY RECOVERY SERVICES                                    62

1   September of 2017.

2       Q.   So it hasn't taken away from your

3   ability to work, correct?

4       A.   Repeat the question.

5       Q.   It hasn't taken away --

6            Ability's attempts to recover the

7   account at issue has not taken away from your

8   ability to make a leaving to earn a salary,

9   correct?

10      A.   It's inaccurate reporting has

11  potentially threatened my ability to earn if I

12  chose to leave my job as I would then be

13  subject to the same background information, and

14  this information would be inaccurate and it

15  would be a reflection of my understanding of my

16  trustworthiness, particularly in a role in

17  which I have access to large sums of money.

18      Q.   But it's no longer on your credit

19  report, right?

20           MR. GOLDSON:  Objection.

21           MR. METCHO:  Basis?

22           MR. GOLDSON:  Asked and answered.



```
1              MR. METCHO:  You can ask if you're

2    able.

3              You can answer if you're able.

4    Excuse me.

5              THE WITNESS:  Repeat the question.

6    BY MR. METCHO:

7       Q.    The information that --

8              -- regarding Ability's attempt to

9    collect a debt is no longer on your credit

10   report, correct?

11      A.    From my understanding, yes.

12      Q.    Okay.  Are you aware that probably

13   about a week ago myself on behalf of both

14   Ability and Pendrick had issued to your counsel

15   what's called an Offer of Judgment Pursuant to

16   Federal Rule of Civil Procedure 68?

17      A.    Am I aware of --

18      Q.    Were you aware of that?

19      A.    Yes.

20      Q.    Okay.  And it's still your position

21   today that you're not going to accept the Offer

22   of Judgment?
```



```
 1              MR. GOLDSON:  Objection.

 2              MR. METCHO:  Basis?

 3              MR. GOLDSON:  Form and privilege.

 4   BY MR. METCHO:

 5       Q.   Okay.  Um, let me ask you this:

 6   What are you looking for here?

 7              MR. GOLDSON:  Objection.

 8              MR. METCHO:  Basis?

 9              MR. GOLDSON:  Form --

10              MR. METCHO:  Okay.  You can answer

11   if you're able.

12              MR. GOLDSON:  -- and harassment.

13              MR. METCHO:  Harassment?

14              MR. GOLDSON:  On the record, form

15   and harassment.

16   BY MR. METCHO:

17       Q.   You can answer.  You filed a lawsuit

18   against several defendants here.  What is your

19   ultimate outcome of this litigation?

20       A.   I'm not sure.

21              MR. METCHO:  Okay.  That's all I

22   have right now.
```



1        EXAMINATION

2   BY MR. MARCUS:

3        Q.      I probably have about 5 minutes of

4   questions.

5             Ms. Long, again, I'm Morgan Marcus.

6   I represent Pendrick.  Your current job you're

7   at Trusted Health Plans Incorporated, correct?

8        A.      That is correct.

9        Q.      And based upon your interrogatory

10  responses that your attorney's provided to me,

11  it indicates that you started there, I believe,

12  September of --

13             -- September 12, 2016.  Does that

14  sound accurate?

15       A.      Yes.

16       Q.      So when did you actually apply to

17  work at Trusted Health Plans Inc?

18       A.      That was June 2016.

19       Q.      And you indicated earlier that you

20  provided --

21             -- that you signed a document, I

22  believe you said, providing your employer the



1    ability to check your credit.  Is that correct?

2        A.    That is correct.

3        Q.    And when exactly would you have

4    signed that document?  Do you recall?

5        A.    When I applied during my

6    application --

7        Q.    Would that have been --

8        A.    -- process.

9        Q.    I'm sorry for interrupting you.

10            So that would have been June of

11   2016?

12       A.    That's correct.

13       Q.    And if you can recall the specific

14   document that you signed, did it give them the

15   ability to only check your credit report during

16   the application process?

17       A.    I can't recall.

18       Q.    Did it give them the ability to

19   continuously check your credit report?

20       A.    It gave them permission.  I can't

21   speak to --

22            It gave them permission to check my



1    background.  It did not indicate that it was

2    for a window of time.

3        Q.    But it was for the purposes of your

4    application.  Is that correct?

5        A.    It was the purpose of employment.

6    You were required to complete and pass before

7    being hired.

8              -- in a condition of hire.

9        Q.    And to your knowledge did they

10   provide --

11             Did those documents have been

12   provided --

13             Strike that.

14             You signed that document.  Is that

15   correct?

16       A.    I did sign the document.

17       Q.    And did they provide you a copy of

18   that document?  To your recollection.

19       A.    Um, I can't recall.

20       Q.    You indicated just now that one of

21   your concerns was about potentially if you have

22   to look for other jobs.  Have you looked for



1   any jobs since December of 2016?

2       A.    I've --

3             I have been --

4             I have checked in and out to see

5   what the job market looked like.  Yes.

6       Q.    What do you mean by that?

7       A.    I've looked at job posting sites.  I

8   have looked at what my skill set earning

9   potential was during that time.

10      Q.    And have you applied for any jobs

11  during that time period?

12      A.    I had, yes.

13      Q.    And where was that to?

14      A.    Several.  I can't list them all.

15      Q.    When would that have happened?

16      A.    That was back in, I would say, May

17  of 2017.

18      Q.    And you submitted applications.  Is

19  that what you're saying?

20      A.    That is correct.

21      Q.    You don't remember any of these

22  companies that you submitted applications to?



1      A.    One was for sure was Bond.  It was a

2   healthcare company in Columbia.  And they

3   request that I give permission to --

4           -- for not just a background, but

5   they specified a credit check.

6      Q.    To your knowledge did they do a

7   credit check?

8      A.    I'm not sure.  I wasn't selected for

9   the job.

10     Q.    Any other companies that you

11  submitted applications to?

12     A.    None that I can recall.

13     Q.    What was this company called?  Bond?

14     A.    Bond.  I can't think of the name.  I

15  think it was --

16          It was a Catholic healthcare company

17  in Columbia.  I think it was Bond SE something.

18  I can't think of the name.  It was a different

19  name.  I can't remember.

20     Q.    And what was the position that you

21  were applying for?

22     A.    I believe it was --



1              I believe it was a Controller role

2     or a Finance Manager role.

3          Q.    And did they give you any reason --

4                Well, strike that.

5                You submitted your documents to

6     them, and did they bring you in for an

7     interview?

8          A.    They did not.

9          Q.    And did they give you any reason why

10    you weren't selected?

11         A.    They did not.

12         Q.    Ms. Long, you never had any direct

13    contact with Pendrick, right?

14         A.    What do you define as "direct"?

15         Q.    Did you ever have any telephone

16    conversations with Pendrick directly?

17         A.    No.

18         Q.    Did you ever send any written

19    communications directly to Pendrick?

20         A.    No.

21         Q.    Did you ever receive anything

22    directly from Pendrick?



1        A.    Define "directly".

2        Q.    Did you ever receive any mailing

3  that came specifically from Pendrick, and not

4  from some other agency?

5        A.    I received a letter from Ability on

6  behalf of Pendrick.  I don't know if that's

7  considered direct, but that's what I received.

8        Q.    Other than the letters that you

9  received from Ability, did you receive anything

10  else?

11        A.    No.

12        Q.    You indicated earlier that you have

13  three credit cards.  Since December --

14              Have you had those three same credit

15  cards since December 2016?

16        A.    Yes.

17        Q.    I believe it was Chase, Barclay's

18  and Sealy's, you said?

19        A.    That's correct.

20        Q.    So continuously from December 2016

21  to today you've had those three cards, correct?

22        A.    That's correct.



1      Q.    Other than that you haven't had any

2    other cards?

3      A.    Not that I can recall.

4      Q.    Have you ever missed any payments on

5    those cards?

6      A.    No.

7      Q.    Have you ever been --

8            On any debt have you ever missed a

9    payment on any debt?  Not just those three

10   cards, any debt.

11     A.    In what time period?

12     Q.    Ever.

13     A.    I'm sure when I was in college.

14     Q.    And which debt was it?  If you have

15   any idea.

16     A.    I don't know.

17     Q.    You think you may have missed one in

18   college?

19     A.    You said "late".

20     Q.    I'm sorry.  Say that one more time.

21     A.    You said "late".

22     Q.    Yes.



1        A.     Yeah, I'm sure I was late on a

2    payment.  This was long before banks did the

3    payments for you.  This was when you actually

4    had to mail stuff in.

5        Q.     Have you ever defaulted on any debt?

6        A.     Define "default".

7        Q.     Made a payment past a payment due

8    date.

9        A.     So would that be considered late?

10   Or is that considered default?

11       Q.     Well, I think it depends on your

12   cardholder agreement.  But have you made a

13   payment past the payment due date that you

14   negotiated with whatever entity that you got

15   the credit from?

16       A.     Depending what time period are we

17   talking about?

18       Q.     Ever.

19       A.     I'm sure I did.

20       Q.     And it's your position that you

21   never missed a payment with those three ones we

22   talked about -- Chase, Barclay's and Sealy's?



1    A.    That is correct.

2    Q.    When did you get the Chase card?

3    A.    I can't recall that.  That's

4    probably my oldest credit card.

5    Q.    Has it been more than 5 years?

6    A.    I would say so, probably.  I can't

7    specify the date.  I don't know.

8    Q.    Do you know what the credit limit is

9    on your Chase credit card?

10   A.    In terms of what time period?

11   Q.    December 2016 'til May of --

12          -- I think May of 2017.

13   A.    I think it was 1600.

14   Q.    And have you ever gone above your

15   credit limit --

16   A.    Yes.

17   Q.    -- during that time period?

18   A.    During that time period?  I can't

19   recall.

20   Q.    And when I asked you if you had ever

21   gone above that credit limit on that card, you

22   indicated the answer was "yes"?



1      A.    I can't recall.

2      Q.    Do you recall what the initial

3  interest rate was on the Chase card?

4      A.    No, I do not.

5      Q.    Your attorneys provided the document

6  that we've titled Long 1, which is in front of

7  you.

8      A.    Uh-huh.

9      Q.    It indicates that your interest rate

10  was 27.99 percent at some point.  Do you know

11  when it started --

12           -- when it went to 27.99 percent?

13     A.    No, I do not recall.

14     Q.    I want to provide you a document

15  that your attorney provided to me.  It's

16  plaintiff's production Bates labeled 100.  I

17  want you to take a second to review that, Ms.

18  Long.

19           For the record, why don't we mark

20  that as Long 2.

21           (Exhibit 2 marked for

22  identification.)



1              Ms. Long, do you recognize this

2    document?  Do you know what this document is?

3         A.    It is --

4              It looks like a snapshot of my

5    credit report for my Chase card from

6    TransUnion.

7         Q.    And the top left indicates this was

8    from April 26, 2017.  Is that correct?

9         A.    That is also correct.

10        Q.    And it's showing --

11             Is this the Chase card that we've

12   been talking about?

13        A.    Yes.

14        Q.    And it shows the usage is

15   107 percent.  Is that correct?

16        A.    That's what it says.  Yes.

17        Q.    Okay.  Since the Ability trade line

18   was reported, have you had a conversation with

19   anyone at your current employment regarding the

20   trade line?

21        A.    I think I answered this, but do I

22   answer it for your response?



1        Q.    I don't believe it was answered, but

2   if it has been then the question is being

3   restated.

4        A.    Can you repeat the question.

5        Q.    Since --

6              Why don't we have the Court Reporter

7   repeat it so we make sure she can state it

8   correctly.

9              (Court Reporter read back.)

10        A.    I've not had any conversations about

11   it --

12              -- this trade line with my current

13   employer.

14        Q.    And have you been provided with any

15   documents from your current employer indicating

16   that they have reviewed your credit report?

17        A.    I have received no documents.

18              MR. MARCUS:   That's all I have.

19              MR. GOLDSON:   Just for the record,

20   Long 1 and Long 2 are both marked confidential,

21   and we do intend to mark portions of the

22   deposition relating to personal information,



1  financial and other personal information, as

2  confidential on this deposition as well, but

3  that's it.  I don't have any questions.

4            Read and sign.

5            MR. METCHO:  Regular.

6            MR. GOLDSON:  Copy, yes.

7            MR. MARCUS:  I'll hold out for now.

8            (Deposition concluded at 2:24 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22



1              DEPOSITION ERRATA SHEET

2   Our Assignment No. J1529142

3   Case Caption:

4   Crystal Long

5   vs.

6   Pendrick Capital Partners, II, LLC, et al

7

8

9         DECLARATION UNDER PENALTY OF PERJURY

10     I declare under penalty of perjury that I

11   have read the entire transcript of my

12   Deposition taken in the captioned matter or the

13   same has been read to me, and the same is true

14   and accurate, save and except for changes

15   and/or corrections, if any, as indicated by me

16   on the DEPOSITION ERRATA SHEET hereof, with the

17   understanding that I offer these changes as if

18   still under oath.

19

20   Signed on the_____day of _____, 2018.

21     _____

22     Crystal M. Long



1        DEPOSITION ERRATA SHEET

2  Page No._____ Line No._____ Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____ Line No._____ Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____ Line No._____ Change to:_____

9  _____

10  Reason for change:_____

11  Page No._____ Line No._____ Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____ Line No._____ Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____ Line No._____ Change to:_____

18  _____

19  Reason for change:_____

20

21  SIGNATURE_____DATE:_____

22                  Crystal M. Long



```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____  Line No._____  Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____  Line No._____  Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____  Line No._____  Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____  Line No._____  Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____  Line No._____  Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____  Line No._____  Change to:_____

18   _____

19   Reason for change:_____

20

21   SIGNATURE:_____DATE_____

22               Crystal M. Long
```



1                    CERTIFICATE OF NOTARY PUBLIC

2                  I, Terry L. Bradley, the officer before

3      whom the foregoing deposition was taken, do

4      hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly

6      sworn by me; that the testimony of said witness

7      was taken by me in shorthand and thereafter

8      reduced to computerized transcription under my

9      direction; that said deposition is a true

10     record of the testimony given by said witness;

11     that I am neither counsel for, related to, nor

12     employed by any of the parties to the action in

13     which this deposition was taken; and further,

14     that I am not a relative or employee of any

15     attorney or counsel employed by the parties

16     hereto, nor financially or otherwise interested

17     in the outcome of the action.

18                 _____

19                 Notary Public in and for
                   the State Of Maryland

20

21     My Commission expires:  November 15, 2019

22



••ll T-Mobile Wi-Fi 🛜 ⚡   10:11 AM          @ ⊿ ⚹ 40% 🔋

**❮ Inbox**                                    ∧   ∨

---

**From: Mint** ⯈

**To:** Crystal Long ⯈                  Hide      **M**

---

## Interest rate change on Chase Bank credit card

Yesterday at 8:29 PM



## Your credit card interest rate went up

The interest rate on your account CHASE
SLATE changed by 0.25% from 27.99% to
28.24%. Your current balance is $1,470.85.

Contact Chase Bank to see why.
Go to https://www.chase.com/. Or apply for
a card with a lower interest rate.

---

            

4/26/2017

CRYSTAL M LONG - TransUnion
Date of Report: Apr 26, 2017

https://usa.experian.com/##/print/transunion/20170426143303625

**TransUnion** ®

*Confidential*

**Long 2**

## ACCOUNT DETAILS

| | CHASE CARD |
| --- | --- |
| | 41858633XXXX |
| | Open |

**CREDIT USAGE**

High Credit Usage
Keeping your account balances as low as possible can have a positive impact on your credit.

**107%**

| Account Name | CHASE CARD |
| --- | --- |
| Account # | 41858633XXXX |
| Account Status | Open |
| Last Updated | Apr 11, 2017 |
| Account Type | Revolving account |
| Date Opened | Mar 8, 2005 |
| Balance | $1,706 |
| Credit Limit | $1,600 |
| Monthly Payment | $55 |
| Past Due Amount | $0 |
| Payment Status | Paid or paying as agreed |
| Highest Balance | $2,205 |
| Terms | Minimum |
| Responsibility | Individual account |
| Comments | - |

**CONTACT INFORMATION**

P.O. BOX 15298
WILMINGTON, DE 19850
(800) 432-3117

**PAYMENT HISTORY**

**2017**

| Jan | Feb | Mar | Apr |
| --- | --- | --- | --- |
| OK | OK | OK | |
| **May** | **Jun** | **Jul** | **Aug** |
| | | | |
| **Sep** | **Oct** | **Nov** | **Dec** |
| | | | |

**2016**

| Jan | Feb | Mar | Apr |
| --- | --- | --- | --- |
| OK | OK | OK | OK |
| **May** | **Jun** | **Jul** | **Aug** |
| OK | OK | OK | OK |
| **Sep** | **Oct** | **Nov** | **Dec** |
| OK | OK | OK | OK |

**2015**

| Jan | Feb | Mar | Apr |
| --- | --- | --- | --- |
| OK | OK | OK | OK |
| **May** | **Jun** | **Jul** | **Aug** |
| OK | OK | OK | OK |
| **Sep** | **Oct** | **Nov** | **Dec** |
| OK | OK | OK | OK |

**2014**

| Jan | Feb | Mar | Apr |
| --- | --- | --- | --- |
| OK | OK | OK | OK |
| **May** | **Jun** | **Jul** | **Aug** |
| OK | OK | OK | OK |
| **Sep** | **Oct** | **Nov** | **Dec** |
| OK | OK | OK | OK |

**2013**

| Jan | Feb | Mar | Apr |
| --- | --- | --- | --- |
| OK | OK | OK | OK |
| **May** | **Jun** | **Jul** | **Aug** |
| OK | OK | OK | OK |
| **Sep** | **Oct** | **Nov** | **Dec** |
| OK | OK | OK | OK |

Open

Long v. Pendrick - Plaintiff Production -- 0100

9/58

https://usa.experian.com/##/print/transunion/20170426143303625

4/26/2017

Confidential

https://usa.experian.com/#/print/transunion/20170426125221761261433038625

| Summary | Accounts (Open) | Collections | Inquiries | Public Records | Credit Score |
|---|---|---|---|---|---|

8/58

Long v. Pendrick - Plaintiff Production -- 0099

https://usa.experian.com/#/print/transunion/20170426125121761261433038625