**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **CRYSTAL LONG,** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Case No.: GJH-17-1955** |
| | * | |
| **PENDRICK CAPITAL PARTNERS II,** | | |
| **LLC, et al.** | | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Crystal Long brings this consumer protection action against Defendants

Pendrick Capital Partners II (Pendrick) and Ability Recovery Services, LLC (Ability) alleging

Fair Credit Reporting Act (FCRA), Fair Debt Collection Practices Act (FDCPA), common-law

defamation, Maryland Consumer Debt Collection Act (MCDCA), and Maryland Consumer

Protection Act (MCPA) claims. Currently pending before the Court are Plaintiff's Partial Motion

for Summary Judgment, ECF No. 45, requesting judgment as a matter of law on her FCRA and

FDCPA, and Defendants' Cross Motions for Summary Judgment on all claims, ECF Nos. 55 &

57. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons that follow,

Plaintiff's Partial Motion for Summary Judgment will be granted in part and denied in part, and

Defendants' Motions for Summary Judgment will be granted in part and denied in part.

## I.    BACKGROUND

Defendant Pendrick is a debt buyer that purchases delinquent medical debts and then

seeks to collect the debts by placing each account with a debt collection agency. ECF No. 45-3 at

47, 49.[1] Pendrick does not resell any of the debts it buys. *Id.* In November 2016, Pendrick purchased a medical debt from EmCare-Randall Emergency Physicians belonging to a "Crystal Long" who lived at 5126 Sekots Road, Baltimore, Maryland.  ECF No. 45-3 at 36. Pendrick then engaged Defendant Ability—a debt collector—to recover two accounts related to the Emcare debt. ECF No. 57-4 ¶ 4. An account ending in "2448" sought to recover $1,125 of the Emcare debt, and an account ending in "2446" related to $74.00 of the Emcare debt. ECF No. 45-3 at 101, 103.

Pendrick transmitted certain information about the Emcare debt to Ability including the debtor's Baltimore address, ECF No. 45-3 at 35, and the fact that the debtor received emergency room services from Emcare in August 2014, *see* Exhibit H.[2] Ability also associated the birthdate "May 1, 1985" and a Social Security number ending in "6876" with the Emcare debt. *See* Exhibit H. Ability uses "skip tracing"—a service that finds potentially identifying information about a consumer based on the details that Ability already knows about a debtor. ECF No. 45-3 at 60. Through skip tracing, Ability associated Plaintiff's address with the Emcare debt. *Id.* at 62.

Plaintiff Crystal Long has lived in Bowie Maryland at 12704 Fairwood Parkway for five years. ECF No. 45-3 at 3. Although Plaintiff shares her name with the Emcare debtor, it is undisputed that she is not responsible for the Emcare debt. ECF No. 45-3 at 24–26, 18; Exhibit H.[3] Further, despite sharing the debtor's name, Plaintiff does not share other personal identifying

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[2] Exhibit H is an audio recording of the November 22, 2016 between Plaintiff Crystal Long and Defendant Ability employee Mark Carlson.

[3] Plaintiff's counsel asked Ability's representative whether Ability still maintained that Plaintiff owes a debt to Ability. ECF No. 45-3 at 59–60. Ability's representative responded: "I don't think we actually know the answer to that." *Id.* at 60. This response is not enough to create a dispute as to whether Plaintiff owes the debt where Plaintiff has introduced significant evidence indicating that she is not responsible for the Emcare debt. Further, as discussed in more detail below, after Plaintiff filed her lawsuit, Defendant Ability ultimately asked the consumer reporting agencies to delete the Emcare debt from Plaintiff's credit report, ostensibly conceding that Plaintiff is not responsible for the debt. ECF No. 57-1 at 6.

information with the debtor. *Id.* at 24–26, 28, 95–96; Exhibit H. The hospital summary of the Emcare services rendered show that the debtor "Crystal Long" received care on August 26, 2014, includes the debtor's birthdate, and indicates that the debtor worked at the Department of Corrections. ECF No. 45-3 at 95–96. Plaintiff has a different birthdate and social security number than debtor "Crystal Long"; she has never received any services from EmCare; and she has never worked at the Department of Corrections. *Id.* at 24–26, 28; Exhibit H.

Based on the match between Plaintiff's and the debtor's name and a skip-traced address associating the debt with Plaintiff, Ability sent Plaintiff Crystal Long initial collection letters for the two accounts related to the underlying Emcare debt on November 14, 2016. *Id.* at 101–104. The letters included this language:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt I [sic] valid. If you notify this office in writing within 30 days from receiving this notice, this office will provide you the name and address of the original creditor, if different from the current creditor. If you notify this office in writing within the thirty-day period that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you by this office.

*Id.* at 101, 103. The letters also stated: "Be further advised that our client has instructed this office to make a direct report to a credit reporting agency should this debt go unresolved." *Id.*

Accordingly, on November 22, 2018, within thirty days of receiving the collection letters, Plaintiff called Ability to notify the office that she disputed the validity of the Emcare debt. Exhibit H. Ability employee Mark Carlson answered Plaintiff's call. *Id.* Carlson and Plaintiff began by discussing the letter for the account ending in "2448" requesting payment of $1,125 of the Emcare debt. *Id.* Plaintiff told Carlson that she did not recognize this debt. *Id.* Carlson explained that the debt was for services rendered at an emergency room in August 2014 and asked whether the birthdate on file for the debtor matched Plaintiff's date of birth. *Id.* No Social

3

Security number was associated with the $1,125 debt (the "2448" account). *Id.* Plaintiff asserted that she was not in the emergency room in August 2014 and that the birthdate on file for the debtor was not her birthdate. *Id.* Carlson responded "You'll have to dispute this with your credit bureau then," and explained that Ability would place the account under dispute. *Id.* Carlson also shared that a Social Security number was purportedly associated with the second account for $74.00. *Id.* That associated Social Security number did not match Plaintiff's.

Carlson at first told Plaintiff that Ability had already reported the debt to the consumer reporting agencies (CRAs); Plaintiff prompted, "you're telling me that these particular items of debt collection have been sent to my credit report, is that what you're saying, which is why you're going to dispute them?" and Carlson responded, "correct." *Id.* However, Carlson later told Plaintiff that Ability had only been aware of the debt for fifteen days, and it waits thirty days before furnishing tradeline information to credit bureaus. *Id.*

Although Ability had not yet furnished the tradeline information and despite Plaintiff's specific assertions that her Social Security number and birthdate did not match the debtor's, Carlson indicated that Ability would report the debt to the CRAs and that Plaintiff's sole recourse was to dispute the debt through the CRAs after it was reported. *Id.* Specifically, as Plaintiff pressed for more information about why Ability contacted her about the debt, Carlson told Plaintiff again and again that she should just dispute it with the CRAs rather than ask Ability questions or take other action: "So I would recommend just dispute this with your credit agency"; "So again, just dispute it with the credit agency"; "rather than ask the questions, the easiest way to resolve this is to just contact the credit agencies"; "you keep asking me why, these 'whys' don't apply, I don't know 'why'"; "several times now I've advised, just dispute it with the credit bureaus under your name"; "that answer is best suited for the credit reporting

agencies." *Id.* Acknowledging the possibility that Ability's collection attempts were based on errors, Carlson continuously suggested that the credit reporting agencies would be best suited to determine whether an error had in fact occurred: "when it gets sent over to the credit reporting agencies, they'll identify whatever unique factors that they utilize, matching up all your information and they'll identify if there was in fact an error. Think of the database in the credit reporting agency—millions upon millions upon millions of people are stored there. Are there errors that occur? Absolutely. On a daily basis. On a case by case basis. So the only way to be able to resolve those types of errors that occur, which, again, based on human hands is certainly possible, you have to go through the steps with the credit reporting agency to dispute this with them." *Id.*

Carlson also told Plaintiff that he would mark the accounts as disputed and Ability would not contact her about the debt. He did not tell her that she had to send in a written dispute to Ability, that she should request validation of the debts, or that she should provide documentation showing that her Social Security number and birthdate did not match the debtor's purported identifying information. *Id.* He stated at his deposition that he does not have the power to determine whether or not a consumer actually owes a debt and he was not sure who at Ability did have that authority. ECF No. 43-3 at 83. Similarly, Ability's corporate representative attested that Ability automatically uploads the information that they are provided to the CRAs, and the CRAs "decide the best fit" by matching the details provided with consumer information. *Id.* at 61.

After the November 22, 2016 phone call, Ability updated its internal records to reflect that Plaintiff had disputed the debt. ECF No. 57-10 at 9. However, after the thirty-day period

outlined in the initial collection letters had passed, it then furnished tradeline information to the CRAs regarding the disputed debt. ECF No. 57-4 ¶ 9.

On December 17, 2016, Plaintiff received an alert from a credit report monitoring service stating that there was "new activity" on her credit report. ECF No. 45-3 at 106. Upon reviewing her credit report, she saw a new derogatory tradeline from Ability, indicating that she was delinquent on a $1,125 debt. *Id.* at 109. Although Plaintiff had received collection letters related to two accounts underlying the Emcare debt, *id.* at 101–104, only one of the two debts appeared on her report, *id.* at 109. That same day, Plaintiff disputed the debt through Equifax Information Services, LLC.'s (Equifax) online credit reporting dispute protocol. *Id.* at 108–09. She explained that she had verbally disputed the debt with Ability, that she learned through a phone call with Ability that the debtor's birthdate did not match her date of birth and that the debt was related to an emergency room bill, which she had never incurred. *Id.* at 109. She wrote that she believed Ability's representatives "were going to make a note on their file stating that Crystal Long, at 12706 Fairwood Parkway, Bowie MD, 20720 was not the correct person and this would not be reported to my credit report. I am gathering by the fact that I am now writing this letter this did not happen." *Id.*

Plaintiff's complaint triggered Equifax to request verification of the account information from Ability. *Id.* at 116, 139. Equifax sent Ability an automated consumer dispute verification (ACDV), which indicated that Plaintiff disputed the debt as "NOT HIS/HERS" requested that Ability "PROVIDE COMPLETE ID" and included Plaintiff's Social Security number and birthdate, which, as previously described, did not match the identifiers in Ability's records. *Id.* at 116. Notwithstanding what Ability knew about the asserted mismatch between Plaintiff's identifying information and that associated with the EmCare debt, "Ability responded to

6

Equifax's request and verified the account belonged to Plaintiff, including Plaintiff's first name, last name, and current address." *Id.* at 116. After receiving verification of the debt from Ability, Equifax provided Plaintiff with its reinvestigation results on December 28, 2017 and did not delete the derogatory tradeline. *Id.*

On January 31, 2017, Plaintiff wrote a dispute letter to Experian Information Solutions, Inc. (Experian), Equifax, and TransUnion disputing the Ability tradeline. *Id.* at 24–26. Those letters included her date of birth, Social Security number, and current address. *Id.* Equifax received that dispute letter on February 5, 2017 and contacted Ability on February 9, 2017 to request it reinvestigate the debt. *Id.* at 116. Ability responded to Equifax on February 24, 2017 and verified the account belong to Plaintiff. *Id.* Experian received the dispute letter on February 7, 2017 and sent it to Ability on February 13, 2017 requesting reinvestigation. *Id.* at 132. "Ability verified" to Experian "that the account was report[ed] accurately." *Id.* The tradeline was not removed from Plaintiff's credit report.

In letters dated May 5, 2017, Plaintiff again disputed the Ability tradeline with Experian and TransUnion. *Id.* at 169–70. Ability again verified the tradeline as accurate. *Id.* at 59, 99, 133. Ability did not communicate with Pendrick about the Emcare debt after receiving the CRA's requests for reinvestigation. ECF No. 45-3 at 62. It did not contact Plaintiff to obtain additional information. *Id.* at 59 ("She didn't get any more phone calls. She didn't get any additional letters."). Instead, the reinvestigation procedure involved looking at the dispute information and reviewing the account details already in their system. *Id.* at 60, 99. Ability's system listed Plaintiff's account as disputed but did not specifically note that Plaintiff claimed she had never received emergency room services from Emcare or that she claimed the debtor's purported birthdate and Social Security number did not match her own.

Although Plaintiff provided her birthdate and Social Security number in her disputes to the CRAs, she did not provide this information directly to Ability. As Ability's representative stated: "she didn't provide any additional information to use to state that it wasn't her, so we left it in a disputed status" and then "we get the [disputes] over [from the CRAs] with no additional information, so we verified what we had on the system which was unknown." ECF No. 45-3 at 59.

Plaintiff works in the finance department at Trust Health Plans in a position that involves significant financial responsibility including "overseeing the staff accountants, the temps, closing the books, approving financial transactions, and reviewing staff accountants' work" and handling millions of dollars in transactions on a regular basis. ECF No. 45-3 at 4, 7. When Plaintiff first applied to work at Trusted Health Plans, she signed a document giving her employer permission to check her credit. *Id.* at 5, 7. Plaintiff signed that document in June 2016 and started her employment with Trusted Health Plans on September 12, 2016. *Id.* at 18. It is not clear from the record whether Plaintiff's employer ever used the consent form to check her credit either when she first applied for employment during the summer of 2016 or later in 2016 and 2017 when the inaccurate derogatory tradeline appeared on her credit report, however the employer did have Plaintiff's consent to do so. *Id.* at 18.

Plaintiff's awareness that her credit report included inaccurate information and that she worked in an industry that requires a high level of trust deterred Plaintiff from pursuing new career opportunities. ECF No. 65-1 at 9, 22. Specifically, in May 2017, after a prospective new employer required access to Plaintiff's credit report as part of a job application and subsequently did not make Plaintiff a job offer, Plaintiff postponed applying for additional new jobs. ECF No. 65-1 at 9, 22. After Plaintiff filed this lawsuit and the Emcare debt tradeline was finally removed

from Plaintiff's credit report, Plaintiff was promoted twice, first in July 2017 and again in September 2017. ECF No. 51-11 at 10.

Plaintiff also provides evidence that at some point the interest rate on one of her credit cards increased. ECF No. 65-1 at 1, 4, 31. However, it is disputed whether there is a connection between the interest rate increase and the inaccurate credit report information, and it is not clear from the record if the interest rate increased after the derogatory tradeline appeared on her credit report.[4]

During the period that the inaccurate tradeline appeared on Plaintiff's credit report, she chose not to apply for new credit, believing a denial of new credit application likely. ECF No. 45-3 at 10, 11. For example, she was deterred from applying for credit to buy a new car. *Id.* at 11. Plaintiff also suffered emotional distress and anxiety that manifested through loss of sleep, headaches, racing pulse, and nausea, knowing that her credit report contained inaccurate information. *Id.* at 6.

On May 19, 2017, Plaintiff filed this lawsuit against Defendants Pendrick and Ability as well as against Equifax and Experian in Prince George's County Circuit Court in Prince George's County, Maryland. ECF No. 1. Plaintiff filed an Amended Complaint on June 12, 2017. ECF No. 2. Defendants removed the action to this Court. ECF No. 1. The Amended Complaint alleged FCRA, FDCPA, MCDCA, MCPA, common law defamation, and declaratory judgment claims. ECF No. 2.

---

[4] At the summary judgment stage, the Court draws all reasonable inferences in favor of the non-moving party. When evaluating Plaintiff's motion for summary judgment, the Court views the facts in the light most favorable to the Defendants; doing so, it would be unfair to assume a connection between the inaccurate credit report and the increased interest rate because Plaintiff has not provided any evidence about when her interest rate increased. However, when analyzing Defendants' motions, the Courts draws all reasonable inferences in Plaintiff's favor, and in this light, it would be fair to assume such a connection.

In June 2017, a month after Plaintiff filed this action, Ability made requests to the CRAs to delete all tradeline information that was furnished regarding the Emcare debt. ECF No. 57-1 at 6.[5] When Ability requested that the tradeline be deleted, it had the same information about Plaintiff's dispute as it had when it had previously verified the accounts to the CRAs.

Plaintiff filed a Partial Motion for Summary Judgment requesting judgment as a matter of law on her FCRA and FDCPA claims. ECF No. 45. Defendants each filed Cross Motions for Summary Judgment on all claims and opposed Plaintiff's partial motion. ECF Nos. 55 & 57. Plaintiff responded, ECF No. 65, and Defendants replied, ECF Nos. 68–69.

## II.     STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson,* 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial."

---

[5] Neither Plaintiff nor Defendants provide accurate record citations for this fact but it is nonetheless undisputed. *Compare* ECF No. 45-1 at 11 ("Following the filing of this lawsuit, the Ability tradeline was removed from Plaintiff's credit report.") *with* ECF No. 57-1 at 6 ("In June of 2017 Ability made requests to the CRAs to delete all tradeline information that was furnished regarding the debt, whereby all tradeline information regarding the debt was then removed from Plaintiff's credit reports.").

*Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255.

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "The Court must deny both motions if it finds there is a genuine issue of material fact, 'but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.'" *Wallace v. Paulos*, 2009 WL 3216622 at *4 (D. Md. Sept. 29, 2009) (citation omitted).

## III. DISCUSSION

### A. FCRA

Plaintiff alleges that Defendant Ability violated the FCRA by negligently and/or willfully failing to conduct a reasonable investigation after the CRAs forwarded her disputes to Ability and by reporting inaccurate information to the CRAs by verifying the Emcare debt after receiving the disputes. Both Plaintiff and Defendant Ability seek summary judgment on this count.[6]

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citations omitted). Pursuant to 15 U.S.C. §§ 1681n & 1681o, individuals may file suit against furnishers of information to CRAs for FCRA violations.[7] 15

---

[6] Defendant Pendrick is not covered by the FCRA, and Plaintiff does not allege that it should be held vicariously liable for the FCRA violations alleged in the complaint. ECF No. 2 at 6–7.

[7] Ability argues that there is no private right of action under 15 U.S. § 1681s-2 in general. ECF No. 57-1 at 7. However, the Fourth Circuit has explained that although the "FCRA explicitly bars private suits for violations of §

U.S.C. §§ 1681n, 1681o; *Dalton v. Capital Associated Indus., Inc.,* 257 F.3d 409, 415 (4th Cir. 2001).

Pursuant to § 1681s-2(b), once a furnisher of information, such as a mortgage lender, credit card issuer, or debt collector is given notice of a dispute about the completeness or accuracy of any information provided to a CRA, the furnisher shall "conduct an investigation with respect to the disputed information," "review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title," and "report the results of the investigation to the [CRA.]" 15 U.S.C. § 1681s-2(b)(1)(A)–(C). "Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading. Courts have held that a credit report is not accurate under [the] FCRA if it provides information in such a manner as to create a materially misleading impression." *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008).

For Plaintiff to be entitled to summary judgment for Ability's failure to comply with § 1681s-2(b)(1)(A)'s investigation requirement, she must show that the undisputed facts establish (1) that she notified a CRA of the disputed information, (2) that the CRA notified the Defendant furnisher of the dispute, and (3) that the furnisher then failed to reasonably investigate and modify the inaccurate information. *Johnson v. MBNA Am Bank, NA*, 357 F.3d 426, 430–31 (4th Cir. 2004). For Plaintiff to prevail on her § 1681s-2(b)(1)(C) claim that Ability reported inaccurate information to the CRAs, the undisputed evidence viewed in the light most favorable

---

1681s–2(a)," aggrieved parties may "still bring private suits for violations of § 1681s–2(b)." *See Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 149 (4th Cir. 2008). *see also Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 431–32 (4th Cir.2004) (affirming jury verdict in consumer suit for violation of § 1681s–2(b)). Plaintiff's complaint mentions § 1681s-2(a), but her partial motion for summary judgment focuses on §1681s-2(b). To the extent that Plaintiff seeks summary judgment on a § 1681s-2(a) claim, that claim fails as a matter of law because no private cause of action exists for violations of § 1681s–2(a).

to the Defendant must show that Ability reported incorrect information or omitted details that rendered the reported information misleading.

It is undisputed that Plaintiff notified the CRAs of her dispute—she sent dispute letters to Equifax on December 17, 2016 and to Equifax, Experian, and TransUnion on January 31, 2017 and May 5, 2017. ECF No. 45-3 at 108–09. It is further undisputed that the CRAs notified Defendant Ability of Plaintiff's disputes; the CRAs sent Automated Consumer Dispute Verification (ACDVs) to Ability on December 17, 2016, February 9, 2017, February 13, 2017, May 17, 2017, and May 21, 2017. ECF No. 45-3 at 139–55. However, Plaintiff and Defendant Ability disagree about whether Ability reasonably investigated and modified the information it furnished to the CRAs, whether Plaintiff suffered actual damages (an element of a negligent violation), and whether any failure to reasonably investigate was willful. The Court now addresses each of these issues.

### i. Ability failed to conduct reasonable investigations of Plaintiff's disputes and failed to appropriately modify furnished information

As the Fourth Circuit has explained, "'investigation,' is defined as '[a] detailed inquiry or systematic examination.'" *Johnson*, 357 F.3d at 430 (quoting Am. Heritage Dictionary 920 (4th ed. 2000)). Furnishers cannot meet their FRCA obligations by conducting "superficial, *un*reasonable inquiries." *Id.* at 430–31 (emphasis in original). In *Wood v. Credit One Bank*, a court held that a consumer-plaintiff was entitled to summary judgment against a furnisher-defendant that failed to conduct an FCRA-compliant reasonable investigation into the consumer's dispute. 277 F. Supp. 3d 821, 851 (E.D. Va. 2017). There, the consumer disputed a credit card account that he claimed was fraudulently opened in his name. *Id.* at 834–35. When the defendant received ACDVs of the account it merely compared the personal information listed on the disputes with the information associated with the credit card account. *Id.* at 852. The

evidence established that the defendant never called the consumer or took steps besides reviewing its own internal file. *Id.* Further, in that case, it was established that "the only information an investigation could produce that would cause [the defendant] to determine that an individual's account was fraudulently opened" was "either a police report or a signed affidavit alleging fraud." *Id.*

The defendant claimed that it continued to verify the account in response to the ACDVs because the consumer had not established that he was not responsible for the debt. *Id.* at 854. Specifically, the defendant pointed out that although the consumer called the defendant to alert it to the fraud, the consumer "never submitted an identity theft report." *Id.* The court concluded that this fact was not "evidence that it performed any 'degree of careful inquiry'" into whether the account was fraudulently opened in the consumer's "name with his birthday, social security number, and an address that was affiliated with him." *Id.* at 853 (citing *Johnson*, 357 F.3d at 430). Ultimately, the court found "it was unreasonable" for the defendant to "simply match" the consumer's "personal identifiers with those associated with the Account" when the consumer "continued to dispute the Account. *Id.*

The *Wood* court also held that the defendant reported "materially misleading" information to the CRAs in violation of its FCRA duty to accurately report reinvestigation results. After each "investigation," the defendant verified the consumer's disputed debt as "now resolved," a term, which according to the defendant meant, not that the consumer certainly owed the disputed debt, but that an investigation had been completed in compliance with the FCRA. *Id.* at 854.

The *Wood* court's analysis is persuasive and applies with equal if not more force here. As in *Wood*, the undisputed evidence here establishes that Defendant Ability performed only a

cursory investigation into Plaintiff's disputes. When Defendant Ability received ACDVs from the CRAs, like the defendant in *Wood*, it merely compared the personal information listed on the disputes with the information associated with the Ability account. Where in *Wood*, the information on the ACDVs at least matched the information in defendant's file, here the record establishes mismatches between the personal identifiers listed on the ACDVs. Specifically, the Social Security number, birthdate, and address provided by Plaintiff appear on the ACDVs and did not match the same listed in Ability's accounts. Nonetheless, Ability verified the debt with the CRVs. This verification was based solely on a match between: 1) the debtor's name and Plaintiff's name and 2) the address that Ability had added to the debtor's file based on skip tracing. Yet, rather than triggering Ability to contact Plaintiff or Defendant Pendrick (the creditor) for more information, Ability continued to verify the debt. Had Ability contacted Plaintiff or Defendant Pendrick, it would have learned that Plaintiff has lived at the same address for five years, while the debtor accrued the Emcare debt while living at a different address within the last five years, and unlike the debtor, Plaintiff has never worked at the Department of Corrections. ECF No. 45-3 at 3, 28.

Further, Ability's position that Plaintiff did not provide it with enough information to determine Plaintiff not responsible for the debt is meritless. Defendant Ability apparently has no policy for determining whether a consumer is actually responsible for a debt. The Ability representative who spoke with Plaintiff on November 22, 2016 when she first called to dispute the debt, attested that he did not have the ability to determine that a consumer is not actually responsible for a debt and he was not aware of who at Ability could make that determination. ECF No. 45-3 at 83. He also made that clear to Plaintiff over the phone. Rather than explaining what additional information the Plaintiff could provide to Ability such as an affidavit swearing to

the fact that she did not receive emergency room services in August 2014 or documentation of her Social Security number and birthdate, which did not match the debtor's, Carlson told Plaintiff over and over that she should simply dispute the debt with the CRAs. Additionally, Ability's corporate representative explained vaguely that "if someone tells us they don't owe [a debt], you know, then we take a look at the information that we have on file and take it from there." *Id.* at 59. When asked to explain that process more specifically, she answered that when a consumer disputes the debt, the consumer does not receive any more phone calls or letters but if the consumer does not provide additional information, Ability will not ask for the debt to be deleted from the CRAs. *Id.* She also stated that Ability automatically uploads information that they receive from creditors to the CRAs and allow the CRAs to "decide the best fit," suggesting that Ability never on its own determines that a consumer does not owe a debt and chooses not to report the debt to the CRAs. *Id.* at 61. Ultimately, Plaintiff had to file a lawsuit for Defendant Ability to acknowledge that she was not responsible for the debt.

Ability also violated its duty to accurately report investigation results and modify erroneously furnished information by continuously verifying the disputed debt despite what it knew about the mismatches between Plaintiff and the debtor's birthdate and Social Security number. It was materially misleading for Ability to verify the validity of the debt and its connection to Plaintiff despite the red flags indicating that Plaintiff was not responsible for the debt. At the very least, Ability negligently violated the FCRA and Plaintiff is entitled to summary judgment as to Ability's liability for failing to reasonably investigate her disputes.

Defendant's argument that it is entitled to summary judgment on Plaintiff's negligent violation of the FCRA claim because Plaintiff "has not provided any evidence of actual damages," ECF No. 57-1 at 12, is unpersuasive. First, a plaintiff may be entitled to judgment as a

matter of law on the issue of FCRA liability even if further proceedings are necessary on the issue of damages. 15 U.S.C. § 1681o (describing the damages a plaintiff may receive but not defining liability under the FCRA). Further, a plaintiff successful at establishing a negligent violation of the FCRA is entitled to actual damages, *id.*, which "may include not only economic damages, but also damages for humiliation and mental distress," *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007). Indeed, a plaintiff may be compensated if she is merely deterred from accessing the credit market because of inaccuracies on her credit report. *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (finding that "no case has held that a denial of credit is a prerequisite to recovery under the FCRA."). Further, a plaintiff's testimony can support an emotional distress award when the plaintiff is able to reasonably explain the circumstances of the "injury and does not resort to mere conclusory statements," so long as the testimony "sufficiently articulates true demonstrable emotional distress." *Sloane*, 510 F.3d at 503 (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)).

Viewing the facts in the light most favorable to the Plaintiff, Long was deterred from pursuing new career opportunities because she knew that her credit report included inaccurate information and she works in an industry that requires a high level of financial trust. In particular, after a prospective employer required access to Plaintiff's credit report and subsequently did not offer Plaintiff a job, Plaintiff postponed applying for additional new jobs. Defendant Ability points out that Plaintiff was recently promoted twice, however the Defendant ignores that these promotions did not occur until after Plaintiff filed this lawsuit and the Emcare debt was removed from her credit report. These promotions may lead a jury to conclude that

Plaintiff did not suffer harm, but they are insufficient to show that Defendant Ability is entitled to summary judgment on the issue of damages.

Further, during the period that the inaccurate tradeline appeared on Plaintiff's credit report, Plaintiff withdrew from the credit market. A jury could reasonably conclude that Plaintiff's decision not to apply for new credit was based on her belief that a new credit application would likely be denied.

Plaintiff also attests that she suffered from emotional distress and anxiety that manifested through loss of sleep, headaches, racing pulse, and nausea, knowing that her credit report contained inaccurate information. Defendant Ability argues that Plaintiff's declarations about her emotional distress amount only to conclusory statements, however it is reasonable to infer that Plaintiff would feel mounting frustration leading to distress and anxiety when it seemed impossible to get the inaccurate tradeline removed from her credit report, especially given Plaintiff's professional role and the particular importance she placed on maintaining a reputation for financial savvy and credit worthiness. Additionally, Plaintiff may have felt particular distress knowing that she had signed a document allowing her employer to access her credit report even if Plaintiff has not demonstrated that the employer actually reviewed her report.

In an attempt to avoid liability, Defendant's highlight Plaintiff's initial view that the furnished tradeline information was "something small" that "wouldn't be an issue." ECF Nos. 57-1 at 14 & 68 at 7. However, Plaintiff's statement that she believed the inaccuracies on her credit report would be easy to resolve actually supports Plaintiff's position that she was harmed rather than Defendant's view that no damages resulted. First, Plaintiff's initial belief that Ability's mistake "was something small that we'd eventually get past and it wouldn't be an issue," ECF No. 45-3 at 10, turned out to be incorrect. Instead, Ability and the CRAs ping-

ponged Plaintiff's complaint back and forth while Plaintiff helplessly tried to referee. It was not until Plaintiff filed her law-suit that Ability requested the CRAs delete the inaccurate tradeline. Further, no matter how "small" plaintiff's injury may be, so long as she was actually injured by Ability's negligence, she is entitled to recover those actual damages. 15 U.S.C. § 1681o ("Any person who is negligent in failing to comply with" the FCRA's investigation requirements "is liable" for "*any* actual damages sustained by the consumer as a result of the failure.") (emphasis added).

In sum, although Plaintiff has not produced sufficient evidence on the issue of damages to be entitled to summary judgment on an amount of damages, Defendant Ability's motion for summary judgment on this issue also must fail because genuine disputes of material fact remain.

### ii. A genuine dispute of material facts exists regarding whether Ability acted willfully to violate the FCRA

"Willfulness" under the FCRA includes "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). "A reckless action includes conduct that violates an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Wood*, 277 F. Supp. 3d at 846 (quoting Safeco, 551 U.S. at 68). Under this standard, a company's interpretation of the FCRA may be erroneous—subjecting the company to liability—without being objectively unreasonable such that the company is liable for willful misconduct. *Id.* "Courts have frequently held that willfulness is a question of fact for the jury" because the issue revolves around determining "whether a party possessed a particular state of mind." *Id.*

Because a genuine dispute of material fact exists as to whether Defendant Ability acted with a "culpable state of mind," the parties' motions for summary judgment on Plaintiff's FCRA willfulness claim must be denied. Plaintiff has introduced evidence that Defendant Ability

should have known that she did not owe the Emcare debt and that Ability's cursory investigations and verification procedures created a risk of FCRA violations. However, Defendant has countered with evidence that Ability did not ignore the warning signs out of recklessness rather than just carelessness. For example, Defendants point out that Plaintiff disputed the debt directly with Ability only verbally and never through a written dispute. Although Ability was on notice of Plaintiff's dispute, a jury could find that the lack of written notice saves Ability's conduct from being labeled willful.

Additionally, the record indicates that the Defendant's representatives may not have known they had the capacity and responsibility to make determinations about whether the Plaintiff actually owed the Emcare debt. Specifically, Mark Carlson stated that he did not have the power to determine whether or not a consumer actually owes a debt and he was not sure who at Ability did have that authority. From this testimony, a jury could conclude that Ability's employees did not knowingly violate the FCRA.

Because genuine disputes of material fact remain, Plaintiff and Defendant Ability's motions for summary judgment on Plaintiff's claim that Ability willfully violated the FCRA must be denied.

### B. FDCPA

The FDCPA seeks "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). The Act "is a strict liability statute and a consumer only has to prove one violation to trigger liability." *Akalwadi v. Risk Mgmt. Alts., Inc.*, 336 F. Supp. 2d 492, 500 (D. Md. 2004). To succeed on a FDCPA claim, a plaintiff must demonstrate that "(1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission

prohibited by the FDCPA." *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759–60 (D. Md. 2012) (internal citations omitted). The evidence establishes conclusively that Plaintiff is a consumer and that Defendant Ability is a debt collector.[8] The parties dispute whether Defendant Ability violated §§ 1692e & 1692f of the FDCPA and whether Defendant Pendrick is a "debt collector" subject to vicarious liability for Defendant Ability's conduct.

For the reasons that follow, the Court finds that Plaintiff is entitled to summary judgment on her § 1692e claim against Defendant Ability; Defendant Ability is entitled to summary judgment on Plaintiff's § 1692f claim; and the parties' motions for summary judgment must each be denied on the issue of whether Defendant Pendrick is a debt collector subject to vicarious liability for Defendant Ability's § 1692e violation.

### i. Defendant Ability - § 1692e

Section 1692e of the FDCPA prohibits a "debt collector" from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," including "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). "The Fourth Circuit has adopted the 'least sophisticated consumer' standard to determine if a Section 1692e violation has occurred," meaning a misrepresentation is actionable so long as it would mislead the "least sophisticated consumer." *Stewart v. Bierman*, 859 F. Supp. 2d 754, 761 (D. Md. 2012) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394 (4th Cir. 1999)). "[T]he test is the capacity of the statement to mislead; evidence of actual deception is unnecessary." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996). Misleading statements are actionable when they

---

[8] Defendant Pendrick claims that Plaintiff is not a consumer because she never owed the Emcare debt, ECF No. 61 at 17, however the Fourth Circuit has held that "any aggrieved party" may bring an action under § 1692e. *Rawlinson v. Law Office of William M. Rudow, LLC*, 460 F. App'x 254, 258 (4th Cir. 2012) (citing *Montgomery v. Huntington Bank,* 346 F.3d 693, 697 (6th Cir.2003) (quoting *Wright,* 22 F.3d at 649–50)).

influence a consumer's decision about "how to respond to the efforts to collect the debt." *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 127 (4th Cir. 2014).

Undisputed record evidence demonstrates that Defendant Ability made representations in connection with the collection of the Emcare debt that had the capacity to mislead "the least sophisticated consumer." When Plaintiff called Ability to dispute the Emcare debt, Mark Carlson represented that Plaintiff's sole recourse was to dispute the debt through the CRAs after Ability reported the debt. Exhibit H. Although Ability had not yet furnished tradeline information to the CRAs, when Plaintiff asked, "you're telling me that these particular items of debt collection have been sent to my credit report, is that what you're saying, which is why you're going to dispute them?," Carlson told her that was "correct." *Id.* Further, Carlson again and again indicated that rather than directly tackling the issue with Ability, "the only way" for Plaintiff to resolve Ability's error would be for Plaintiff to dispute the debt with the CRAs. *Id.*

These statements have to capacity to mislead "the least sophisticated consumer" into believing that a disputed debt will inevitably be reported to the CRAs no matter what action the consumer takes to prove that she is not responsible for the debt. The statements thus are likely to influence a consumer's decision about "how to respond to the efforts to collect the debt." 782 F.3d at 127. Circularly, after convincing Plaintiff that she should not take further action directly with Ability, the Defendant argues that Plaintiff's lack of action justifies their careless credit reporting practices. ECF No. 57-1 at 3, 4, 23. Specifically, Ability chastises Plaintiff for failing to provide written disputes to Ability regarding the debt. *Id.* Additionally, Ability's corporate representative explained why Ability consistently verified the debt to the CRAs this way: "she didn't provide any additional information to use to state that it wasn't her, so we left it in a disputed status" and then "we get the [disputes] over [from the CRAs] with no additional

information, so we verified what we had on the system which was unknown." ECF No. 45-3 at 59. This evidence plainly contradicts Carlson's statements to Plaintiff that she should "*just* dispute" the debt with the CRAs because that is "the *only* way to be able to resolve" errors. Exhibit H.

If a jury can find an FDCPA violation where no "actual deception" occurred, then surely such a violation arises where, as here, the record evinces not just that a statement had the capacity to mislead but that Plaintiff was actually misled. *See Nat'l Fin. Servs., Inc.*, 98 F.3d at 139. After Carlson's insistence that taking further steps with Ability would be futile, Plaintiff did not follow up with the Defendant directly even though they now contend that a written dispute might have prevented Ability from reporting derogatory and inaccurate tradeline information to the CRAs. Following Carlson's misleading advice, Plaintiff disputed the debt directly with the CRAs. The game of hot potato between the CRAs and Ability ensued, with the CRAs sending Plaintiffs' dispute to Ability, and Ability sending the dispute back to the CRAs by verifying the tradeline as accurate. ECF No. 45-3 at 59, 99, 113, 116. Notably, although it would be enough for Plaintiff to demonstrate that Defendant's representations could mislead a less sophisticated consumer, Plaintiff has showed that she—a relatively sophisticated consumer who works in finance and is aware of the importance of maintaining good credit—was in fact misled by Defendant Ability.

### ii. Defendant Ability - § 1692f

Plaintiff also claims that Ability violated either § 1692e or the FDCPA's backstop § 1692f provision by sending Plaintiff two collection letters without knowing if the debts at issue belonged to Plaintiff. Section 1692f prohibits debt collectors from using "unfair or unconscionable means to collect any debt," 15 U.S.C. § 1692f, and allows courts to sanction

conduct that the FDCPA does not directly address. *Price-Richardson v. DCN Holdings, Inc.*, No. CV MJG-17-2038, 2018 WL 902167 at *8 (D. Md. Feb. 15, 2018). For example, courts have found "debt collectors that engage in collection activities without a license are in violation" of § 1692f. *See Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358, 366 (D. Md. 2013). "However, courts have limited § 1692f's prohibitive reach to conduct that is 'separate and distinct' from other alleged FDCPA violations." 2018 WL 902167 at *8 (collecting cases).

Plaintiff's § 1692f claim fails because it does not implicate conduct outside the scope of other FDCPA violations. *See  Stewart v. Bierman*, 859 F. Supp. 2d 754, 765 (D. Md. 2012), *aff'd sub nom. Lembach v. Bierman*, 528 F. App'x 297 (4th Cir. 2013) ("Plaintiffs' § 1692f claim here fails to allege any conduct separate and distinct from the alleged § 1692e violations."). Instead, Plaintiff relies on the same facts to allege both her § 1692f and § 1692e claims (that Defendant Ability sent Plaintiff two collection letters without knowing whether Plaintiff was in fact the debtor). Ultimately, if this conduct, which is within the scope of conduct prohibited by the FDCPA, does not violate § 1692e, Plaintiff cannot shoehorn it into §1692f's purview. Although, as described above, Plaintiff has established a § 1692e violation with evidence of Plaintiff's call with Carlson, the collection letters are not proof of an additional FDCPA violation. At the time that Defendant Ability sent Plaintiff the initial collection letters, it did not know that it was seeking to collect a debt from the wrong person. Though Defendant Ability may have been uncertain about whether the debt belonged to Plaintiff, it was not on notice until Plaintiff's November 22, 2016 call that it was collecting from the wrong person.[9] After the November 22,

---

[9] Defendant is also entitled to summary judgment on Plaintiff's MCDCA § 14-202(8) claim to the extent that it relies on these same facts. MCDCA § 14-202(8) prohibits a debt collector from claiming, attempting, or threatening to enforce a right with knowledge that the right does not exist. Md. Code Ann., Com. Law § 14-202(8). To prevail on a § 14-202(8) claim, a plaintiff must show (1) that the defendant did not possess the right to collect the amount of the debt sought, and (2) that the defendant attempted to collect the debt knowing that they lacked the right to do so. *Akalwadi v. Risk Mgmt. Alts., Inc.*, 336 F.Supp.2d 492, 511 (D.Md. 2004) (explaining that the plaintiff must show the defendant acted with actual knowledge or reckless disregard). Nothing in the record suggests that Defendant

2016 phone call in which Plaintiff disputed the debt and Defendant Ability had reason to believe Plaintiff not responsible, Ability did not send Plaintiff additional collection letters though it did still report the debt to the CRAs.

To be sure, seeking to collect from the wrong person could certainly qualify as an FDCPA violation under other circumstances. If, for example, Ability had continued to send collection letters to Plaintiff after learning that her personal identifiers did not match the debtor's and that she never received Emcare services, § 1692e might apply. Further, § 1692g is the provision that safeguards against the "problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." *Chaudhry v. Gallerizzo,* 174 F.3d 394, 406 (4th Cir.1999). That section requires debt collectors to obtain verification of a debt if a consumer disputes the debt in writing within thirty days. 15 U.S.C. § 1692g. Requiring debt collectors to know with certainty that a consumer owes a debt earlier than when their § 1692g obligations are triggered would render that FDCPA provision superfluous.

In sum, Plaintiff is entitled to summary judgment on her claim that Defendant Ability violated §1692e of the FDCPA by insisting that she could only dispute the debt after Ability reported it to the CRAs, but Defendant Ability is entitled to summary judgment on Plaintiff's § 1692f claim.

### iii.  Defendant Pendrick

Although the Fourth Circuit has not yet ruled on vicarious liability under the FDCPA, "more courts than not 'support[ ] the notion that an entity which itself meets the definition of debt collector may be held vicariously liable for unlawful collection activities carried out by

---

Ability knew that the debt did not belong to Plaintiff at the time that it sent her the initial collection letters. To be sure, the record indicates that Defendant Ability may have been uncertain about whether Plaintiff owed the Emcare debt, but Plaintiff has not pointed to any evidence suggesting that Defendant Ability knew it was collecting from the wrong individual from the start.

another on its behalf.'" *McWilliams v. Advanced Recovery Sys., Inc.*, 174 F. Supp. 3d 936, 942 (S.D. Miss. 2016) (quoting *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 404 (3d Cir. 2000) (abrogated on other grounds)).[10] That is because "a debt collector should not be able to avoid liability for unlawful debt collection practice simply by contracting with another company to do what the law does not allow it to do itself." *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016); *see also Barbato v. Greystone All., LLC*, — F.3d —, No. 18-1042, 2019 WL 847920, at *1 (3d Cir. Feb. 22, 2019) (a debt collector "cannot avoid the dictates of the FDCPA merely by hiring a third party to do its collecting."). Before vicarious liability attaches though, an entity must meet the definition of "debt collector." 825 F.3d at 325. Thus, as a threshold matter, the Court must decide whether the undisputed facts establish that Defendant Pendrick qualifies as a debt collector under the FDCPA.

There are three definitions of the term "debt collector" under the FCPA, but only one is relevant here. Per the relevant definition, **"**[t]he term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a. "Stated more simply, this provision defines a debt collector as (1) a person whose principal purpose is to collect debts." *Henson v. Santander Consumer USA, Inc.*, 817 F.3d 131, 136 (4th Cir. 2016) (*cert. granted*, 137 S. Ct. 810, 196 L. Ed. 2d 595 (2017), and *aff'd*, 137 S. Ct. 1718, 198 L. Ed. 2d 177 (2017))

In *Henson v. Santander*, the Supreme Court declined to address whether a debt buyer that seeks to collect a debt that it owns but did not originate may fall within this "principal purpose" definition. 137 S.Ct. 1718, 1721 (2017). Since then, courts across the country have found that

---

[10] *See also Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016); *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 108 (6th Cir.1996) (client may be vicariously liable only if the client qualifies as a debt collector); *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1516 (9th Cir.1994) (holding debt collector vicariously liable for the FDCPA violation of its attorney).

debt buyers may qualify as debt collectors if their principal purpose is to collect debts. *See e.g.*, *Barbato v. Greystone All., LLC*, — F.3d —, No. 18-1042, 2019 WL 847920, at *1 (3d Cir. Feb. 22, 2019); *Hordge v. First Nat'l Collection Bureau, Inc.*, No. 4:15-CV-1695, 2018 WL 3741979 at *5 (S.D. Tex. Aug. 7, 2018); *McMahon v. LVNV Funding, LLC*, 301 F. Supp. 3d 866, 883 (N.D. Ill. 2018); *Mitchell v. LVNV Funding, LLC*, No. 2:12-CV-523-TLS, 2017 WL 6406594 at *2–7 (N.D. Ind. Dec. 15, 2017). Further, on at least one occasion, Defendant Pendrick, appearing as a defendant in another case, stipulated that it is a debt collector under the FDCPA's principal purpose prong. *Schweer v. HOVG, L.L.C.*, 2017 WL 2906504, *5 (M.D. Pa. July 7, 2017).

The Third Circuit recently concluded that an entity that "principally derives revenue from liquidating the consumer debt it has acquired" meets the FDCPA's "principal purpose" definition and "cannot avoid the dictates of the FDCPA merely by hiring a third party to do its collecting." *Barbato v. Greystone All., LLC*, — F.3d —, No. 18-1042, 2019 WL 847920, at *1, *3 (3d Cir. Feb. 22, 2019). The court found that a debt buyer fell within the "principal purpose" debt-collector definition even though it did "not contact consumers directly." *Id.* at *1.

Similarly, in *Mitchell v. LVNV Funding, LLC*, an Illinois district court held that "[i]f the collection of debts is precisely what sustains" a debt buyer, "unaided by any other significant sources of revenue, then the 'collection of . . . debts' must be the business's 'primary purpose.'" 2017 WL 6406594 at *6. The court there could not "see why it should matter if the debt buyer hires a third party to actually collect its debt *i.e.*, to be the one who interacts with the debtor to obtain payment." *Id.* Ultimately, the court found that the evidence did not "conclusively establish" that the debt buyer's principal purpose was debt collection and that "unlike a jury," courts "may not 'sift through the evidence and decide whom to believe' at the summary judgment stage." *Id.* However, "viewing all the evidence in the light most favorable to plaintiff

and drawing all reasonable inferences in his favor," the court held that "a reasonable juror could reach a verdict in favor of plaintiff on the question of whether the principal purpose of [the debt buyer's] business is debt collection." The court thus denied the parties' motions for summary judgment on the issue of whether the debt buyer was a debt collector.

As in *Mitchell*, the evidence here does not "conclusively establish" that Pendrick's principal purpose is debt collection but viewing all the evidence in the light most favorable to the Plaintiff, a reasonable juror could reach a verdict in favor of the Plaintiff on the question. Pendrick purchases delinquent consumer medical debts and places each account with collection agencies. ECF No. 45-3 at 47. Pendrick does not resell any of its accounts, meaning it is reasonable to infer that all Pendrick's revenue comes from liquidating the consumer debt it has acquired. Like the Third Circuit and the *Mitchell* court, this Court fails to see why outsourcing collection matters would change the debt buyer's principal business purpose. Finally, although not conclusive on the issue, that Pendrick has in the past stipulated to its status as a debt collector pursuant to the FDCPA's principal purpose prong indicates that, at the very least, whether Pendrick is a debt collector is disputed. *Schweer v. HOVG, L.L.C.*, 2017 WL 2906504, *5 (M.D. Pa. July 7, 2017).

Pointing to a passage from *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003), Defendant Pendrick claims that because it "did not have any interaction with plaintiff," it cannot be liable under the FDCPA, ECF No. 61 at 13–14, but the *Scholler* reasoning does not help Pendrick's cause. First, that case did not examine the "principal purpose" debt-collector definition. Further, the passage Pendrick cites distinguishes between FDCPA-covered entities "who may have 'no future contact with the consumer and often are unconcerned with the consumer's opinion of them'" and creditors "who are generally restrained by the desire to protect

their good will when collecting past due accounts." *Id.* (quoting S. Rep. 95–382, at 2 (1977),

*reprinted in* 1977 U.S.C.C.A.N. 1695, 1696)). Pendrick, which buys delinquent debt, outsources

debt collection, and does not have contact with consumers does not fit within the category of

creditors "who are generally restrained by the desire to protect their good will when collecting

past due accounts." Further, "'collection' by its very definition may be indirect," and "the

existence of a middleman does not change the essential nature—the "principal purpose"—of [an

entity's debt collection] business." *Barbato*, No. 18-1042, 2019 WL 847920, at *7. Moreover, if

Pendrick is found vicariously liable for Ability's conduct, then the fact that Pendrick did not

directly interact with the Plaintiff is of no consequence.

Because genuine disputes of material facts exist as to whether Defendant Pendrick's

primary business purpose is to collect debts the Court must deny the parties' motions for

summary judgment on the issue of whether Pendrick is a debt collector.

### C. Defamation

Only Defendants have moved for summary judgment on Plaintiff's defamation claim,

meaning the Court must view all facts and draw all reasonable inferences in the light most

favorable to Plaintiff. Common-law claims for defamation are preempted by the FCRA except

where "false information [is] furnished with malice or willful intent to injure consumer." 15

U.S.C. § 1681h(e). "Malice can be established by evidence showing the defendant made a false

statement 'with knowledge that it was false or with reckless disregard of whether it was false or

not.'" *New York Times v. Sullivan,* 376 U.S. 254, 279–80 (1964); *Capital–Gazette Newspapers,*

*Inc. v. Stack,* 293 Md. 528, 445 A.2d 1038, 1043–45 (Md.1982) (adopting the Supreme Court's

definition of malice in the context of Maryland common-law defamation cases).

A jury could conclude that Defendant Ability acted with reckless disregard for the truth when it initially furnished data about the disputed Emcare debt to the CRAs and when it verified the debt more than once. Plaintiff put Defendant Ability on notice that she was not responsible for the Emcare debt, yet Ability reported the debt anyway. Specifically, Ability learned on November 22, 2016 that Plaintiff's social security number and birthdate did not match the debtor's and that Plaintiff had never received emergency room services from Emcare. A jury could thus reasonably find that based on the November 22, 2016 phone call, Ability should not have reported the Emcare debt to the CRAs in Plaintiff's name. Because fact issues remain, Defendant Ability is not entitled to summary judgment on Plaintiff's defamation claim.

However, Defendant Pendrick is entitled to summary judgment on Plaintiff's defamation claim because Plaintiff has not introduced any evidence that Pendrick should be held vicariously liable for Ability's alleged defamation. In general, an employer of an independent contractor is not liable for the contractor's negligence or intentional torts unless an exception applies. *See generally Restatement (Second) of Torts* § 409 (1965). Plaintiff has not articulated what exception would apply to hold Defendant Pendrick vicariously liable for a defamation claim, and she has similarly not pointed to record evidence in support of applying an exception.

### D. Remaining Maryland Law Claims[11]

As Plaintiff concedes, the FCRA prohibits her from bringing Maryland Consumer Debt Collection Act (MCDCA) claims related to conduct otherwise covered by 15 U.S.C. § 1681s-2, which outlines "the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b)(1)(F). ECF No. 65 at 20. However, to the extent that Plaintiff's MCDCA claim relates to collection efforts separate from Defendant Ability's responsibilities as

---

[11] Defendant Ability is entitled to summary judgment on Plaintiff's claim pursuant to Md. Code Ann., Com. Law § 14-202(8) for the reasons stated previously.

a furnisher, the FCRA does not preempt states from imposing additional requirements that pose no obstacle to the FCRA's objectives. *Id.* Thus, in evaluating whether Plaintiff's MCDCA claims can survive Defendants' motions for summary judgment, the Court considers only conduct not otherwise regulated by 15 U.S.C. § 1681s-2. In this light, the Court looks specifically to action take before Defendant Ability furnished information to the CRAs, triggering its responsibilities under 15 U.S.C. § 1681s-2.

Unlike the FDCPA, which includes the "principal purpose" definition of "debt collector," the MCDCA defines a "collector" only as "a person collecting or attempting to collect an alleged debt," thus Defendant Pendrick is not covered by the MCDCA provisions underlying Plaintiff's claims. Given that the undisputed facts establish that Defendant Pendrick is not a debt collector within that term's meaning under the MCDCA, as a matter of law, vicarious liability could not attach. *See e.g.*, *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 108 (6th Cir.1996) (client may be vicariously liable only if the client qualifies as a debt collector). Defendant Pendrick's motion for summary judgment as to Plaintiff's MCDCA claims will therefore be granted.

However, Defendant Ability may still be liable under the MCDCA. Per § 14-202(3), collectors may not "threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false." Md. Code Ann., Com. Law § 14-202(3). Actual knowledge or reckless disregard as to information's falsity satisfies the statute's "knowledge" requirement. *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 128 (4th Cir. 2014). And "ignorance of the law" does not immunize debt collectors from liability for mistakes of law. *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 594 (D. Md. Dec. 16, 1999) (citing *Hopkins v. State*, 193 Md. 489, 498 (1950)).

Fact issues preclude Defendant Ability from prevailing as a matter of law on this claim. The November 22, 2016 call alone creates genuine disputes of material fact as to whether Defendant Ability knew that Plaintiff was not responsible for the Emcare debt and whether it threatened to disclose derogatory credit information despite this knowledge. As described in detail above, Plaintiff put Defendant Ability on notice that she was not the debtor during the November 22 phone conversation. Yet, Carlson insisted that Plaintiff's only recourse was to dispute the debt with the CRAs after Ability reported the debt. A jury could reasonably infer that by framing Plaintiff's options in this way, Defendant Ability was threatening to disclose derogatory tradeline information despite Plaintiffs' specific assertions that her Social Security number and birthdate did not match the debtor's.

Because Plaintiff has introduced sufficient evidence about whether Defendant Ability violated the MCDCA and the FDCPA, it follows that enough is in the record to prove a Maryland Consumer Protection Act (MCPA) violation. The MCPA prohibits the use of unfair or deceptive practices in the collection of any debts, Md. Code Ann., Com. Law § 13-303(5), including the use of "false, falsely disparaging, or misleading oral or written statements" which have "the capacity, tendency, or effect of deceiving or misleading consumers," Md. Code Ann., Com. Law § 13-301(1). Because, as discussed above, Defendant Ability made misleading statements to Plaintiff during the November 22, 2016 phone call, it likely also violated this provision of the MCPA. Finally, the MCPA ties in violations of the MCDCA by defining unfair, abusive, or deceptive trade practices to include violations of "Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act." *Id.* § 13-30(14)(iii). Thus, for the same reasons that Defendant Ability's motion for summary judgment on Plaintiff's remaining MCDCA claim

fails, Defendant Ability can also not prevail at the summary judgment stage on Plaintiff's MCPA claim.

## IV.     CONCLUSION

For the foregoing reasons, the parties' cross motions for summary judgment will be granted in part and denied in part. A separate Order shall issue.


Date: <u>March 18, 2019</u>                                              /s/_____
                                                                                     GEORGE J. HAZEL
                                                                                     United States District Judge